83 A.3d 901

ROBINSON TOWNSHIP, WASHINGTON COUNTY, PA; Brian Coppola, Individually and in his Official Capacity as Supervisor of Robinson Township; Township of Nockamixon, Bucks County, PA; Township of South Fayette, Allegheny County, PA; Peters Township, Washington County, PA; David M. Ball, Individually and in his Official Capacity as Councilman of Peters Township; Township of Cecil, Washington County, PA; Mount Pleasant Township, Washington County, PA; Borough of Yardley, Bucks County, PA; Delaware Riverkeeper Network; Maya Van Rossum, The Delaware Riverkeeper; Mehernosh Khan, M.D.

v.

COMMONWEALTH of Pennsylvania; Pennsylvania Public Utility Commission; Robert F. Powelson, in his Official Capacity as Chairman of the Public Utility Commission; Office of the Attorney General of Pennsylvania; Kathleen Kane, in her Official Capacity as Attorney General of the Commonwealth of Pennsylvania; Pennsylvania Department of Environmental Protection; and E. Christopher Abruzzo, in his Official Capacity as Secretary of the Department of Environmental Protection.

Appeal of: Pennsylvania Public Utility Commission; Robert F. Powelson, in his Official Capacity as Chairman of the Public Utility Commission; Pennsylvania Department of Environmental Protection; and E. Christopher Abruzzo, in his Official Capacity as Secretary of the Department of Environmental Protection.

Robinson Township, Washington County, PA; Brian Coppola, Individually and in his Official Capacity as Supervisor of Robinson Township; Township of Nockamixon, Bucks County, PA; Township of South Fayette, Allegheny County, PA; Peters Township, Washington County, PA; David M. Ball, Individually and in his Official Capacity as Councilman of Peters Township; Township of Cecil, Washington County, PA; Mount Pleasant Township, Washington County, PA; Borough of Yardley, Bucks County, PA; Delaware Riverkeeper Network; Maya Van Rossum, The Delaware Riverkeeper; Mehernosh Khan, M.D.

v.

Commonwealth of Pennsylvania; Pennsylvania Public Utility Commission; Robert F. Powelson, in his Official Capacity as

Chairman of the Public Utility Commission; Office of the Attorney General of Pennsylvania; Kathleen Kane, in her Official Capacity as Attorney General of the Commonwealth of Pennsylvania; Pennsylvania Department of Environmental Protection; and E. Christopher Abruzzo, in his Official Capacity as Secretary of the Department of Environmental Protection.

Appeal of: Office of the Attorney General of Pennsylvania; Kathleen Kane, in her Official Capacity as Attorney General of the Commonwealth of Pennsylvania.

Robinson Township, Washington County, PA; Brian Coppola, Individually and in his Official Capacity as Supervisor of Robinson Township; Township of Nockamixon, Bucks County, PA; Township of South Fayette, Allegheny County, PA; Peters Township, Washington County, PA; David M. Ball, Individually and in his Official Capacity as Councilman of Peters Township; Township of Cecil, Washington County, PA; Mount Pleasant Township, Washington County, PA; Borough of Yardley, Bucks County, PA; Delaware Riverkeeper Network; Maya Van Rossum, The Delaware Riverkeeper; Mehernosh Khan, M.D., Cross-appellants

v.

Commonwealth of Pennsylvania; Pennsylvania Public Utility Commission; Robert F. Powelson, in his Official Capacity as Chairman of the Public Utility Commission; Office of the Attorney General of Pennsylvania; Kathleen Kane, in her Official Capacity as Attorney General of the Commonwealth of Pennsylvania; Pennsylvania Department of Environmental Protection; and E. Christopher Abruzzo, in his Official Capacity as Secretary of the Department of Environmental Protection, Cross-appellees.

Robinson Township, Washington County, PA; Brian Coppola, Individually and in his Official Capacity as Supervisor of Robinson Township; Township of Nockamixon, Bucks County, PA; Township of South Fayette, Allegheny County, PA; Peters Township, Washington County, PA; David M. Ball, Individually and in his Official Capacity as Councilman of Peters Township; Township of Cecil, Washington County, PA; Mount Pleasant Township, Washington County, PA; Borough of Yardley, Bucks County, PA; Delaware Riverkeeper Network; Maya Van Rossum, The Delaware Riverkeeper; Mehernosh Khan, M.D., Cross-appellants

v.

Commonwealth of Pennsylvania; Pennsylvania Public Utility Commission; Robert F. Powelson, in his Official Capacity as Chairman of the Public Utility Commission; Office of the Attorney General of Pennsylvania; Kathleen Kane, in her Official Capacity as Attorney General of the Commonwealth of Pennsylvania; Pennsylvania Department of Environmental Protection; and E. Christopher Abruzzo, in his Official Capacity as Secretary of the Department of Environmental Protection, Cross-appellees.

Supreme Court of Pennsylvania.

Argued Oct. 17, 2012.

Decided Dec. 19, 2013.

568

572

574

576

578

580

Joshua Martin Bloom, Esq., Jonathan Robert Colton, Joshua M. Bloom and Associates, P.C., for International Union of Operating Engineers, Local No. 66, et al., amicus curiae.

Devin John Chwastyk, Esq., McNees, Wallace & Nurick, LLC, for Senator Joseph Scamati, III & Representative Samuel H. Smith, amicus curiae.

Robert Abraham Jackel, Esq., for Conservation Voters of Pennsylvania, amicus curiae.

Matthew Hermann Haverstick, Esq., James J. Rohn, Esq., Mark Edward Seiberling, Esq., Joshua John Voss, Esq., Conrad O'Brien PC, for PA PUC & PA Dept. of Environmental Protection.

Lawrence Henry Baumiller, Esq., Kevin J. Barber, Esq., Blaine Allen Lucas, Esq., Babst, Calland, Clements & Zomnir, P.C., for Pennsylvania Coal Alliance, amicus curiae.

Walter A. Bunt Jr., Esq., Christopher R. Nestor, Esq., K & L Gates, LLP, David R. Overstreet, Esq., for PA Indep Oil & Gas; Marcellus Shale Coalition; Markwest Liberty; Penneco Oil; Chesapeake Appalachia, amicus curiae.

Richard Ejzak, Esq., Cohen & Grigsby, P.C., for Duquesne Light Holdings, Inc., amicus curiae.

Lester L. Greevy Jr., Esq., Greevy & Associates, John A. Shoemaker II, Esq., for National Association of Royalty Owners, Pennsylvania Chapter, amicus curiae.

Quin Mikael Sorenson, Esq., Sidney Austin, LLP, Joseph R. Guerra, Esq., for American Petroleum Institute, amicus curiae.

Jeffrey Joseph Norton, Esq., for Northern Wayne Property Owners Alliance, amicus curiae.

Russell Lane Schetroma, Esq., Kristian Erik White, Esq., Steptoe & Johnson, PLLC, for Civil & Environmental Consultants, Inc., amicus curiae.

Patrick Hilary Zaepfel, Esq., Kegel, Kelin, Almy & Grimm, L.L.P., for PA Chamber of Business & Industry; PA Manufacturers' Assoc.; et al., amicus curiae.

John J. Arminas, Esq., Jonathan Mark Kamin, Esq., Goldberg, Kamin & Garvin, John Michael Smith, Esq., Smith Butz, L.L.C., Lauren M. Williams, Esq., Jordan Berson Yeag-

er, Esq., Curtin & Heefner LLP, Jennifer Lynn Fahnestock, Esq., William A. Johnson, Esq., Susan Jill Kraham, Esq., for Robinson Twp; Twp of Nockamixon; Twp of S. Fayette; Peters Twp; Twp of Cecil; Mt. Pleasant Twp; et al.

Howard Greeley Hopkirk, Esq., Kathleen Granahan Kane, Esq., Linda L. Kelly, Esq., John G. Knorr III, Esq., Calvin R. Koons, Esq., Gregory R. Neuhauser, Esq., PA Office of Attorney General, for Commonwealth of PA, Attorney General's Office.

Sarah L. Clark, Esq., David Vincent Vitale, Esq., Nora Winkelman, Esq., for House of Democratic Caucus, amicus curiae.

Scott Everett Coburn, Esq., for State Association of Township Supervisors, amicus curiae.

Mark Forrest Dunkle, Esq., Parkowski, Guerke & Swayze P.A., Katy Dunlap, Esq., for Trout Unlimited Inc., amicus curiae.

Stanley J.A. Laskowski, Esq., Caldwell & Kearns, P.C., David Evenhuis, Esq., for PA State Association of Boroughs, amicus curiae.

Robert P. Ging Jr., Esq., Robert P. Ging, Jr., P.C., for Mountain Watershed Association, amicus curiae.

Deborah Goldberg, Esq., Bridget Lee, Esq., Charles McPhedran, Esq., Berks Gas Truth, et al., amicus curiae.

Claude Joseph Hafner II, Esq., Thomas F. Lebo Jr., Esq., PA Senate, for Members of the Democrat Caucus of the PA Senate, amicus curiae.

Stephen B. Harris, Esq., Daniel Raichel, Esq., Katherine Sinding, Esq., for Bell Acres Borough, East Finley Township, et al., amicus curiae.

Thomas Lizzi, Esq., IP and Internet Law North, L.L.C., for PA Chapter of the American Planning Assoc., amicus curiae.

Patricia L. McGrail, Esq., Matthew David Racunas, Esq., Law Offices of Patricia L. McGrail, L.L.C., for Council of the City of Pittsburgh, amicus curiae.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

*OPINION*

Chief Justice CASTILLE.

Mr. Chief Justice Castille announces the Judgment of the Court. Mr. Chief Justice Castille delivers the Opinion of the Court with respect to Parts I, II, IV, V, and VI(A), (B), (D)–(G), in which Mr. Justice Baer, Madame Justice Todd, and Mr. Justice McCaffery join, and delivers an Opinion with respect to Parts III and VI(C), in which Madame Justice Todd and Mr. Justice McCaffery join.

In this matter, multiple issues of constitutional import arise in cross-appeals taken from the decision of the Commonwealth Court ruling upon expedited challenges to Act 13 of 2012, a statute amending the Pennsylvania Oil and Gas Act ("Act 13").[1] Act 13 comprises sweeping legislation affecting Pennsylvania's environment and, in particular, the exploitation and recovery of natural gas in a geological formation known as the Marcellus Shale. The litigation proceeded below in an accelerated fashion, in part because the legislation itself was designed to take effect quickly and imposed obligations which required the challengers to formulate their legal positions swiftly; and in part in recognition of the obvious economic importance of the legislation to the Commonwealth and its citizens.

The litigation implicates, among many other sources of law, a provision of this Commonwealth's organic charter, specifically Section 27 of the Declaration of Rights in the Pennsylvania Constitution, which states:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources,

1. Act No. 13 of Feb. 14, 2012, P.L. 87, *eff.* immediately (in part) and Apr. 16, 2012 (in part), 58 Pa.C.S. §§ 2301–3504.

the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27 (the "Environmental Rights Amendment"). Following careful deliberation, this Court holds that several challenged provisions of Act 13 are unconstitutional, albeit the Court majority affirming the finding of unconstitutionality is not of one mind concerning the ground for decision. This Opinion, representing the views of this author, Madame Justice Todd, and Mr. Justice McCaffery, finds that several core provisions of Act 13 violate the Commonwealth's duties as trustee of Pennsylvania's public natural resources under the Environmental Rights Amendment; other challenges lack merit; and still further issues require additional examination in the Commonwealth Court. Mr. Justice Baer, in concurrence, concurs in the mandate, and joins the Majority Opinion in all parts except Parts III and VI(C); briefly stated, rather than grounding merits affirmance in the Environmental Rights Amendment, Justice Baer would find that the core constitutional infirmity sounds in substantive due process.[2] Accordingly, we affirm in part and reverse in part the Commonwealth Court's decision, and remand for further proceedings consistent with specific directives later set forth in this Opinion. *See* Part VI (Conclusion and Mandate), *infra.*

## I. Background

Before the Court are the direct appeals of the Commonwealth, by (a) the Office of the Attorney General and (former) Attorney General Linda L. Kelly, and (b) the Public Utility Commission and its Chairman Robert F. Powelson, and the Department of Environmental Protection and its (former) Secretary Michael L. Krancer (together, the "Commonwealth"). We also decide cross-appeals by several Pennsylvania municipalities; by Brian Coppola and David M. Ball, two residents and elected local officials; by the Delaware Riverkeeper Network, a non-profit environmental group, and its Executive Director Maya Van Rossum; and by Mehernosh

---

**2.** This Opinion (representing a plurality view on Part III), offers no view on the merits of the due process argument that is the core focus of the three responsive opinions.

Khan, a Pennsylvania physician (together, the "citizens").[3] The parties challenge different aspects of the Commonwealth Court's decision, a decision which accepted in part and rejected in part numerous constitutional challenges to Act 13 of 2012.

The Marcellus Shale Formation has been a known natural gas reservoir (containing primarily methane) for more than 75 years.[4] Particularly in northeastern Pennsylvania, the shale rock is organic-rich and thick. Early drilling efforts revealed that the gas occurred in "pockets" within the rock formations, and that the flow of natural gas from wells was not continuous. Nonetheless, geological surveys in the 1970s showed that the Marcellus Shale Formation had "excellent potential to fill the needs of users" if expected technological development continued and natural gas prices increased. Those developments materialized and they permitted shale drilling in the Marcellus Formation to start in 2003; production began in 2005.[5]

In shale formations, organic matter in the soil generates gas molecules that absorb onto the matrix of the rock. Over time,

3. In his dissent, Mr. Justice Saylor notes that appellees/cross-appellants, which we denominate citizens, are instead largely discontent municipalities. Political subdivisions are creations of the General Assembly, but they are places populated by people, created for the benefit of the people that live and work there. *See Franklin Twp. v. Commonwealth*, 500 Pa. 1, 452 A.2d 718, 723 (1982) (Opinion Announcing Judgment of Court). Those of the appellees/cross-appellants which are indeed municipalities consist of local governments, with local resident leaders elected by other local residents of the municipalities to represent their interests. Political subdivisions and their leaders frequently find themselves in the position of petitioning the Commonwealth government on behalf of their constituents. *See, e.g., City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566, 579 (2003). And, in this case, as we have very carefully noted, the appellees/cross-appellants include individuals and groups suing as citizens, as well as municipal leaders suing both as citizens and as elected officials representing their constituents.

4. John A. Harper, The Marcellus Shale—An Old "New" Gas Reservoir in Pennsylvania, Pennsylvania Geology, Vol. 38, No. 1, at 2–3 (Spring 2008). Pennsylvania Geology is a quarterly published by the Bureau of Topographic and Geologic Survey of the Pennsylvania Department of Conservation and Natural Resources.

5. *Id.* at 9. *Accord* U.S. Dep't of Energy, Shale Gas: Applying Technology to Solve America's Energy Challenges, at 1, 3 (March 2011).

tectonic and hydraulic stresses fracture the rock and natural gas (*e.g.*, methane) migrates to fill the fractures or pockets. In the Marcellus Shale Formation, fractures in the rock and naturally-occurring gas pockets are insufficient in size and number to sustain consistent industrial production of natural gas. The industry uses two techniques that enhance recovery of natural gas from these "unconventional" gas wells: hydraulic fracturing or "fracking" (usually slick-water fracking) and horizontal drilling. Both techniques inevitably do violence to the landscape. Slick-water fracking involves pumping at high pressure into the rock formation a mixture of sand and freshwater treated with a gel friction reducer, until the rock cracks, resulting in greater gas mobility. Horizontal drilling requires the drilling of a vertical hole to 5,500 to 6,500 feet—several hundred feet above the target natural gas pocket or reservoir—and then directing the drill bit through an arc until the drilling proceeds sideways or horizontally. One unconventional gas well in the Marcellus Shale uses several million gallons of water.[6] The development of the natural gas industry in the Marcellus Shale Formation prompted enactment of Act 13.

In February 2012, the Governor of Pennsylvania, Thomas W. Corbett, signed Act 13 into law. Act 13 repealed parts of the existing Pennsylvania Oil and Gas Act and added provisions re-codified into six new chapters in Title 58 of the Pennsylvania Consolidated Statutes. The new chapters of the Oil and Gas Act are:

— Chapter 23, which establishes a fee schedule for the unconventional gas well industry, and provides for the collection and distribution of these fees;

— Chapter 25, which provides for appropriation and allocation of funds from the Oil and Gas Lease Fund;

— Chapter 27, which creates a natural gas energy development program to fund public or private projects for converting vehicles to utilize natural gas fuel;

6. *See* Harper, at 9–12. *Accord* U.S. Dep't of Energy, at 5 ("more than 10 million gallons of water may be pumped into a single well during the [well-]completion process").

— Chapter 32, which describes the well permitting process and defines statewide limitations on oil and gas development;

— Chapter 33, which prohibits any local regulation of oil and gas operations, including via environmental legislation, and requires statewide uniformity among local zoning ordinances with respect to the development of oil and gas resources;

— Chapter 35, which provides that producers, rather than landowners, are responsible for payment of the unconventional gas well fees authorized under Chapter 23.

*See* 58 Pa.C.S. §§ 2301–3504. Chapter 23's fee schedule became effective immediately upon Act 13 being signed into law, on February 14, 2012, while the remaining chapters were to take effect sixty days later, on April 16, 2012.

In March 2012, the citizens promptly filed a fourteen-count petition for review in the original jurisdiction of the Commonwealth Court, broadly requesting a declaration that Act 13 is unconstitutional, a permanent injunction prohibiting application of Act 13, and legal fees and costs of litigation.[7] The citizens claimed that Act 13 violated the Pennsylvania Constitution, specifically, Article I, Section 1 (relating to inherent rights of mankind); Article I, Section 10 (relating in relevant part to eminent domain); Article I, Section 27 (relating to natural resources and the public estate); Article III, Section 3 (relating to single subject bills); and Article III, Section 32

---

7. The citizens also sought a preliminary injunction (Count XIII of the Citizens' Petition for Review), which the Commonwealth Court granted in part via a single judge order. Cmwlth. Ct. Order, 4/11/2012 (Quigley, S.J.). Senior Judge Keith B. Quigley enjoined those parts of Act 13 which preempted pre-existing local ordinances, pending further order of the court. Moreover, Senior Judge Quigley delayed for a period of 120 days the effective date of that section of Act 13, 58 Pa.C.S. § 3309, which required municipalities to amend and conform their zoning ordinances to Act 13. The Commonwealth appealed the order to this Court. In light of the present decision, the two separate appeals from Senior Judge Quigley's order, one filed by the Office of the Attorney General and (former) Attorney General Linda L. Kelly, and the other by the Department of Environmental Protection, the Public Utility Commission, and their respective top officials, are hereby dismissed as moot. *See* 37 & 40 MAP 2012.

(relating in relevant part to special laws). Moreover, the citizens argued that Act 13 was unconstitutionally vague, and violated the separation of powers doctrine and the due process clause of the U.S. Constitution. *See* Citizens' Petition for Review, 3/29/12, at 1–108 (Counts I–XIV) (citing PA. CONST. art. I, §§ 1, 10, 27; art. II, § 1; art. III, §§ 3, 32 and U.S. CONST. amend. XIV, § 1). The Commonwealth filed preliminary objections to the citizens' petition for review and, while the objections were pending, the parties also filed cross-applications for summary relief. Upon the request of the Public Utility Commission, the Department of Environmental Protection, and their respective executive officials, the matter was expedited and placed on the Commonwealth Court's earliest list for argument *en banc.* *See* Cmwlth. Ct. Order, 5/9/2012 (*per curiam* ).[8]

On June 6, 2012, the parties argued the pending objections and motions for summary relief to an *en banc* panel of the Commonwealth Court. In July 2012, the Commonwealth Court sustained the Commonwealth's preliminary objections to eight counts of the citizens' petition for review; overruled objections to four counts of the petition for review and granted the citizens' application for summary relief on these four counts; and denied the Commonwealth's application for summary relief in its entirety. Accordingly, the *en banc* panel held Act 13 unconstitutional in part and enjoined application of: (1) Section 3215(b)(4) of Chapter 32, and (2) Section 3304 and any "remaining provisions of Chapter 33 that enforce [Section] 3304," *i.e.,* Sections 3305 through 3309. *Robinson Twp. v. Commonwealth,* 52 A.3d 463, 494 (Pa.Cmwlth.2012).

The parties filed direct cross-appeals with this Court, which were later consolidated. At the parties' request, briefing and argument were expedited. The Public Utility Commission and its Chairman Robert F. Powelson, along with the Depart-

8. The court also permitted the following *amici curiae* to participate in oral argument, all in support of the Commonwealth: the Pennsylvania Independent Oil and Gas Association, the Marcellus Shale Coalition, MarkWest Liberty Midstream and Resources, LLC, Penneco Oil Company, Inc., and Chesapeake Appalachia, LLC. *See* Cmwlth. Ct. Order, 5/9/2012 (*per curiam* ).

ment of Environmental Protection and its then-Secretary Michael L. Krancer filed an appeal and appellants' brief on behalf of the Commonwealth ("Agencies' Brief (as appellants)") separate from the appeal and brief of the Office of the Attorney General and then-Attorney General Linda L. Kelly herself ("OAG's Brief (as appellant)"). The citizens respond to the separate Commonwealth appeals in a joint appellees' brief ("Citizens' Brief (as appellees)"). In the cross-appeals, the citizens file one appellants' brief ("Citizens' Brief (as cross-appellants)"), to which the Commonwealth responds in two separate briefs, *i.e.*, "Agencies' Brief (as cross-appellees)," "OAG's Brief (as cross-appellee)." In the four cross-appeals before this Court, the parties raise a total of fourteen issues (twelve of which are distinct), which we have reordered for clarity.

## II. Justiciability: Standing, Ripeness, Political Question

We begin by addressing the several questions of justiciability raised by the parties. *See Rendell v. Pa. State Ethics Comm'n*, 603 Pa. 292, 983 A.2d 708, 717 (2009) (standing, ripeness, and political question "give body to the general notions of case or controversy and justiciability"). Issues of justiciability are a threshold matter generally resolved before addressing the merits of the parties' dispute. *Council 13, Am. Fed. of State, County & Mun.Employees, AFL–CIO v. Commonwealth*, 604 Pa. 352, 986 A.2d 63, 74 n. 10 (2009) ("*Council 13*"). The Commonwealth Court sustained the Commonwealth's preliminary objections to the standing to sue of the Delaware Riverkeeper Network and its Executive Director Maya van Rossum, and of Mehernosh Khan, M.D.; overruled objections to the standing to sue and the ripeness of claims of individual citizen-petitioners and of the several municipalities; and overruled objections regarding the application of the political question doctrine to bar this action in its entirety. In their respective cross-appeals, the parties challenge the decisions of the lower court on individual issues that were adverse to their positions.

Parties may raise questions regarding standing, ripeness, and the political question doctrine by filing preliminary objections to a petition for review filed in the original jurisdiction of the Commonwealth Court, similar to those permitted in a civil action. *See* Pa.R.A.P. 1516(b) and note (Rule 1516(b) is patterned after Rule of Civil Procedure 1017(a) (Pleadings Allowed)). Upon review of a decision sustaining or overruling preliminary objections, "we accept as true all well-pleaded material facts set forth in the [petition for review] and all inferences fairly deducible from those facts." *Thierfelder v. Wolfert*, 617 Pa. 295, 52 A.3d 1251, 1253 (2012). We will affirm an order sustaining preliminary objections only if it is clear that the party filing the petition for review is not entitled to relief as a matter of law. *See Stilp v. Commonwealth*, 596 Pa. 62, 940 A.2d 1227, 1232 n. 9 (2007).

In contrast to the federal approach, notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's jurisdiction, and are regarded instead as prudential concerns implicating courts' self-imposed limitations. *See Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487, 500 n. 5 (2009); *Rendell*, 983 A.2d at 717 & n. 9. Justiciability questions are issues of law, over which our standard of review is *de novo* and the scope of review is plenary. *Council 13*, 986 A.2d at 74 n. 10.

## A. Standing and Ripeness

Generally, the doctrine of standing is an inquiry into whether the petitioner filing suit has demonstrated aggrievement, by establishing "a substantial, direct and immediate interest in the outcome of the litigation." *Fumo*, 972 A.2d at 496. There is considerable overlap between the doctrines of standing and ripeness, especially where the contentions regarding lack of justiciability are focused on arguments that the interest asserted by the petitioner is speculative, not concrete, or would require the court to offer an advisory opinion. *Rendell*, 983 A.2d at 718. In this sense, a challenge that a petitioner's interest in the outcome of the litigation is hypothetical may be pled either as determinative of standing

or restyled as a ripeness concern although the allegations are essentially the same. *Id.* Standing and ripeness are distinct concepts insofar as ripeness also reflects the separate concern that relevant facts are not sufficiently developed to permit judicial resolution of the dispute. Pure questions of law, including those in the present cross-appeals, do not suffer generally from development defects and are particularly well suited for pre-enforcement review. *Id.* at 718 n. 13.

### 1. Brian Coppola and David M. Ball

The Commonwealth Court held that Brian Coppola and David M. Ball had standing as elected officials and "as individual landowners and residents" of their respective townships. According to the court, Coppola and Ball live in a residential district in which, contrary to the prior legal regime, Act 13 now permits oil and gas operations. The value of Coppola's and Ball's existing homes, the panel stated, is affected negatively because the two can neither enjoy their properties as expected, nor guarantee to potential buyers the enjoyment of these properties without intrusion of burdensome industrial uses in their residential districts. Moreover, in their capacity as elected officials of their municipalities, the court concluded, Coppola and Ball both were aggrieved because, under provisions of Act 13, they would be "required to vote for zoning amendments they believe are unconstitutional." *Robinson Twp.,* 52 A.3d at 475–76.

According to the Commonwealth, local officials do not have any cognizable legal interest in their powers to make land use determinations and, therefore, Coppola and Ball suffered no harm from the General Assembly's decision to alter or remove those powers. OAG's Brief (as appellant) at 22–26. While recognizing that distinct interests are implicated, the Commonwealth does not challenge the standing of Coppola and Ball as landowners and residents of townships whose zoning districts are affected by Act 13. *See id.* at 23 n.8. The citizens respond by subscribing to the Commonwealth Court's reasoning with respect to the standing of individual citizens to sue. Citizens' Brief (as appellees) at 48–62.

As noted, on appeal to this Court, the Commonwealth does not offer any arguments regarding the interests in the outcome of this litigation of Coppola and Ball in their individual capacities as landowners and residents of townships located in areas atop the Marcellus Shale Formation. We have consistently held that we will not raise standing claims *sua sponte. Rendell,* 983 A.2d at 717–18. Moreover, because Coppola and Ball both have standing to sue as landowners and residents and they assert the same claims in both individual and official capacities, we need not address whether they have a separate interest as local elected officials sufficient to confer standing.[9]

### 2. Robinson Township, Township of Nockamixon, Township of South Fayette, Peters Township, Township of Cecil, Mount Pleasant Township, Borough of Yardley

The Commonwealth Court also held that Robinson Township, Township of Nockamixon, Township of South Fayette, Peters Township, Township of Cecil, Mount Pleasant Township, and the Borough of Yardley had standing to sue because "Act 13 imposes substantial, direct and immediate obligations on them that affect their government[al] functions." In the alternative, the court noted that the municipalities' claims were "inextricably bound" with rights of property owners, who the Commonwealth conceded had standing to challenge the constitutionality of Act 13. *Robinson Twp.,* 52 A.3d at 475. As a related matter, the Commonwealth Court also addressed the Commonwealth's ripeness challenge to the municipalities' claims. The court held that the constitutionality of Act 13 was an issue ripe for review as a pre-enforcement challenge because, once Act 13 went into effect, the townships would "be forced to submit to the regulations [that required modification of their zoning codes] and incur cost[s] and burden[s] that the regulations would impose or be forced to defend themselves against sanctions for non-compliance with the law." The panel

9. Alternatively, we conclude that, to the extent that the Commonwealth Court addressed the interests in the outcome of this litigation of Ball and Coppola, the court did so persuasively. *Accord In re Milton Hershey Sch.,* 590 Pa. 35, 911 A.2d 1258, 1262 (2006) (person with special interest in charitable trust may bring action for enforcement of trust).

thus concluded that the declaratory judgment action was properly filed. *Id.* at 479 n. 17.

On appeal, the Commonwealth characterizes the harm claimed by the municipalities as illusory because local governments (political subdivisions) have no inherent legal interest in the power to make land use determinations within their boundaries, and because municipalities do not enjoy constitutional protections similar to those of citizens. OAG's Brief (as appellant) at 24. The Commonwealth also asserts that the municipalities' claims are unripe because they are based on what the Commonwealth says is "a wholly speculative parade of horribles" that the municipalities claim "might occur in the future following implementation of Act 13." According to the Commonwealth, the record does not establish that appellee municipalities will be required to modify their zoning ordinances or that they will fail to do so and thereby incur penalties.[10] Agencies' Brief (as appellants) at 40–43.

■ The citizens respond that the municipalities have standing because Act 13 requires them to act in conflict with their functions, duties, and responsibilities under the Pennsylvania Constitution and other laws. For example, the citizens argue, existing ordinances that address land use in their municipalities were adopted pursuant to powers delegated to them by the General Assembly over a span of years, and provide a balance between citizens' safety, their rights, and orderly community development. The citizens claim that Act 13 displaces existing zoning ordinances and land use interests, prohibits municipalities from discharging their duties to adopt effective legislation to protect the health, safety, and welfare of citizens and the public natural resources from industrial activity, and requires them, instead, to create new exceptions for the oil and gas industry that are inconsistent with long-established municipal land use plans. Moreover, the citizens

10. Finally, the Commonwealth suggests that the panel's exercise of equitable jurisdiction was in error. This assertion is premised solely upon standing defects. Because, as we have already noted, standing and ripeness are prudential rather than jurisdictional concerns for this Court, the Commonwealth's jurisdictional sub-claim is meritless. *See Rendell*, 983 A.2d at 717 & n. 9.

argue that Act 13 places local government in the untenable position of having to choose between either violating certain constitutional obligations or violating Act 13's newly-imposed requirements, which carries a risk of severe monetary penalties that most municipalities cannot afford. Municipalities, according to the citizens, are aggrieved because the effect upon their duty and interest in ensuring a healthy environment and a quality of life for their citizenry is direct, substantial, and immediate. Citizens' Brief (as appellees) at 51–60 (citing, *inter alia, Franklin Twp. v. Commonwealth*, 500 Pa. 1, 452 A.2d 718, 720 (1982) (Opinion Announcing Judgment of Court)). We do not view this question to be close; we agree with the citizens and affirm the Commonwealth Court's decision with respect to the standing of the municipalities and the ripeness of their claims.

This Court has held that a political subdivision has a substantial, direct, and immediate interest in protecting the environment and the quality of life within its borders, which interest confers upon the political subdivision standing in a legal action to enforce environmental standards. *Susquehanna County v. Commonwealth*, 500 Pa. 512, 458 A.2d 929, 931 (1983) (county has standing to appeal executive agency order related to operation of sanitary landfill by corporate permit holder); *Franklin Twp.*, 452 A.2d at 720 (municipality and county have standing to appeal agency's decision to issue permit to operate solid waste facility). Political subdivisions, the Court has recognized, are legal persons, which have the right and indeed the duty to seek judicial relief, and, more importantly, they are "place[s] populated by people." *Id.* The protection of environmental and esthetic interests is an essential aspect of Pennsylvanians' quality of life and a key part of local government's role. Local government, therefore, has a substantial and direct interest in the outcome of litigation premised upon changes, or serious and imminent risk of changes, which would alter the physical nature of the political subdivision and of various components of the environment. Moreover, the same interest in the environment and in the citizenry's quality of life cannot be characterized as remote:

"[w]e need not wait until an ecological emergency arises in order to find that the interest of the municipality and county faced with such disaster is immediate." *Id.* at 720–22. *See Susquehanna County*, 458 A.2d at 931 ("The aesthetic, environmental and quality of life considerations discussed in *Franklin Township* are equally applicable here."); [11] *cf. Pennsylvania Game Comm'n v. Dep't of Envt'l Res.*, 521 Pa. 121, 555 A.2d 812, 815 (1989) (unless otherwise explicitly provided, agency invested with duties or responsibilities regarding certain concerns has implicit power to be litigant in matters touching upon those concerns).

The *Franklin Township* and *Susquehanna County* decisions are dispositive of the Commonwealth's appeal with respect to the municipalities' standing and to the ripeness of their claims. Contrary to the Commonwealth's characterization, the municipalities' claims are not rooted simply in an asserted narrow legal interest in retaining powers as against the Commonwealth government to make land use determinations relating to oil and gas production. Rather, the municipalities, much like Messrs. Coppola and Ball, maintain claims premised upon threatened fundamental changes to esthetic and environmental values, which implicate the political subdivisions' responsibilities to protect the quality of life of its citizens. The aggrievement alleged by the political subdivisions is not limited to vindication of individual citizens' rights but extends to allegations that the challenged statute interferes with the subdivisions' constitutional duties respecting the environment and, therefore, its interests and functions as a governing entity. *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566, 579 (2003) (citing *Franklin Twp., supra* ) (city has standing to bring action premised on assertions that challenged statute affects its interests and functions as governing entity). We find that the municipalities' interests are sufficiently substantial, direct, and immediate to

11. The *Franklin Township* decision represented a plurality view of three Justices on the Court; three other Justices concurred in the result, and one Justice dissented. One year later, however, the *Susquehanna County* Court, in a clear majority decision, adopted the reasoning of the *Franklin Township* plurality.

confer standing. Furthermore, we also dismiss the Commonwealth's ripeness claim, which is merely a restyling of the remoteness concern already addressed in our standing discussion. *See Rendell,* 983 A.2d at 718 n. 13. The Commonwealth Court's decision is affirmed in this respect.

### 3. *Maya van Rossum and the Delaware Riverkeeper Network*

With respect to Maya van Rossum and the Delaware Riverkeeper Network, the Commonwealth Court sustained the Commonwealth's preliminary objections, and held that these parties failed to plead any direct and immediate interest or harm. According to the court, van Rossum's concern over the negative effect of Act 13 on her personal use and enjoyment of the Delaware River Basin and her work as Executive Director of the Delaware Riverkeeper Network did not amount to a sufficient interest in the outcome of the litigation to confer standing. The Commonwealth Court further explained that, although an association like the Delaware Riverkeeper Network may have standing as a representative of its members who are suffering immediate or threatened injury, the group had "not shown that at least one member has suffered or is threatened with suffering" the requisite type of injury. *Robinson Twp.,* 52 A.3d at 476.

The Delaware Riverkeeper Network challenges the lower court's decision, asserting that its members are residents of areas whose existing protective zoning ordinances "will be eviscerated by Act 13," and that their interests in the values of their homes and businesses (*e.g.,* an organic farm in the Delaware River watershed) are similar to those of Messrs. Coppola and Ball. The Delaware Riverkeeper Network also emphasizes the deleterious effects of industrial activities close to its members' homes, including effects on their health and their ability to enjoy natural beauty, environmental resources, and recreational activities in the Delaware River corridor, such as fishing, boating, swimming, and bird-watching. The Delaware Riverkeeper Network further explains that drilling guided by Act 13 will affect well water supply as well as the

sensitive ecosystems of the Delaware River, from which the group's members derive sustenance and other benefits. Citizens' Brief (as cross-appellants) at 61 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.")). According to these citizens, esthetic and environmental well-being, "like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Id.* (emphasis omitted) (quoting *Unified Sportsmen of Pa. v. Pa. Game Comm'n,* 903 A.2d 117, 122–24 (Pa. Cmwlth.2006)) (citing *Sierra Club v. C.B. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Van Rossum, as Executive Director of the Delaware Riverkeeper Network, alleges similar concerns in the outcome of this litigation.

The Commonwealth responds that the Commonwealth Court's decision should be affirmed because any harm alleged by these particular parties is speculative and remote. The Commonwealth states that there are other parties better positioned to raise claims regarding Act 13's validity and, therefore, this Court need not recognize that these parties have standing. OAG's Brief (as cross-appellee) at 21–22; Agencies' Brief (as cross-appellees) at 21–22. Moreover, the Commonwealth notes that this Court "need not address the standing of the [Delaware Riverkeeper Network] and van Rossum" because these two appellants "did not seek any unique relief in their own name" and addressing their standing would not affect the disposition of the present appeals. Agencies' Brief (as cross-appellees) at 29.[12]

12. Although the claims of the Delaware Riverkeeper Network and van Rossum may not be significantly different from those of the citizens found by the Commonwealth Court to have standing, a decision to allow or prohibit the Delaware Riverkeeper Network and van Rossum from participating in this matter obviously may have consequences.

■ We agree with the citizens and reverse the decision of the Commonwealth Court with respect to the standing of the Delaware Riverkeeper Network and van Rossum, and with respect to the ripeness of their claims. The Commonwealth Court's finding that the Delaware Riverkeeper Network failed to show that any of its members were threatened with an injury sufficient to confer upon the group associational standing is not supported by the record. In response to preliminary objections, the citizens relied on of-record affidavits to show that individual members of the Delaware Riverkeeper Network are Pennsylvania residents and/or owners of property and business interests in municipalities and zoning districts that either already host or are likely to host active natural gas operations related to the Marcellus Shale Formation. *See* Citizens' Consolidated Brief in Opposition to [the Commonwealth's] Preliminary Objections, 5/14/2012, at 22–24. Like Messrs. Coppola and Ball (as to whom the Commonwealth conceded the standing issue), these members asserted that they are likely to suffer considerable harm with respect to the values of their existing homes and the enjoyment of their properties given the intrusion of industrial uses and the change in the character of their zoning districts effected by Act 13. *See, e.g., id.* at Exh. 15, 16 (affidavits of G. Swartz and T. Kowalchuk). These individual members have a substantial and direct interest in the outcome of the litigation premised upon the serious risk of alteration in the physical nature of their respective political subdivisions and the components of their surrounding environment. This interest is not remote. *See Franklin Twp.*, 452 A.2d at 720–22; *Susquehanna County*, 458 A.2d at 931; *accord Friends of the Earth, Inc., supra*, 528 U.S. at 183, 120 S.Ct. 693.

■ Under Pennsylvania law, an association has standing as representative of its members to bring a cause of action

For example, party status permits these citizens to offer evidence upon remand, or to apply to the court for an order enforcing our decision. In addition, there is nothing to prevent the parties from seeking to develop or supplement their claims, a not-unlikely-prospect given the expedited nature of this legislation and ensuing litigation. The fact that others have standing does not eliminate the standing of these citizens.

even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged. *Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare*, 614 Pa. 574, 39 A.3d 267, 278 (2012); *accord South Whitehall Twp. Police Serv. v. South Whitehall Twp.*, 521 Pa. 82, 555 A.2d 793, (1989) (collective bargaining agent has standing to sue if members are aggrieved, even if action is not related solely to collective bargaining). Several members of the Delaware Riverkeeper Network have alleged sufficient injury to show that they are aggrieved by the enactment of Act 13. As these members' associational representative, the Delaware Riverkeeper Network has standing. Van Rossum, as the Executive Director of the Delaware Riverkeeper Network, is in a similar legal position and, as a result, has standing in her official capacity to represent the membership's interests in this matter. *Cf. Pennsylvania Med. Soc'y, supra.* Accordingly, the decision of the Commonwealth Court with respect to the standing of the Delaware Riverkeeper Network and Ms. van Rossum is reversed.

### *4. Mehernosh Khan, M.D.*

 Finally, the Commonwealth Court held that Dr. Khan lacked standing to sue the Commonwealth in this matter because the interest he asserted was remote. The citizens appeal the Commonwealth Court's decision, explaining that Dr. Khan is a physician who treats patients in an area where drilling operations are taking place, and whose interest in the outcome of this litigation is sufficient to confer standing. The doctor claims that Act 13's restrictions on obtaining and sharing information with other physicians regarding the chemicals used in drilling operations impede his ability to diagnose and treat his patients properly. *See* 58 Pa.C.S. § 3222.1(b)(10)-(11).[13] In denying Dr. Khan standing, the

---

13. Section 3222.1(b) provides, in relevant part:

(10) A vendor, service company or operator shall identify the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information to any health professional who requests the information in writing if the health professional executes

Commonwealth Court reasoned that Dr. Khan would not have standing until he actually requested confidential information under Section 3222.1(b) of Act 13, and that information either was not supplied at all or was supplied with restrictions interfering with his ability to provide proper medical care to his patients. The court also noted that, if upon receiving information on chemicals protected as trade secrets by Section 3222.1(b), Dr. Khan believes that the chemicals pose a public health hazard, he would have standing then to challenge the confidentiality provisions. *See Robinson Twp.*, 52 A.3d at 477–78. Although the Commonwealth Court articulated its holding to sustain the Commonwealth's objections in terms of lack of standing, the court's reasoning also addresses the Commonwealth's ripeness argument.

On appeal, Dr. Khan argues that the challenged provision prevents physicians from sharing diagnostic test results (*e.g.,* blood test results), and a patient's history of exposure, including the dose and duration of exposure—all of which are essential tools of treating patients and practicing medicine competently. Dr. Khan continues that the restrictions on sharing fracking chemicals' composition places medical professionals in a position to choose between abiding by the manda-

a confidentiality agreement and provides a written statement of need for the information indicating all of the following:

(i) The information is needed for the purpose of diagnosis or treatment of an individual.

(ii) The individual being diagnosed or treated may have been exposed to a hazardous chemical.

(iii) Knowledge of information will assist in the diagnosis or treatment of an individual.

(11) If a health professional determines that a medical emergency exists and the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information are necessary for emergency treatment, the vendor, service provider or operator shall immediately disclose the information to the health professional upon a verbal acknowledgment by the health professional that the information may not be used for purposes other than the health needs asserted and that the health professional shall maintain the information as confidential. The vendor, service provider or operator may request, and the health professional shall provide upon request, a written statement of need and a confidentiality agreement from the health professional as soon as circumstances permit, in conformance with regulations promulgated under this chapter.

tory provisions of Act 13 and adhering to their ethical and legal duties to report findings in medical records and to make these records available to patients and other medical professionals. Dr. Khan's injury is therefore actual and immediate, the citizens say, given that the health of patients is jeopardized by a potentially lengthy wait for resolution of a challenge after Section 3222.1(b) goes into effect. Citizens' Brief (as cross-appellants) at 52–56.

The Commonwealth generally subscribes to the Commonwealth Court's reasoning. Additionally, the Commonwealth claims that Dr. Khan's interest is illusory because the restriction Act 13 places upon medical professionals allows the use of confidential information for the health needs of an individual patient, and Dr. Khan does not explain why, as a treating physician, he needs further disclosure for non-medical purposes. OAG's Brief (as cross-appellee) at 22–24. Furthermore, the Commonwealth argues that Dr. Khan's harm is speculative because it is based on the rights of his patients and on "serial 'mights'" which are unfounded. According to the Commonwealth, Section 3222.1(b) is not "a muzzle" on the dissemination of information, but it actually requires disclosures of otherwise protected information. Agencies' Brief (as cross-appellees) at 22–27.

We agree with the citizens that Dr. Khan's interest in the outcome of litigation regarding the constitutionality of Section 3222.1(b) is neither remote nor speculative. Dr. Khan describes the untenable and objectionable position in which Act 13 places him: choosing between violating a Section 3222.1(b) confidentiality agreement and violating his legal and ethical obligations to treat a patient by accepted standards, or not taking a case and refusing a patient medical care. The Commonwealth's attempt to redefine Dr. Khan's interests and minimize the actual harm asserted is unpersuasive. Our existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide medical services to a patient, is equally undesirable. *See, e.g., Cozen O'Connor v. City of*

*Phila. Bd. of Ethics,* 608 Pa. 570, 13 A.3d 464 (2011) (law firm has standing to test validity of Ethics Act provision in advance of undertaking potentially prohibited action where alternative is testing law by defying it and potentially damaging firm's ethical standing and reputation; third option of maintaining client debt on books for decades equally unappealing); *Shaulis v. Pa. State Ethics Comm'n,* 574 Pa. 680, 833 A.2d 123 (2003) (attorney has standing to challenge statutory limitation on her practice of law in certain venues without taking prohibited action that would expose her to ethical investigation she was attempting to forestall; third option of foregoing practice in area of expertise equally unappealing); *see also Arsenal Coal Co. v. Commonwealth,* 505 Pa. 198, 477 A.2d 1333 (1984) (pre-enforcement review of regulations is appropriate where lengthy process of addressing regulations' validity in enforcement action would result in ongoing uncertainty in industry and potential operational impediments and penalties).

In light of Dr. Khan's unpalatable professional choices in the wake of Act 13, the interest he asserts is substantial and direct. Moreover, Dr. Khan's interest is not remote. A decision in this matter may well affect whether Dr. Khan, and other medical professionals similarly situated, will accept patients and may affect subsequent medical decisions in treating patients—events which may occur well before the doctor is in a position to request information regarding the chemical composition of fracking fluid from a particular Marcellus Shale industrial operation. Additional factual development that would result from awaiting an actual request for information on behalf of a patient is not likely to shed more light upon the constitutional question of law presented by what is essentially a facial challenge to Section 3222.1(b). Accordingly, we reverse the decision of the Commonwealth Court regarding Dr. Khan's standing and we remand the matter to the Commonwealth Court for a merits decision of Dr. Khan's substantive claims.[14]

14. The Commonwealth also offers arguments regarding the merits of Dr. Khan's distinct claims premised upon Article III, Section 3 (bills to contain single subject) and Article III, Section 32 (special laws), includ-

## B. Political question

■■■ Also in the justiciability rubric, the Commonwealth argues that the Commonwealth Court "went beyond merely assessing the constitutionality of Act 13" and violated the separation of powers doctrine. According to the Commonwealth, the Commonwealth Court interfered with the exercise of the General Assembly's constitutional police powers by "revisiting" and "second-guessing" legislative choices. The Commonwealth accuses the court below of substituting its own "policy judgments and preferences" to dictate how the General Assembly should regulate local government. Citing Article I, Section 27 and Article IX, Section 1 of the Pennsylvania Constitution, the Commonwealth asserts that the General Assembly has the power and exclusive authority to retract local governments' powers to regulate oil and gas operations. *See* PA. CONST. art. I, § 27; art. XI, § 1 (General Assembly to provide by general law for local government). The lower court, according to the Commonwealth, should have respected Act 13 as an exercise of legislative branch power and should have refrained from acting in this matter at all.[15]

ing an assertion that Section 3222.1(b) contains limitations on dissemination of confidential information that are no different than those found in federal government regulations. *See* Agencies' Brief (as cross-appellees) at 27–29; *see also* Citizens' Petition for Review, 3/29/12, at 97–106 (Counts XI and XII). In their reply brief, the citizens respond that the federal scheme regarding protection of trade secrets is substantially different from Act 13, and address at some length the merits of Dr. Khan's claims. The Commonwealth Court did not reach the merits, however, having dismissed Dr. Khan from the action on standing grounds. In light of the procedural posture of the matter and the distinct and narrow nature of his challenge, we offer no opinion on the merits in advance of remand. *See Cozen O'Connor*, 13 A.3d at 471.

15. To support its allegation that the Commonwealth Court engaged in judicial policy-making, the Agencies' Brief cites comments made during oral argument by the Honorable Dan Pellegrini, President Judge of the Commonwealth Court, and the author of the opinion below. In those exchanges, President Judge Pellegrini recounted the legislative efforts of sister states to promote oil and gas development and the legal predicate for the existence of municipalities in Pennsylvania. Agencies' Brief (as appellants) at 34–40. The record does not support the *ad hominem* attack on President Judge Pellegrini by the agencies. Courts explain their decisions with reasoned expressions, and the Commonwealth Court did so here. On appeal, our review is focused on the decision and the legal grounds upon which the decision is rendered, in

In support of this global position of non-reviewability, the OAG's Brief asserts that the sovereign is the constitutional trustee of Pennsylvania's public natural resources and the General Assembly is vested with exclusive authority to regulate the oil and gas industry. OAG's Brief (as appellant) at 27 (citing PA. CONST. art. I, § 27). The Commonwealth portrays the citizens here as merely discontent with the General Assembly's policy choices, and their challenge as a veiled attempt to change the result of a political clash within the General Assembly, in which the interests of these particular citizens were defeated. According to the Commonwealth, even proceeding to a merits decision here interferes with the General Assembly's "discretionary authority," as the Constitution does not articulate any manageable standards by which the judicial branch can reasonably assess the merits of the General Assembly's policy choices regarding the Commonwealth's natural resources. *Id.* at 27–30.

The citizens respond that the Commonwealth Court simply decided a constitutional challenge to Act 13 properly subject to judicial review, and pointedly note that the General Assembly does not police the constitutionality of its own acts. According to the citizens, the political question doctrine bars courts from deciding "a very limited subset of cases," *i.e.,* those cases in which courts are considering matters that are committed in the constitutional text to a co-equal branch of government and,

light of the claims raised by the parties and of the governing law. We review the decision of the lower court for error and not for alleged motivations of individual panel members, just as we view challenged legislation itself according to its terms and not according to any alleged motivations on the part of individual members of the General Assembly. *See City of Philadelphia v. Commonwealth,* 575 Pa. 542, 838 A.2d 566, 580 (2003) (with respect to enrolled bill, "subjective, individualized motivations or impressions of specific legislators [are not] an appropriate basis upon which to rest a determination as to [the bill's] validity"). Even if the Commonwealth Court's reasoned expression provided unpersuasive support for the court's positions, the agencies' opinion that President Judge Pellegrini's questioning from the bench revealed that the *en banc* Court majority was making an inappropriate policy-driven decision on a political question would lack merit. We also note that the Commonwealth offered no objection to President Judge Pellegrini's questioning, along the lines of its argument here, at the time the exchange occurred.

in addition, which contain no claims that the co-equal branch of government acted outside the scope of its constitutional authority. The citizens characterize their challenges as soundly based upon the question of whether the General Assembly enacted legislation in accordance with constitutional mandates that exist precisely to restrict its powers. The citizens dismiss as an unsubstantiated label the Commonwealth's claims that their challenge is to unreviewable policy determinations by the General Assembly. According to the citizens, the limitations on the General Assembly's powers derive from the Constitution, not from some general body of law, and alleged good intentions of the legislative branch "do not excuse non-compliance with the Constitution." In this regard, the citizens emphasize that courts, and the Pennsylvania Supreme Court in particular, have the power to determine the constitutionality of statutes, and the General Assembly cannot "instruct" courts as to what measures are constitutional, or are beyond the reach of a constitutional challenge. Citizens' Brief (as appellees) at 63–66.

The Commonwealth Court held that the citizens presented a justiciable question. On this point, the *en banc* panel was unanimous. The court noted that it was simply required to determine whether Act 13 violates the Pennsylvania Constitution, a task implicating a core judicial function. The court rejected the Commonwealth's arguments, reasoning that adopting the Commonwealth's approach to the political question doctrine would mean that no action of the General Assembly, defended as an exercise of its police power, would ever be subject to a constitutional challenge. *Robinson Twp.*, 52 A.3d at 479.

██ We agree with the core position of the citizens and the Commonwealth Court. The political question doctrine derives from the principle of separation of powers which, although not expressed in our Constitution, is implied by the specific constitutional grants of power to, and limitations upon, each co-equal branch of the Commonwealth's government. Our Constitution vests legislative power in the General Assembly, which consists of the Senate and the House of Repre-

sentatives. *See* PA. CONST. art. II, § 1. The General Assembly is charged with the passage of laws generally and, additionally, with passage of specifically authorized legislation. *See* PA. CONST. art. III, §§ 1–27. Passage of laws is subject to the restrictions of Article III, Sections 28 through 32, and is further limited fundamentally by those rights and powers reserved to the people in Article I. *See* PA. CONST. art. III, §§ 28–32; art. I, § 25. The judicial power of the Commonwealth is not vested in the General Assembly, but in a unified judicial system, which includes the Commonwealth Court and, ultimately, this Court, which presides over our branch of government. *See* PA. CONST. art. V, § 1.

In application, the Court has recognized that "[i]t is the province of the Judiciary to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts. That our role may not extend to the ultimate carrying out of those acts does not reflect upon our capacity to determine the requirements of the law." *Council 13*, 986 A.2d at 75 (quoting *Thornburgh v. Lewis*, 504 Pa. 206, 470 A.2d 952, 955 (1983)). This is not a radical proposition in American law. *See, e.g., Marbury v. Madison*, 1 Cranch 137, 166, 2 L.Ed. 60 (1803) ("where a specific duty is assigned by law [to another branch of government], and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy").[16] Indeed, "[o]rdinarily, the exercise of the judicia-

16. In the Federalist Paper #48, James Madison observed on the separation of powers in government:

[I]n a representative republic, where the executive magistracy is carefully limited; both in the extent and the duration of its power; and where the legislative power is exercised by an assembly, which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions, by means which reason prescribes; it is against the enterprising ambition of this [legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions.

ry's power to review the constitutionality of legislative action does not offend the principle of separation of powers," and abstention under the political-question doctrine is implicated in limited settings. *See Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth,* 621 Pa. 260, 77 A.3d 587, 596 (2013) (*"HHAP "*) (quoting *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698, 705 (1977)).

The applicable standards to determine whether a claim warrants the exercise of judicial abstention or restraint under the political question doctrine are well settled. Courts will refrain from resolving a dispute and reviewing the actions of another branch only where "the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'" *Sweeney,* 375 A.2d at 706; *Council 13,* 986 A.2d at 76 (quoting *Thornburgh* ). To illustrate our approach to the political question doctrine, we customarily reference the several formulations by which the U.S. Supreme Court has described a "political question" in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *See, e.g., Council 13; Thornburgh.* Cases implicating the political question doctrine include those in which: there is a textually demonstrable constitutional commitment of the

Federalist Paper # 48. Madison continued, quoting Thomas Jefferson's seminal work, *Notes on the State of Virginia,* concerning the prospect of the most extreme of abuses:

> All the powers of government, legislative, executive, and judiciary, result to the legislative body. The concentrating these in the same hands, is precisely the definition of despotic government. It will be no alleviation, that these powers will be exercised by a plurality of hands, and not by a single one. One hundred and seventy-three despots would surely be as oppressive as one. Let those who doubt it, turn their eyes on the republic of Venice. As little will it avail us, that they are chosen by ourselves. An elective despotism was not the government we fought for; but one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others.

*Id.; see also United States v. Brewster,* 408 U.S. 501, 546–47, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) (Brennan, J., dissenting, joined by Douglas, J.) ("Jefferson looked on the 'tyranny of the legislatures' as 'the most formidable dread at present, and will be for long years.'").

disputed issue to a coordinate political department; there is a lack of judicially discoverable and manageable standards for resolving the disputed issue; the issue cannot be decided without an initial policy determination of a kind clearly for non judicial discretion; a court cannot undertake independent resolution without expressing lack of the respect due coordinate branches of government; there is an unusual need for unquestioning adherence to a political decision already made; and there is potential for embarrassment from multifarious pronouncements by various departments on one question. *See Council 13*, 986 A.2d at 75 (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691); *see also HHAP*, 77 A.3d at 596–98 & n. 11 (listing examples).

We have made clear, however, that "[w]e will not refrain from resolving a dispute which involves only an interpretation of the laws of the Commonwealth, for the resolution of such disputes is our constitutional duty." *Council 13*, 986 A.2d at 76 (quoting *Thornburgh*). "[T]he need for courts to fulfill their role of enforcing constitutional limitations is particularly acute where the interests or entitlements of individual citizens are at stake." *HHAP*, 77 A.3d at 597 (citing *Sweeney*, 375 A.2d at 709 ("[T]he political question doctrine is disfavored when a claim is made that individual liberties have been infringed.")); *accord Gondelman v. Commonwealth*, 520 Pa. 451, 554 A.2d 896, 899 (1989) ("Any concern for a functional separation of powers is, of course, overshadowed if the [statute] impinges upon the exercise of a fundamental right....."). There is no doubt that the General Assembly has made a policy decision respecting encouragement and accommodation of rapid exploitation of the Marcellus Shale Formation, and such a political determination is squarely within its bailiwick. But, the instant litigation does not challenge that power; it challenges whether, in the exercise of the power, the legislation produced by the policy runs afoul of constitutional command. Responsive litigation rhetoric raising the specter of judicial interference with legislative policy does not remove a legitimate legal claim from the Court's consideration; the political question doctrine is a shield and not a sword to

deflect judicial review. *Council 13,* 986 A.2d at 75–76. Furthermore, a statute is not exempt from a challenge brought for judicial consideration simply because it is said to be the General Assembly's expression of policy rendered in a polarized political context. *See id.* at 76; *HHAP,* 77 A.3d at 598 ("political question doctrine does not exist to remove a question of law from the Judiciary's purview merely because another branch has stated its own opinion of the salient legal issue"). Whatever the context may have been, it produced legislation; and it is the legislation that is being challenged. As the U.S. Supreme Court has stated:

> The idea that any legislature, state or federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions, and the liberty which is enjoyed under them, depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land.

*Smyth v. Ames,* 169 U.S. 466, 527–28, 18 S.Ct. 418, 42 L.Ed. 819 (1898), *overruled on other grounds by Federal Power Comm'n v. Natural Gas Pipeline Co. of Am.,* 315 U.S. 575, 602, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); *accord Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 2577–80, 183 L.Ed.2d 450 (2012) (citing *Marbury v. Madison,* 1 Cranch at 175–76 ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. Our respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed.... And there can be no question that

it is the responsibility of this Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits.")).

Here, the Commonwealth does not identify any provision of the Constitution which grants it authority to adopt non-reviewable statutes addressing either oil and gas or policies affecting the environment. Organic constitutional provisions on which the citizens rely offer, as will become evident in our later discussion, the type of judicially discoverable and manageable standards by which courts are able to measure and resolve the parties' dispute without overstepping the Judiciary's own constitutional bounds. Furthermore, this case presents no prospect that the Court would be required to make an initial policy determination outside our judicial function or undertake independent resolution of a policy matter outside the purview of our judicial authority; nor is there an unusual need for unquestioning adherence to the legislative decision already made. Indeed, in terms of the judicial function, at least, this case is not extraordinary at all: all that is required to resolve the parties' various disputes is that we construe and apply constitutional provisions and determine whether aspects of Act 13 violate our charter. The task is neither more nor less intrusive upon a coordinate branch function than in other matters in which we are called upon to determine the constitutional validity of a legislative act. *Accord HHAP*, 77 A.3d at 598 & n. 12 (noting that notion of "respect" due coordinate branches is relatively narrow criterion in political question jurisprudence; judicial finding that Legislature passed unconstitutional law entails no lack of respect in constitutional sense nor does it create political question).

Litigation polemics aside, Act 13 is a legislative act subject to the strictures of the Pennsylvania Constitution and the U.S. Constitution. The Commonwealth offers no persuasive argument that the citizens' varied challenges raise only questions essentially political in nature regarding the validity of Act 13. The parties' dispute implicates questions of whether Act 13 was adopted pursuant to constitutional procedures, and of whether Act 13 impinges upon the rights reserved to citizens

and guaranteed by the Pennsylvania Constitution and the U.S. Constitution. The evident investment of the parties to this dispute in the policies articulated in and the politics behind Act 13 do not serve to alter the nature as "questions of law" of the specific legal issues before us. *See Council 13*, 986 A.2d at 76. The nature of the citizens' claims requires nothing more than the exercise of powers within the courts' core province: the vindication of a constitutional right. *See Thornburgh*, 470 A.2d at 955–56. Accordingly, we conclude that the citizens' claims are justiciable and, as a result, the Commonwealth Court's decision on this point is affirmed.

### III. The Constitutionality of Act 13

As noted, on the merits, the Commonwealth Court held that certain specific provisions of Act 13 were unconstitutional. The *en banc* panel enjoined enforcement of Sections 3215(b)(4) and 3304 of Act 13, and of those provisions of Chapter 33 which enforce Section 3304. *See Robinson Twp.*, 52 A.3d at 485, 493 (citing 58 Pa.C.S. §§ 3215(b)(4), 3304–3309). The effect of the injunction was to prohibit the Department of Environmental Protection from granting waivers of mandatory setbacks from certain types of waters of the Commonwealth, *see* 58 Pa.C.S. § 3215(b)(4); and to permit local government to enforce existing zoning ordinances, and adopt new ordinances, that diverge from the Act 13 legal regime, without concern for the legal or financial consequences that would otherwise attend non-compliance with Act 13, *see* 58 Pa.C.S. §§ 3304–3309.

The Commonwealth Court rejected the citizens' remaining claims. Specifically, the panel sustained the Commonwealth's preliminary objections to claims: (1) that provisions of Act 13 violate the Environmental Rights Amendment, Article I, Section 27 of the Pennsylvania Constitution; (2) that Act 13 is a "special law," in violation of Article III, Section 32 of the Pennsylvania Constitution; (3) that Section 3241(a) permits a private taking of property in violation of Article I, Sections 1 and 10 of the Pennsylvania Constitution; (4) that Section 3305(a)–(b) delegates judicial and legislative powers to the Public Utility Commission, an executive agency, in violation of

the separation of powers doctrine; and (5) that provisions of Act 13 are unconstitutionally vague.[17]

On appeal, the Commonwealth challenges the lower court's decision regarding Sections 3215(b)(4) and 3304 through 3309, but supports affirmance of the Commonwealth Court in all other respects. The citizens offer several reasons upon which to affirm the aspects of the Commonwealth Court's decision sustaining their challenges. And, the citizens advance other theories in support of the claim that other provisions of Act 13 and Act 13, in its totality, are unconstitutional.

### A. Article I, Section 27 of the Pennsylvania Constitution (Environmental Rights)

### Article I, Section 1 of the Pennsylvania Constitution and the Fourteenth Amendment to the U.S. Constitution (Due Process);

### Article II, Section 1 of the Pennsylvania Constitution (Legislative Power)

We begin by reviewing the parties' respective claims regarding Sections 3215(b)(4) and (d), 3303, and 3304. *See* Citizens' Petition for Review, 3/29/12, at 27–49, 63–82, 88–91 (Counts I–III, VI, VIII). The Commonwealth Court granted the citizens summary relief on separation of powers and due process theories, holding that Sections 3215(b)(4) and 3304 are unconstitutional.[18] As we will explain in more detail *infra,*

17. On appeal, the citizens have abandoned the claim that Act 13 is unconstitutionally vague (Counts IX and X of the citizens' petition for review).

18. In Count VIII of the Citizens' Petition for Review, the citizens sought "a declaration that the delegation of powers to the Pennsylvania Department of Environmental Protection in Act 13, Section 3215(b)(4) . . . is an unconstitutional breach of the doctrine of Separation of Powers. . . ." See Citizens' Petition for Review, 3/29/12, at 88–91 (Count VIII). The citizens claimed that Section 3215(b)(4) violates Article II, Section 1 of the Pennsylvania Constitution, which vests legislative power in the General Assembly. The Commonwealth Court disposed of this claim citing the non-delegation doctrine, the theoretical underpinnings of which are in the separation of powers doctrine. 52 A.3d at 490–91 ("Count VIII—Violation of Non–Delegation Doctrine—DEP") (citing PA. CONST. art. II, § 1).

Section 3215(b)(4) creates a process by which the Department of Environmental Protection grants waivers to oil or gas well permit applicants from statutory protections of certain types of waters of the Commonwealth. Section 3304, meanwhile, implements a uniform and statewide regulatory regime of the oil and gas industry by articulating narrow parameters within which local government may adopt ordinances that impinge upon the development of these resources. *See* 58 Pa.C.S. §§ 3215(b)(4), 3304. The court sustained the Commonwealth's preliminary objections with respect to the remaining claims.

In enjoining Section 3304, the Commonwealth Court held that the provision violated the citizens' due process rights by requiring local governments to amend their existing zoning ordinances without regard for basic zoning principles and, thereby, failing to protect interests of property owners from harm and altering the character of neighborhoods. *Robinson Twp.*, 52 A.3d at 484–85. The court explained that zoning laws protect landowners' enjoyment of their property by categorizing uses, designating compatible uses to the same district, and generally excluding incompatible uses from districts, with limited exceptions that do not affect the comprehensive land use scheme of the community. Local government, according to the court, relies on public input to produce a rational plan of development, under which "each piece of property pays, in the form of reasonable regulation of its use, for the protection that the plan gives to all property lying within the boundaries of the plan." *Id.* at 482. The court stated that the goal of zoning is to preserve the rights of property owners within the constraints of the maxim "use [your] own property as not to injure your neighbors." *Id.* (quoting *In re Realen Valley Forge Greenes Assocs.*, 576 Pa. 115, 838 A.2d 718, 728 (2003)).

Addressing residential districts in particular, the court noted that "reserving land for single-family residences preserves the character of neighborhoods, securing zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Id.* at 481 (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94

S.Ct. 1536, 39 L.Ed.2d 797 (1974)). But, the court observed, Act 13 requires municipalities to act affirmatively to allow incompatible uses, such as "drilling operations and impoundments, gas compressor stations, storage and use of explosives" in all zoning districts, including residential, and "applies industrial criteria to restrictions on height of structures, screening and fencing, lighting and noise." *Id.* at 484–85. The court held that, because it commands unconstitutional zoning outcomes, Section 3304 violates due process.

The court also rejected the Commonwealth's attempt to justify Act 13's abrupt disruption of existing zoning schemes as an exercise of police power rationally related to its stated purposes, *i.e.,* the optimal development of the Commonwealth's natural resources. According to the court, the interests that justify the exercise of police power in zoning and in the development of the oil and gas industry are not the same. This is so because the interest in oil and gas development is centered on efficient production and exploitation of resources, while the interest in zoning focuses on the orderly development and regulation of land use, consistent with local demographic and environmental concerns. *Id.* at 483 (quoting *Huntley & Huntley, Inc. v. Borough Council of Oakmont,* 600 Pa. 207, 964 A.2d 855, 865 (2009)). Accordingly, the court explained, Act 13's stated purposes, including its main interest in accommodating the exploitation of the Commonwealth's oil and gas resources, are not a creditable justification for the Section 3304 zoning guidelines; zoning action is only justified if compliant with the comprehensive plan of the community. *Id.* at 483–84 (citing 58 Pa.C.S. § 3202).

Regarding Section 3215(b)(4), which the Commonwealth Court also enjoined, the panel explained that the provision lists specific setbacks between a water source and a gas well bore (the physical well bore is the opening in the ground through which gas is extracted and is generally surrounded by the wider disturbed area of a well site). Waiver of planned statutory setbacks is broadly authorized by Section 3215(b)(4) and neither other parts of Section 3215, nor Act 13 generally, constrain or guide the exercise of discretion by the Depart-

ment of Environmental Protection, an executive agency, as to when setback waivers are appropriate. The panel concluded that Act 13 gives the executive branch "the power to make legislative policy judgments otherwise reserved for the General Assembly" and is, therefore, unconstitutional on that ground. *Id.* at 493 (citing PA. CONST. art. II, § 1; *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) ("*PAGE* ")).

Finally, the Commonwealth Court briefly discussed and ultimately rejected the citizens' claims regarding both the enjoined provisions and Sections 3215(d) and 3303, premised upon Article I, Section 27 of the Pennsylvania Constitution.[19] With respect to this Environmental Rights Amendment challenge, the Commonwealth Court stated that any municipal obligation "to strike a balance between oil and gas development and the preservation of natural, scenic, historic and esthetic values of the environment" derived from the Municipalities Planning Code, a General Assembly enactment. Because Act 13 preempts environmental obligations, the panel determined that municipalities are "relieved of their responsibilities to strike a balance between oil and gas development and environmental concerns under the [Municipalities Planning Code]." The court thus concluded that the citizens failed to state a claim for relief under Article I, Section 27. *Id.* at 488–89 (citing 53 P.S. § 10301(a)(6); *Cmty. Coll. of Del. County v. Fox*, 20 Pa.Cmwlth. 335, 342 A.2d 468 (1975)).

Judge Brobson filed a dissenting opinion, joined by Judges Simpson and Covey. The dissent would have held that Act 13, except for Section 3215(b)(4)'s setback waiver provision, is constitutional. According to the dissent, Section 3304 of Act 13 was a legitimate exercise of the police power and it was not the court's "role to pass upon the wisdom of a particular

19. Briefly, Section 3215(d) states that the Department of Environmental Protection "may consider" comments from—in relevant part—municipalities in making its well permit determinations, and forecloses any appeal by a municipality from permit decisions. Section 3303 purports to occupy the field of environmental regulation to the extent it implicates oil and gas operations, to the exclusion of any existing or future local ordinances. *See* 58 Pa.C.S. §§ 3215(d), 3303.

legislative enactment." *Id.* at 497–98 (Brobson, J., dissenting, joined by Simpson, Covey, JJ.).

## 1. The Parties' Arguments

As appellant, the Commonwealth argues that the Commonwealth Court erred in granting the citizens summary relief as to Sections 3304 and 3215(b)(4) of Act 13. Regarding Section 3304, the Commonwealth argues that the General Assembly delegated zoning powers to municipalities through the Municipalities Planning Code; the Code, like any other statute, is subject to amendment, alteration, and repeal by subsequent enactments, such as Act 13. According to the Commonwealth, the Commonwealth Court turned the relationship between the General Assembly and local government "upside-down" by concluding that Section 3304 is unconstitutional. Agencies' Brief (as appellants) at 12–15.

Moreover, the Commonwealth states that Act 13, in its entirety, is constitutional. The Commonwealth notes that the General Assembly exercised its "broad police power" to enact Act 13, which is "a comprehensive reform of the oil and gas laws of this Commonwealth driven by, among other things, policy determinations of promoting the development of the Commonwealth's vast natural gas reserves; encouraging economic development, job creation and energy self-sufficiency; providing for impact fees to benefit municipalities where unconventional gas drilling occurs; ensuring uniformity of local zoning ordinances throughout the Commonwealth; and revising and updating the Commonwealth's environmental regulations related to the oil and gas industry." According to the Commonwealth, Act 13's stated purposes are valid legislative objectives, and the means for implementing these objectives is based on the General Assembly's "informed judgment" regarding the balance of interests at issue. *Id.* at 15. The Commonwealth offers that Act 13 is a non-arbitrary and non-discriminatory exercise of the police power. This power, the Commonwealth states, is one of the "least limitable powers" of the General Assembly, and the burden to prove that the General Assembly exceeded its power is heavy. *Id.* at 17

(quoting *Eagle Envtl. II, L.P. v. Commonwealth*, 584 Pa. 494, 884 A.2d 867, 882 (2005)).[20]

The standard to overcome the strong presumption of constitutionality of duly-enacted legislation is whether the statute "clearly, palpably, and plainly" violates the Constitution. *Id.* at 880. The Commonwealth states that the *en banc* panel failed to apply this deferential standard of review to the citizens' claims regarding Section 3304.[21] If the Common-

**20.** Business and industry *amici* writing in support of the Commonwealth note the economic and energy benefits to the people expected from the exploitation of natural gas resources in the Marcellus Shale Formation. One brief emphasizes that the Marcellus Shale deposits offer great potential to answer the present and future energy necessities of the Commonwealth and the nation from an affordable domestic source. The deposits are located in proximity to East Coast metropolitan areas and industrial and commercial centers, which promises to keep gas transportation costs to a minimum. Without offering many details about the amount of recoverable natural gas with current or developing technology, *amici* suggest that the Marcellus Shale Formation holds "trillions of cubic feet of natural gas" that will support the burgeoning natural gas industry for several decades. *See, e.g.*, Brief of *Amicus Curiae* American Petroleum Institute at 2.

According to another brief, the natural gas industry is playing a key role in economic recovery by creating jobs and stimulating service industries in communities across Pennsylvania. *See, e.g.*, Brief of *Amici Curiae* The Pennsylvania Independent Oil and Gas Association *et al.* at 12. The Commonwealth, meanwhile, suggests that the balkanization of land use regulation in the various communities across Pennsylvania has generally hindered the development of the Marcellus Shale play. Act 13, according to the Commonwealth, resolves this problem and fosters optimal development while also adequately respecting property and environmental rights. *See* Agencies' Brief at 16 (citing 58 Pa.C.S. § 3202).

**21.** According to the Commonwealth, this failure was critical because the lower court was supposedly divided evenly regarding the provision's constitutionality and, in light of the presumption, the question should have been resolved in favor of constitutionality. *Id.* at 18 (citing *Estate of Fridenberg v. Commonwealth*, 613 Pa. 281, 33 A.3d 581, 591 (2011) ("In reviewing the constitutionality of a statute, we presume the Legislature did not intend for the statute to violate either the United States or this Commonwealth's Constitution.")). This particular claim of error involving the standard of review has no merit. The Commonwealth Court has nine commissioned judges. Pursuant to the Commonwealth Court's Internal Operating Procedures, the present matter was assigned to an *en banc* panel composed of seven commissioned judges of the court chosen in rotation: President Judge Dan Pellegrini, and Judges Bernard L. McGinley, Bonnie Brigance Leadbetter, Robert Simpson, P.

wealth Court had applied the proper standard, the Commonwealth asserts, the court would have concluded that Act 13 is a valid exercise of the police power, and that any and all amendments to local ordinances required by Act 13 would be *a fortiori* valid. *Id.* at 22–23.[22]

Kevin Brobson, Patricia A. McCullough, and Anne E. Covey. *See* Cmwlth. Ct. I.O.P. §§ 111, 112. The Commonwealth Court has an internal operating procedure by which commissioned judges who did not sit on the panel hearing the case are offered an opportunity to object to the decision, and the writing judge can then make revisions. In close cases concerning whether the entirety of the commissioned judges agree with the result, a majority vote of the commissioned judges determines whether the panel's opinion will be filed. *See id.* at §§ 251–256.

In this case, the actual panel hearing the case was divided 4–3. Of the two commissioned judges who were not members of the *en banc* panel, Judge Mary Hannah Leavitt indicated her non-participation, and Judge Renee Cohn Jubelirer indicated her disagreement with the proposed opinion, resulting in a tie vote of the eight participating commissioned judges. As we understand the internal procedure, the disagreement did not oblige or entitle Judge Cohn Jubelirer to file a responsive opinion and, as a result, change the outcome of the panel vote. *Id.* Per court rule, the court then filed the proposed opinion (and dissent) as circulated by the *en banc* panel members. *See id.* at § 256(b). That filed opinion represents the decision of the court.

The limited full-court participation before a decision and opinion is filed is a procedural matter, governed by rules that operate independently of the nature of the claims presented, *e.g.*, constitutional or nonconstitutional claims. The judges to whom the case was assigned for decision weighed the presumption of constitutionality into their decision, as a matter of substantive law governing the burden of proof on the citizens; and the dissenting opinion did not dispute the governing standard. A majority of the panel concluded that the citizens met their burden as to two claims. Contrary to the Commonwealth's current contention, the presumption of constitutionality did not require the Commonwealth Court to alter its decisional procedures, and the decision in *Estate of Fridenberg* is not to the contrary.

In any event, this Court's decisional task in passing upon the questions of law posed on appeal is not affected by the happenstance of which party prevailed below.

22. The parties also make arguments concerning whether this Court reviews a due process claim in the zoning context under a rationally-related test, *i.e.*, whether the statute "seek[s] to achieve a valid state objective by means that are rationally related to that objective," or under heightened scrutiny. *See* Agencies' Brief (as appellants) at 20 (quoting *Khan v. State Bd. of Auctioneer Examiners*, 577 Pa. 166, 842 A.2d 936, 946–47 (2004); *Boundary Drive Assocs. v. Shrewsbury Twp. Bd. of Supervisors*, 507 Pa. 481, 491 A.2d 86, 90 (1985)); Citizens' Brief (as appellees) at 17–20 (citing, *inter alia, Surrick v. Zoning Hearing Bd.*,

Regarding Section 3215(b)(4), the Commonwealth argues that the lower court erred in determining that the General Assembly failed to make basic policy choices and/or to create adequate standards to guide and restrain the setback waiver decisions committed to the Department of Environmental Protection. According to the Commonwealth, Section 3215(b)(4) cannot be read separately from the rest of subsection (b), which articulates "rigid setbacks" from particular bodies of water and provides that additional conditions may be employed if necessary to protect the waters of the Commonwealth. The Department, according to the Commonwealth, indeed has discretion to grant waivers but its discretion is restrained by the condition that a permittee must submit a plan identifying additional measures to protect the Commonwealth's waters. *See* Agencies' Brief (as appellants) at 24–28.[23]

From the Commonwealth's perspective, Section 3215(b) therefore "narrowly" delimits agency discretion and precludes the issuance of arbitrary setback waivers. In addition, under Section 3215(b), the Department may not burden the permittee with more than "necessary" permit conditions. These requirements, according to the Commonwealth, create a floor and a ceiling within which the Department may articulate appropriate permit restrictions. In its determinations, the Commonwealth states, the Department is further "guided and

476 Pa. 182, 382 A.2d 105, 108 (1977)). In light of our ultimate disposition, we offer no opinion on the issue.

**23.** The Commonwealth also notes that Section 3215(b) continues substantially the same regime of review and approval of permit proposals as the prior version of the Oil and Gas Act, suggesting that, as a result, the provision should be found constitutional. We agree with the citizens' assessment, *see infra*, that the current setback waiver scheme is substantially different from its predecessor. More importantly, we note that this Court has never addressed a constitutional challenge to the predecessor of Section 3215(b) premised upon the same arguments that the citizens make here. Accordingly, to the extent that the Commonwealth is suggesting that we have tacitly approved Section 3215(b), we cannot credit the assertion. *Holt v. Legislative Reapportionment Comm'n*, 614 Pa. 364, 38 A.3d 711, 735–36 (2012) (legislative redistricting plan "[wa]s not insulated from attack by decisions of this Court finding prior redistricting plans constitutional, unless a materially indistinguishable challenge was raised and rejected in those decisions").

restrained" by the purposes of Act 13 and by the Commonwealth's other environmental statutes, such as the Clean Water Act. *Id.* at 29 (citing 58 Pa.C.S. § 3202); *see also* OAG's Brief (as appellant) at 37 (citing 58 Pa.C.S. § 3257 (existing rights and remedies preserved and cumulative remedies authorized)). The Commonwealth asserts that this Court has never required the General Assembly "to set forth every detail of what is and is not necessary" or to establish exact setbacks for industrial well drilling. Rather, "details of a general program can be left to the particular agency." Agencies' Brief (as appellants) at 30 (citing *Dussia v. Barger*, 466 Pa. 152, 351 A.2d 667, 672 (1976)). In the Commonwealth's view, Section 3215(b) does not simply direct the Department to consider certain standards, but creates a process with definite guidelines and a specific performance standard for the Department to follow in determining whether to grant setback waivers. *Id.* at 31–32 (citing *PAGE*, 877 A.2d at 418). The statutory scheme then permits the Department to use its expertise to apply express statutory standards. *Id.* at 32–33 (citing *Eagle Envtl. II*, 884 A.2d at 880–81); OAG's Brief (as appellant) at 36.[24]

In response to the Commonwealth's appeal, the citizens request that we affirm the lower court's decision. To start, the citizens claim that Article I, Section 1 of the Pennsylvania Constitution guarantees an individual's rights "to acquire, possess and protect property and to use that property as the individual sees fit." Citizens' Brief (as appellee) at 8 (citing *Appeal of Girsh*, 437 Pa. 237, 263 A.2d 395, 397 n. 3 (1970)). This right, according to the citizens, is limited by the Commonwealth's police power. The citizens do not dispute that the General Assembly has the authority to preempt local laws, amend the Oil and Gas Act, or simply remove municipalities' zoning power entirely. But, the citizens argue, having the

**24.** The Commonwealth also suggests that review of the citizens' Section 3215(b) claim is premature because the citizens "do not point to any specific waivers which have been granted or any regulations which have been enacted." OAG's Brief (as appellant) at 35. We have addressed at length why the citizens' interest in the outcome of this litigation is neither remote nor speculative. The similar contention in the context of the Section 3215 claim necessarily fails.

power does not equate to the conclusion that the exercise of the power in a particular instance is per se proper. According to the citizens, while the General Assembly may dissolve the municipalities' power to zone, the General Assembly may not remove the protections created by existing zoning districts only to replace them with a zoning scheme that is inconsistent with constitutional mandates generally imposed on any legislative zoning effort. *Id.* at 12–15. The citizens emphasize that the exercise of the police power to zone is limited by the Constitution. Thus, a zoning legislative enactment like Act 13 is constitutional only if it ensures that a use of property does not cause harm to neighboring property rights or interests, and it protects "the lives, health, morals, comfort and general welfare of the populace." *Id.* at 8, 15 (citing *Realen,* 838 A.2d at 728). According to the citizens, the purpose of zoning is to develop a comprehensive and orderly land use scheme that segregates incompatible uses, based on the unique characteristics of each community; in this sense, "[t]he police power to zone cannot be exercised in an unreasonable or arbitrary manner" but must balance costs and benefits in each community. *Id.* at 9–11, 15 (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 387–88, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Realen,* 838 A.2d at 729).

The citizens state that the General Assembly cannot justify a zoning action violative of these fundamental parameters by reference to a policy to promote oil and gas development in the Commonwealth. The interests implicated in zoning, the citizens assert, are distinct from, and more complex than, those implicated in the narrow arena of oil and gas development. Accordingly, an action that, when viewed in isolation, is perfectly acceptable to accomplish the resource utilization purposes of Act 13 may be unconstitutional from a zoning perspective. The citizens emphasize that Act 13 is a zoning act that must be assessed in accordance with constitutional standards applicable to all other zoning legislation. According to the citizens, Act 13 confers no benefits to the community sufficient to justify its disruptive effects, and the Commonwealth's blanket assertion that the statute has an appropriate

purpose is insufficient to meet constitutional standards. *Id.* at 14–17.

By any measure, the citizens argue, Act 13 works a remarkable revolution in zoning in this Commonwealth. The Act introduces heavy-duty industrial uses—natural gas development and processing, including permission to store wastewater (a drilling by-product)—into all existing zoning districts as of right, including residential, agricultural, and commercial. The intrusion is made, according to the citizens, regardless of whether the district is suitable for industrial use, whether the industrial use is compatible with existing uses and expectations, and whether dictated accompanying setbacks are sufficient to protect the environmental health, safety, and welfare of residents in particular affected communities. The citizens describe the development process of shale drilling for natural gas:

> Unconventional well sites are generally developed in different stages and are on average several acres in size. Initially, a road is constructed and a pad is cleared. The impact is typical of any a[sic] noisy, dusty construction site, and the process can take several months to complete. Upon completion of the pad, drilling generally entails twenty-four (24) hour operation of sizeable drilling rigs accompanied by numerous diesel engines to provide power to the site. There will also be a substantial amount of truck traffic to and from the drill site. Once completed, the well pads will include wellheads, condensate tanks, vapor destruction units with open flames, pipelines and metering stations. These are typically structures that vary tremendously in size, scale and appearance from dwellings or other buildings found in residential and commercial zoning districts. Compressor stations and processing plants are clearly industrial uses as they process raw materials into various products. Unlike well development, the intensity of activities remains constant.

*Id.* at 21 n.11. Natural gas extraction, the citizens continue, requires heavy truck traffic, open flames, workers living onsite, and the process unavoidably produces noise, odors, and

harmful emissions, including volatile organic compounds and sulfur dioxide, a neurotoxin. *Id.* at 22, 25.

For example, one affidavit of record recounts the experience of a homeowner in a previously rural, non-industrialized area of Amwell Township, Washington County. *See* S. Taney Affidavit, 5/3/2012. The homeowner, a nurse, leased her mineral rights and drilling operations (three wells, a fracking fluid impoundment, and a drill cuttings pit) began approximately 1,500 feet from her home. Access to the drilling site occurred mainly via a dirt road running approximately fifteen feet from her residence. The homeowner describes that, during the initial construction process, the access road was used daily and continuously by heavy truck traffic, causing structural damage to her home's foundation, road collapse, as well as large amounts of dust and deterioration to the air quality; the gas company subsequently repaired the damage to her home, and widened and paved the access road to accommodate additional traffic. Moreover, and unsurprisingly, the 24–hour–a–day traffic caused significant noise pollution, which affected the homeowner's ability to enjoy her property.

Once drilling and fracking operations began, and over the next several years, the homeowner noticed significant degradation in the quality of the well water which had supplied her homestead and those of several neighbors with fresh and clean water during the century in which her family had owned the property. In the homeowner's words: "my well water began to stink like rotten eggs and garbage with a sulfur chemical smell[,] ... when running water to take a bath, my bathtub filled with black sediment and again smelled like rotten eggs." *Id.* at ¶¶ 12–13. The gas company gave the homeowner a "water buffalo" as a replacement water source.[25] Air quality also became degraded, beginning "to smell of rotten eggs, sulfur, and chemicals" and seeping into the home and the

**25.** A "water buffalo" is a fresh water supply tank or trailer originally designed for field hydration by the military. *See* Military Field Hydration, online at http://olive-drab.com/od_medical_other_hydration.php (last accessed on May 23, 2013); Wastecorp Pumps, Wastecorp Water Trailers, online at www.wastecorp.com/mudsucker/water-trailer.html (last accessed on May 23, 2013).

owner's belongings. *Id.* at ¶ 15. Several pets died as a result of their exposure to contaminated water. Finally, upon her physician's advice, the homeowner abandoned her family home because the exposure to the toxic water and air caused her and her children severe health problems such as constant and debilitating headaches, nosebleeds, nausea, difficulty and shortness of breath, skin rashes and lesions, bone and muscle pain, inability to concentrate, and severe fatigue. *Id.* at ¶¶ 16, 17.

Moreover, the citizens state, communities "have a reasonable concern over the impact on property values due to the perceived or real risk associated with living near industrial activity." Property values, according to the citizens, will decrease with the prospect of storing drilling wastewater "less than a football field's distance from ... homes," and the prospect of contamination of the soil, air, and water supply.[26] The citizens state that they "relied on the zoning ordinances in their respective municipalities to protect their investments in their homes and businesses, and to provide safe, healthy, and desirable places in which to live, work, raise families, and engage in recreational activities." Act 13's blunt "one size-fits-all" accommodation of the oil and gas industry, the citizens argue, will change the character of existing residential neighborhoods and affect planning for future orderly growth in municipalities with significant shale gas reserves, the very neighborhoods which zoning laws encouraged and currently protect. One aspect of the new law, for example, provides for setbacks of 300 feet from "existing structures," which does not account for currently undeveloped properties or large parcels,

26. A resident of Damascus, Wayne County, who operates a twelve-acre organic farm, describes the economic impact that she expects as a result of her neighbors leasing their gas rights. *See* T. Kowalchuk Affidavit, 5/10/2012. This homeowner relates that an exploratory well was constructed approximately a half mile from her home in 2010. Because Act 13 would permit drilling closer to her home and farm, the homeowner expects that an actual contamination event, *i.e.,* "industrial activity, spills, blowouts, or subsurface methane migration," or even simply the appearance or possibility of such occurrences, will affect her organic farming business substantially. In the homeowner's words: "because the farm is our primary asset and we have invested heavily in it, a contamination event would wipe us out financially." *Id.* at ¶ 30.

much less roads and property lines. In more sparsely-populated rural communities, the effect of Act 13 will be, according to the citizens, "unlimited drilling; drilling rigs and transportation of the same; flaring, including carcinogenic and hazardous emissions; damage to roads; an unbridled spider web of pipeline; installation, construction and placement of impoundment areas; compressor stations and processing plants; and unlimited hours of operation, all of which may take place in residentially zoned areas." The citizens conclude that, as a zoning regulation, Act 13 fails to meet the standards of Article I, Section 1 of the Pennsylvania Constitution, the Fourteenth Amendment of the U.S. Constitution, and the caselaw that interprets those respective constitutional provisions. Citizens' Brief (as appellants) at 22–27.[27]

**27.** The township manager of Mount Pleasant Township, Washington County, described the results of operating under Act 13–like conditions. *See* M.A. Stevenson Affidavit, 5/4/2012. Mount Pleasant is a thirty-six square mile community of approximately 3,500 people. When Marcellus Shale development began, the local zoning ordinance permitted oil and gas drilling operations as a use of right in all zoning districts. Gas drilling, as a result, developed unrestrained in all areas and zoning districts between 2004 and 2010–11. Mount Pleasant has 108 gas wells, of which 97 are active, two compressor stations, one dew point control facility, four fracking fluid impoundment areas, and miles of pipeline. The manager relates that, "Mount Pleasant has experienced an overturned tanker truck, an explosion, a spill, and seven fires at well sites." The Township was forced to close one road and threatened to close another in a residential area because the roads had not been built for the "onslaught of heavy truck traffic." *Id.* at ¶ 8. Citizen complaints increased, taking a toll on township resources. Subsequently, the Township revised the zoning ordinance, as proposed by a citizens' committee, to allow oil and gas operations as conditional uses, and to require that the Board of Supervisors undertake site-by-site reviews of proposed drilling. *Id.* at ¶¶ 13–17.

Other elected officials highlighted additional concerns specific to their townships. *See, e.g.,* A. Schrader Affidavit, 5/3/2012. In Cecil Township, Washington County, a member of the Board of Supervisors noted that one gas drilling company alone has notified the Township that it intends to drill a minimum of 300 wells, on 40 percent of the land within the municipality's borders. Among other concerns, the supervisor emphasized that some local homes are situated over abandoned coal mines, some of which "have only 10–20 feet of cover above a mine shaft." *Id.* at ¶ 36. Such properties are sensitive to seismic testing using dynamite or thumper trucks that could cause subsidence, as well as to explosions of methane gas "typically found in abandon[ed] mines." *Id.*

Regarding Section 3215(b), the citizens argue that the General Assembly has granted the Department of Environmental Protection open-ended and unrestricted authority "to make fundamental policy choices concerning the setback distance from oil and gas wells to sensitive features," in violation of the separation of powers doctrine. Specifically, Section 3215(b)(4) requires that the Department issue waivers of setbacks, without providing substantive guidance on standards pursuant to which the Department may decide waiver applications. "In practice," the citizens state, "the General Assembly requires the Department to ignore the oil and gas well location setback restrictions contained elsewhere in Section 3215 and to create and apply totally new setbacks in the absence of any substantive standards, guidelines or benchmarks."

Unlike its predecessor, the citizens explain, Act 13 requires the Department to issue waivers; the repealed Oil and Gas Act simply allowed waivers at the Department's discretion. Citizens' Brief (as appellees) at 44 (comparing 58 Pa.C.S. § 3215(b)(4) (Department "shall waive" setbacks) and 58 P.S. § 601.205 (Department "may waive" setbacks)). Act 13 provides guidelines which the Department may consider, but it offers no standards of the factors' weight in the waiver determination. *Id.* at 46 (citing *PAGE*, 877 A.2d at 418–19). The citizens also reject any comparison between Section 3215(b) and the review process for permit applications under the Solid Waste Management Act, whose constitutionality was at issue in *Eagle Environmental II.* They note that the permit application provision of the Solid Waste Management Act is part of a comprehensive regulatory scheme and does not stand as the sole basis for approval of an application. *Id.* (citing Pennsylvania Code provisions implementing Solid Waste Management Act). According to the citizens, Act 13 grants the Department unbridled and unprecedented discretion, when it comes to granting waivers.

The citizens argue further that the standards described by the Commonwealth as implicit in Section 3215(b) are not evident in the plain language of the provision. Section 3215(b) does not require either a meaningful plan, nor a floor and a

ceiling for what may be necessary to protect the Commonwealth's waters and the health of communities. Moreover, Section 3202 creates no standards of decision but simply recites general considerations underlying Act 13. None of the non-textual requirements guide the Department's discretion; rather, the agency operates in a legal environment in which its "powers [are] on par with those possessed by the General Assembly," in violation of the separation of powers doctrine. *Id.* at 48.

Notably, on cross-appeal, the citizens also address their related Environmental Rights Amendment claims, building upon their prior arguments regarding zoning and the protection of local and environmental interests. According to the citizens, municipalities are agents of the Commonwealth, which share the Commonwealth's duties "as trustees to conserve and maintain Pennsylvania's public natural resources for the benefit of [the Commonwealth's] citizens." Citizens' Brief (as cross-appellants) at 32 (citing *United Artists Theater Circ. v. City of Philadelphia*, 535 Pa. 370, 635 A.2d 612, 620 (1993)). Section 27, according to the citizens, creates a public trust for the benefit of all people, including future generations, and the trustee relationship between the Commonwealth and the people requires no implementing legislation to take effect. The citizens recognize that asserting a Section 27 claim does not entitle them to automatic relief, but they argue that "a balancing must take place" between constitutionally-based conservation interests and the exercise of the police power for other purposes. *Id.* at 33 (quoting *Payne v. Kassab*, 468 Pa. 226, 361 A.2d 263, 273 (1976)).

Act 13, the citizens assert, has removed from the municipalities "the ability to strike that balance between oil and gas development and the preservation of the natural, scenic, historic and esthetic values of the environment," and "essentially requires" that industrial uses be permitted across the Commonwealth. The citizens state that Act 13 eliminated any meaningful role for local government as Section 27 trustee, for example, by removing its principal tool in this regard—zoning; by denying or constricting any right of community members or local government to be heard in the permitting process;

and by prohibiting any appeals by municipalities of Department of Environmental Protection—issued well permits. *Id.* at 34 (citing 58 Pa.C.S. §§ 3212.1(b) & (c), 3215(d)).[28] The citizens also note that zoning is the primary means by which municipalities implement statewide environmental statutes, such as the Appalachian Trail Act, the Wild and Scenic Rivers Act, and the Commonwealth's Environmental Master Plan.

According to the citizens, the Commonwealth Court erred in failing to recognize that the municipalities' fiduciary obligation under Section 27 to evaluate short-term and long-term discrete and cumulative effects on public resources continues to exist even though the General Assembly bluntly sought to occupy the field of environmental regulation insofar as the oil and gas industry is concerned. *See id.* at 37–39 (citing 58 Pa.C.S. § 3303). These oil and gas operations, according to the citizens, present risks and "will cause degradation and diminution of trust resources" protected by the Environmental Rights Amendment. The citizens claim that Act 13 removes the municipalities' capacity to evaluate and react appropriately and meaningfully to the potential impact of oil and gas operations and, as a result, impedes the municipalities' ability to comply with their constitutional duties. The basic error, the citizens state, derives from the conclusion that the Municipalities Planning Code is the source of the municipalities' obligations rather than the Constitution. A statutory enactment such as Act 13 simply cannot eliminate organic constitutional obligations. *See id.* at 36–38.[29]

**28.** The citizens further assert that Section 3212.1(b)-(c) is unconstitutional because it prohibits local input into well permit decisions. The provision states that: the Department of Environmental Protection may consider comments and responses of municipalities in accordance with Section 3215(d), relating to well locations, albeit that the Department's consideration of comments does not extend the period for issuing or denying well permits. 58 Pa.C.S. § 3212.1(b)-(c). The Commonwealth Court rejected this claim in disposing of the citizens' other Article I, Section 27 arguments, without addressing Section 3212.1 specifically. The citizens fail to develop their arguments to a degree sufficient to permit this Court to render a reasoned conclusion on this discrete point.

**29.** In the alternative, the citizens assert that Section 3303 of Act 13 (occupying the field of environmental regulation of oil and gas develop-

The Commonwealth responds that Act 13 does not violate the Environmental Rights Amendment, found in Section 27 of Article I of our charter. According to the Commonwealth, municipalities have no powers outside those granted by the General Assembly, and the General Assembly has acted via Act 13 to preempt the field and excuse any obligation that municipalities may have had previously "to plan for environmental concerns for oil and gas operations." Agencies' Brief (as cross-appellees) at 13 (citing *Huntley,* 964 A.2d at 862). Section 27, the Commonwealth states, is not a basis to expand the trustee role or the powers of governmental entities, such as municipalities, beyond those granted by the General Assembly. *Id.* (citing *Belden & Blake Corp. v. Commonwealth,* 600 Pa. 559, 969 A.2d 528, 532–33 (2009); *Fox, supra,* 342 A.2d at 483 (Bowman, J., concurring)). The Commonwealth argues that, "[t]hrough the legislative process," the General Assembly balanced Section 27 concerns, and the constitutional provision does not confer a right upon the municipalities to challenge the General Assembly's policy judgments or for citizens to oppose actions of the General Assembly with which they disagree. *Id.* at 12–15.

The Commonwealth adds that Section 27 "provides specific constitutional authority for the [General Assembly] to enact laws like Act 13 which serve to manage and protect the environment while allowing for the development of Pennsylvania's valuable natural resources." Moreover, while the Commonwealth agrees that municipalities have some duties and responsibilities under Section 27, the Commonwealth disputes that Section 27 grants municipalities any power to protect public natural resources beyond that granted by the General Assembly. The Commonwealth claims that, as named trustee, the sovereign is "plainly" given "the authority and the obligation to control Pennsylvania's natural resources." The mu-

ment) should be read narrowly to mean that the municipalities cannot regulate operations (the "how") but allowing zoning restrictions (the "where"). According to the citizens, the narrow reading is the sole application of Section 3303 that is consistent with Article I, Section 27. *See* Citizens' Brief (as cross-appellants) at 38–39 (citing *Huntley,* 964 A.2d at 857). In light of our decision, we express no opinion on the merits of this alternative argument.

nicipalities have no power to assert authority under Section 27 "as against the Legislature." OAG's Brief (as cross-appellee) at 28–29. In short, the Commonwealth's position is that the Environmental Rights Amendment recognizes or confers no right upon citizens and no right or inherent obligation upon municipalities; rather, the constitutional provision exists only to guide the General Assembly, which alone determines what is best for public natural resources, and the environment generally, in Pennsylvania. The Commonwealth thus requests that we affirm the decision of the Commonwealth Court in this respect.

In their reply briefs, all parties generally reprise their initial arguments.

We are asked to determine whether the Commonwealth Court erred in its several decisions regarding the constitutionality of Act 13. As noted, the Commonwealth Court granted the citizens relief on due process and separation of powers grounds, finding merit in the citizens' challenges to discrete provisions of Act 13 governing zoning and agency decisionmaking. The parties focus their briefing primarily on these issues in their appeals to this Court, while offering overlapping arguments premised upon the Environmental Rights Amendment.

To describe this case simply as a zoning or agency discretion matter would not capture the essence of the parties' fundamental dispute regarding Act 13. Rather, at its core, this dispute centers upon an asserted vindication of citizens' rights to quality of life on their properties and in their hometowns, insofar as Act 13 threatens degradation of air and water, and of natural, scenic, and esthetic values of the environment, with attendant effects on health, safety, and the owners' continued enjoyment of their private property. The citizens' interests, as a result, implicate primarily rights and obligations under the Environmental Rights Amendment— Article I, Section 27. We will address this basic issue, which we deem dispositive, first.

In doing so, we recognize that the parties do not develop their Environmental Rights Amendment arguments to the

same extent as, for example, the due process arguments as to Section 3304 and separation of powers arguments as to Section 3215(b)(4). This is explained, no doubt, by the fact that the citizens were successful in asserting these claims below, and perhaps by the limited decisional law developed in relation to the Environmental Rights Amendment. In any event, the claims regarding Article I, Section 27 were raised and preserved below and are renewed on appeal; there is no claim of waiver by the Commonwealth. *See HHAP*, 77 A.3d at 600 & n. 15 (internal citations omitted) ("Appellees' present advocacy intermixes concepts of vested rights under the Due Process Clause and causes of action under the Remedies Clause. Although they place much of their emphasis on the Remedies Clause ... we consider the due process aspect of Appellees' argument sufficiently developed to preserve that claim as such.").

We also perceive no prudential impediment to articulating principles of law that offer guidance to the bench and bar upon the broader legal issue, while providing context to the decision in this case. *Accord Scampone v. Highland Park Care Ctr., LLC*, 618 Pa. 363, 57 A.3d 582, 604–05 (2012) (this Court's "task is not simply to decide this case, but also to provide guidance upon the broader legal issue"); *Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 618 Pa. 175, 55 A.3d 1056, 1078 (2012) (in articulating principle of law, Court is not bound by parties' agreement on legal point when, in Court's judgment, legal point is incorrect); *Commonwealth v. Collins*, 564 Pa. 144, 764 A.2d 1056, 1058 n. 4 (2001) (same). Finally, to the extent a number of the issues in this case, on both sides, have not been better or optimally developed, and the reasoning of the Commonwealth Court on a number of issues likewise is not optimal, we are cognizant of the fact that Act 13 required local government to implement challenged provisions within narrow timeframes, with substantial financial consequences for non-compliance; this necessarily prompted the citizens to commence litigation quickly and to assent to expedited judicial review both below and here. *See* 58 Pa.C.S. § 3309 (local government has 120 days to amend existing ordinances to

comply with Act 13). We are aware that expedition has salutary features in appropriate cases, such as this one, while the practice also poses burdens and impediments in these cases that we might not see elsewhere.[30]

## 2. The Scope and Standard of Review

 The constitutional validity of Act 13 presents a pure question of law and, as with any question of law, our review of the lower court's decision is plenary and *de novo*. *West Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 4 A.3d 1042, 1048 (2010). In our review, we are not constrained by the Commonwealth Court's reasoning and may affirm on any grounds, as long as the record supports the judgment. *Scampone*, 57 A.3d at 596.

 Regarding any duly enacted statute, courts begin with the presumption that the General Assembly did not intend to violate the Pennsylvania Constitution, "in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 938–39 (2006); *see also* 1 Pa.C.S. § 1922(3). Accordingly, a statute is presumed valid and will be declared unconstitutional only if the challenging party carries the heavy burden of proof that the enactment "clearly, palpably and plainly violates the Constitution." *See Zahorchak*, 4 A.3d at 1048. The practical implication of this presumption is that "[a]ny doubts are to be resolved in favor of a finding of constitutionality." *Stilp*, 905 A.2d at 939.

 Our decision implicates primarily the construction and application of Article I, Section 27 of our Constitution. In

---

**30.** In dissent, Justice Saylor takes a unitary approach to the citizens' claims in a manner that tracks the Commonwealth's framing of the parties' dispute. This approach is to characterize the citizens' arguments, whether premised upon the Environmental Rights Amendment or upon due process grounds, as expressions of some municipalities' discontent with the sovereign's policy decision to limit their zoning powers. But, as we explain, the claims and arguments of the citizens are considerably more nuanced and complex. In addition, for reasons also developed at great length *infra*, we obviously reject the claim that our decision today, enforcing the Environmental Rights Amendment, "completely redefine[s] the role of municipalities relative to the sovereign." Dissenting Op. at 744, 83 A.3d at 1011 (Saylor, J., dissenting).

the process of interpretation, "[o]ur ultimate touchstone is the actual language of the Constitution itself." *Id.* (quoting *Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 925 (2004)). "[T]he Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Id.* Towards this end, we avoid reading the provisions of the Constitution in any "strained or technical manner." *Jubelirer v. Rendell*, 598 Pa. 16, 953 A.2d 514, 528 (2008). Indeed, "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *Commonwealth ex rel. Paulinski v. Isaac*, 483 Pa. 467, 397 A.2d 760, 766 (1979).[31]

The Environmental Rights Amendment has no counterpart in the federal charter and, as a result, the seminal, comparative review standard described in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), is not strictly applicable here. Nonetheless, some of the *Edmunds* factors obviously are helpful in our analysis. *Jubelirer*, 953 A.2d at 524–25; *see also Edmunds*, 586 A.2d at 895.[32] Thus, in

31. Addressing voter qualifications, this Court in 1868 spoke broadly to the nature of constitutional interpretation in the interplay between rights and state power:

> For the orderly exercise of the right [to vote] resulting from these qualifications, it is admitted that the legislature must prescribe necessary regulations, as to the places, mode and manner, and whatever else may be required, to insure its full and free exercise. But this duty and right, inherently imply, that such regulations are to be subordinate to the enjoyment of the right, the exercise of which is regulated. The right must not be impaired by the regulation. It must be regulation purely, not destruction. If this were not an immutable principle, elements essential to the right itself might be invaded, frittered away, or entirely exscinded under the name or preten[s]e of regulation, and thus would the natural order of things be subverted by making the principle subordinate to the accessory....

*Page v. Allen*, 58 Pa. 338 at *8 (Pa.1868) (citing Pa Const. art. III, § 1 (1838)).

32. *Accord Blum by Blum v. Merrell Dow Pharm., Inc.*, 534 Pa. 97, 626 A.2d 537, 550 (1993) (Larsen, J. concurring, joined by Papadakos, J.)

addition to our explicatory analysis of the plain language, we may address, as necessary, any relevant decisional law and policy considerations argued by the parties, and any extrajurisdictional caselaw from states that have identical or similar provisions, which may be helpful and persuasive. *See Jubelirer*, 953 A.2d at 525 n. 12. Furthermore, there is a growing body of law and academic commentary concerning how state constitutional interpretation is to be undertaken. As our colleague Mr. Justice Saylor has noted in a scholarly article, "there is some degree of consensus [among courts interpreting state constitutions] that the overarching task is to determine the intent of voters who ratified the constitution. In furtherance of this aim, courts reference, *inter alia*, text; history (including 'constitutional convention debates, the address to the people, [and] the circumstances leading to the adoption of the provision'); structure; underlying values; and interpretations of other states." Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged Prophylactic Rule*, 59 N.Y.U. Annual Survey of Am. L. 283, 290–91 (2003) (footnotes omitted) (focusing on state provisions that have federal counterparts, and in context of prophylactic rules, author observes that, in era of new federalism, there is diversity but also some consensus among state courts in approach to development of constitutional decisional law).[33]

(where appellant grounds claim only upon state constitutional provision, it is unnecessary to subject case to *Edmunds* analysis; *Edmunds* analysis "is appropriate only when there is a question of whether our constitution provides a source of individual rights which is alternative to and independent of rights guaranteed by the United States Constitution").

33. "New federalism," a characterization dating back to the 1970s, relates to a pattern of state court decisions that offer an independent analysis of arguments premised upon the state constitution, rather than following U.S. Supreme Court precedent interpreting analogous federal constitutional provisions in lock-step, even where the state and federal constitutional language is identical or similar. *See, generally,* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977); *accord* Saylor, 59 N.Y.U. Annual Survey of Am. L. at 287–88. Of note among academic commentary on state constitutionalism, especially regarding Pennsylvania's decisional law, is the work of Professor Robert F. Williams. *See, e.g.,* Robert F.

These observations merely recognize the duty of state court judges to uphold state constitutional provisions along with the provisions of the U.S. Constitution. As a result, state court judges "have an obligation to make some independent assessment of state constitutional provisions." *Id.* at 289; *see* PA. CONST. art. VI, § 3 (all judicial officers to take solemn oath to "support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth"). Where arguments grounded in the Pennsylvania Constitution have been forwarded or developed, this Court has undertaken the task in earnest. *See, e.g., Blum by Blum v. Merrell Dow Pharm., Inc.,* 534 Pa. 97, 626 A.2d 537 (1993) (analysis of Article I, Section 6—right to trial by jury "as heretofore"); *Byers v. Commonwealth,* 42 Pa. 89, 1862 WL 5076, at *3 (Pa.1862) (same; stating, *inter alia,* "We do not mean to be understood as asserting that there may not be legislation conferring upon magistrates a power to convict summarily, which would be in violation of the [C]onstitution. Undoubtedly there may. We speak only of the case before us."); *Edmunds, supra* (analysis of Article I, Section 8—people secure from searches and seizures); *Ieropoli,* 842 A.2d at 921 (analysis of Article I, Section 11—courts to be open; remedy by due course of law for injury; statute held to be unconstitutional); *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143, 151–57 (2001) (Opinion Announcing Judgment of Court) (analysis of Article I, Section 13—prohibition against excessive bail and fines, and infliction of cruel punishments; statute held to be constitutional); *Adoption of Walker,* 468 Pa. 165, 360 A.2d 603, 605–06 (1976) (analysis of Article I, Section 28—equality of rights not to be denied or abridged because of sex of individual; statute held to be unconstitutional); *Common-*

Williams, *State Courts Adopting Federal Constitutional Doctrine: Case-By-Case Adoptionism or Prospective Lockstepping?,* 46 Wm. & Mary L. Rev. 1499 (2005); *The Brennan Lecture: Interpreting State Constitutions as Unique Legal Documents,* 27 Okla. City U.L. Rev. 189 (2002); *A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to Its State Constitutional Equality Doctrine,* 3 Widener J. Pub. L. 343 (1993). *See also* Ken Gormley, *The Pennsylvania Constitution: A Treatise on Rights and Liberties,* at 683–706 (George T. Bisel Company, Inc. 2004) (chapter addressing Article I, Section 27, authored by John C. Dernbach).

*wealth v. Butler,* 458 Pa. 289, 328 A.2d 851, 855 & 858 (1974) (same; further noting that denial of equal protection under federal constitution is "independent basis" for decision).

 If, in the process of undertaking explication of a provision of the Pennsylvania Constitution, any ambiguity, conflict, or inconsistency becomes apparent in the plain language of the provision, we follow rules of interpretation similar to those generally applicable when construing statutes. *See, e.g., Commonwealth v. Omar,* 602 Pa. 595, 981 A.2d 179, 185 (2009). Relevant here, if the constitutional language is clear and explicit, we will not "delimit the meaning of the words used by reference to a supposed intent." *Id.* (quoting *Commonwealth ex rel. MacCallum v. Acker,* 308 Pa. 29, 162 A. 159, 160 (1932)). If the words of a constitutional provision are not explicit, we may resort to considerations other than the plain language to discern intent, including, in this context, the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained; and the contemporaneous legislative history. 1 Pa.C.S. §§ 1921, 1922; *see Mercury Trucking,* 55 A.3d at 1068; *accord* Robert F. Williams, *The Brennan Lecture: Interpreting State Constitutions as Unique Legal Documents,* 27 Okla. City U.L. Rev. 189, 195 & 200 (2002) (state constitutions, ratified by electorate, are characterized as "voice of the people," which invites inquiry into "common understanding" of provision; relevant considerations include constitutional convention debates that reflect collective intent of body, circumstances leading to adoption of provision, and purpose sought to be accomplished); *but see Bowers v. Pa. Labor Rels. Bd.,* 402 Pa. 542, 167 A.2d 480, 487 (1961) (relevancy of constitutional debates limited). A specific provision will prevail over a general principle found elsewhere but, because the Constitution is an integrated whole, we are cognizant that effect must be given to all of its provisions whenever possible. *Jubelirer,* 953 A.2d at 528 (quoting *Commonwealth ex rel. Specter v. Vignola,* 446 Pa. 1, 285 A.2d 869, 872 (1971) and *Cavanaugh v. Davis,* 497 Pa. 351, 440 A.2d 1380, 1382 (1982)).

Furthermore, in circumstances where prior decisional law has obscured the manifest intent of a constitutional provision as expressed in its plain language, engagement and adjustment of precedent as a prudential matter is fairly implicated and salutary. *See Holt v. Legislative Reapportionment Comm'n*, 614 Pa. 364, 38 A.3d 711, 759 n. 38 (2012) ("As a function of our system of government, this Court has the final word on matters of constitutional dimension in Pennsylvania. Our charter ... is not easily amended and any errant interpretation is not freely subject to correction by any co-equal branch of our government, other than this Court. For this reason, we are not constrained to closely and blindly re-affirm constitutional interpretations of prior decisions which have proven to be unworkable or badly reasoned."); *see also Commonwealth v. Dickson*, 591 Pa. 364, 918 A.2d 95, 101 (2007) ("we cannot simply fall back on an attenuated assertion of *sub silentio* legislative acquiescence and wash our hands of the stain" of prior erroneous interpretation of statutory language); *see also Freed v. Geisinger Med. Ctr.*, 607 Pa. 225, 5 A.3d 212 (2010); *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002).

### 3. The Applicable Constitutional Paradigm

■ The General Assembly derives its power from the Pennsylvania Constitution in Article III, Sections 1 through 27. The Constitution grants the General Assembly broad and flexible police powers embodied in a plenary authority to enact laws for the purposes of promoting public health, safety, morals, and the general welfare. *See Clifton v. Allegheny County*, 600 Pa. 662, 969 A.2d 1197, 1211 n. 19 (2009); *Adams Sanitation Co. v. Dep't of Envt'l Prot.*, 552 Pa. 304, 715 A.2d 390, 395 (1998); *Gambone v. Commonwealth*, 375 Pa. 547, 101 A.2d 634, 636–37 (1954); *accord Nat'l Fed. of Indep. Bus. v. Sebelius*, ─── U.S. ───, 132 S.Ct. 2566, 2577–78, 183 L.Ed.2d 450 (2012) (federal government is one of enumerated powers; by comparison, state governments have general governance power); *Dydell v. Taylor*, 332 S.W.3d 848, 853 & n. 3 (Mo. 2011) (same). The police power to legislate for the general welfare "embraces regulations designed to promote the public

convenience or the general prosperity." *Best v. Zoning Bd. of Adjustment,* 393 Pa. 106, 141 A.2d 606, 611 (1958). But, when the state pursues these ends by regulating or restricting individual rights, the exercise of the police power must be reasonable and non-discriminatory. *See United Artists,* 635 A.2d at 616 (quoting *Andress v. Zoning Bd. of Adjustment,* 410 Pa. 77, 188 A.2d 709, 712–13 (1963)).

Moreover, although plenary, the General Assembly's police power is not absolute; this distinction matters. Legislative power is subject to restrictions enumerated in the Constitution and to limitations inherent in the form of government chosen by the people of this Commonwealth. *See* PA. CONST. art. III, §§ 28–32 (enumerating restrictions).[34] Specifically, ours is a government in which the people have delegated general powers to the General Assembly, but with the express exception of certain fundamental rights reserved to the people in Article I of our Constitution. *See* PA. CONST. art. I, § 25 (reservation of powers in people); *see also Nat'l Wood Preservers, Inc. v. Commonwealth,* 489 Pa. 221, 414 A.2d 37, 44 (1980) (citing PA. CONST. art. I, § 27) ("maintenance of the environment is a fundamental objective of state power"). Section 25 of Article I articulates this concept in no uncertain terms: "[t]o guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate." Accordingly, Article I of our Constitution, as a general matter, is not a discrete textual source of police power delegated to the General Assembly by the people pursuant to which legislation is enacted. *See Page, supra,* 58 Pa. 338 at *7; *accord* Williams, 27 Okla. City U.L. Rev. at 207–08 (*inter alia,* quoting Frank P. Grad, The State Constitution: Its Function and Form for Our Time, 54 Va. L. Rev. 928,

---

**34.** The U.S. Constitution, of course, imposes additional limitations on the exercise of the General Assembly's police powers. *See, e.g., Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (state may not exercise power to protect natural resources in manner that conflicts with constitutional federal prerogatives); *see also Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–42, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Cleaver v. Bd. of Adjustment,* 414 Pa. 367, 200 A.2d 408, 412 (1964).

964–65 (1968)) (given nature of state legislatures as bodies already vested with plenary powers, emphasis in state constitutions is on limitations; "very nearly everything that may be included in a state constitution operates as a restriction on the legislature, for both commands and prohibitions directed to the other branches of the government or even to the individual citizen will operate to invalidate inconsistent legislation").[35]

Article I is the Commonwealth's Declaration of Rights, which delineates the terms of the social contract between government and the people that are of such "general, great and essential" quality as to be ensconced as "inviolate." PA. CONST. art. I, Preamble & § 25; *see also* PA. CONST. art. I, § 2 ("All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness."); *accord Edmunds*, 586 A.2d at 896 (since 1776, Declaration of Rights has been "organic part" of Constitution, and "appear[s] (not coincidentally) first in that document"). The Declaration of Rights assumes that the rights of the people articulated in Article I of our Constitution—vis-à-vis the government created by the people—are inherent in man's nature and preserved rather than created by

35. A majority of the members of the Court agreed with this construction in *Commonwealth v. Nat'l Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588 (1973) ("*Gettysburg*"), the first case decided by this Court involving the Environmental Rights Amendment. Mr. Justice Roberts wrote that the Commonwealth, prior to the adoption of Article I, Section 27, "possessed the inherent sovereign power to protect and preserve for its citizens the natural and historic resources now enumerated in Section 27. The express language of the constitutional amendment merely recites the 'inherent and independent rights' of mankind relative to the environment which are 'recognized and unalterably established' by Article I, Section 1 of the Pennsylvania Constitution." *Id.* at 595 (Roberts, J., concurring, joined by Manderino, J.); *accord id.* at 596 (Jones, C.J., dissenting, joined by Eagen, J.) ("As part of the declaration of rights embraced by Article I, the amendment confers certain enumerated rights upon the people of the Commonwealth and imposes upon the executive branch a fiduciary obligation to protect and enforce those rights."). To the extent that the two-Justice lead opinion in *Gettysburg* is susceptible to a contrary reading, that opinion is neither precedential, nor supported by the plain language of the Constitution. *See id.* at 592 (Opinion Announcing Judgment of Court by O'Brien, J., joined by Pomeroy, J.) (Section 27 gave General Assembly new police power to act in areas of purely esthetic or historic concern). *Id.*

the Pennsylvania Constitution. *See Appeal of Lord,* 368 Pa. 121, 81 A.2d 533, 537 (1951) ("right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right [that] does not owe its origin to constitutions [but] existed before them"); *Appeal of White,* 287 Pa. 259, 134 A. 409, 412 (1926) (same); *accord Edmunds,* 586 A.2d at 896 (Pennsylvania's original constitution of 1776 "reduce[d] to writing a deep history of unwritten legal and moral codes which had guided the colonists from the beginning of William Penn's charter in 1681."). This concept is illustrated in the basic two-part scheme of our Constitution, which has persisted since the original post-colonial document: one part establishes a government and another part limits that government's powers. *See Western Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331, 1334–35 (1986) (Opinion Announcing Judgment of Court) (recounting origin and evolution of Article I rights during post-colonial period). The Declaration of Rights is that general part of the Pennsylvania Constitution which limits the power of state government; additionally, "particular sections of the Declaration of Rights represent specific limits on governmental power." *Id.* at 1335 (citing *O'Neill v. White,* 343 Pa. 96, 22 A.2d 25 (1941). *Commonwealth ex rel. Smillie v. McElwee,* 327 Pa. 148, 193 A. 628 (1937); *Commonwealth ex rel. McCormick v. Reeder,* 171 Pa. 505, 33 A. 67 (1895)).[36]

36. The Court's recent decision in *Driscoll v. Corbett,* 620 Pa. 494, 69 A.3d 197 (2013) recognized that, in Pennsylvania, "the concept that certain rights are inherent to mankind, and thus are secured rather than bestowed by the Constitution, has a long pedigree in Pennsylvania that goes back at least to the founding of the Republic." *Id.* at 511, 69 A.3d at 208. The *Driscoll* Court also spoke to, but ultimately did not need to resolve, the question of whether a constitutional provision may be held infirm because it impinged upon Article I rights, and observed that "theoretically at least, there is some possibility that a constitutional amendment might impinge on inherent, inalienable rights otherwise recognized in the Constitution itself." *Id.* at 522, 69 A.3d at 214. The theoretical tension addressed in *Driscoll* involved whether the right of the people as articulated in Article I of the Constitution were "inviolate" as against the will of the people as expressed elsewhere in the Constitution (in that case in Article V, Section 16(b)). That theoretical tension is not present in this matter, where the citizens are asserting constitutional protection against infringement of their rights by a governmental action—the enactment of Act 13.

The first section of Article I "affirms, among other things, that all citizens 'have certain inherent and indefeasible rights.'" *Pap's*, 812 A.2d at 603 (quoting PA. CONST. art. I, § 1). Among the inherent rights of the people of Pennsylvania are those enumerated in Section 27, the Environmental Rights Amendment:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27 (Natural resources and the public estate).[37]

Before examining the application of Section 27 to the controversy before us, it is necessary to identify and appreciate the rights protected by this provision of the Constitution. *See* Saylor, 59 N.Y.U. Annual Survey of Am. L. at 309–10 (footnotes omitted) ("Methodologically, it seems to be a shared ideal that courts [conducting state constitutional analyses] should at the outset identify the constitutional value or norm at issue; and this should be accomplished via principles of state constitutional interpretation. Thus, the initial task resides in the domain of state constitutional law, encompassing the attendant debate concerning the fertility of unique state sources, content, and context as bases for independent interpretation."). Much as is the case with other Declaration of Rights provisions, Article I, Section 27 articulates principles of relatively broad application, whose development in practice often is left primarily to the judicial and legislative branches. *Accord Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County*

against infringement of their rights by a governmental action—the enactment of Act 13.

37. Unlike the Environmental Rights Amendment, the two other provisions of the Constitution that relate to the environment, which empower the Commonwealth to raise funds for conservation purposes, are included in Article VIII, addressing taxation and finance. *See* PA. CONST. art. VIII, §§ 15, 16.

*Bd. of Assessment Appeals,* 615 Pa. 463, 44 A.3d 3, 7 (2012) (*"Mesivtah"*) ("While the General Assembly necessarily must attempt to interpret the Constitution in carrying out its duties, the judiciary is not bound to the legislative judgment concerning the proper interpretation of constitutional terms."). Articulating judicial standards in the realm of constitutional rights may be a difficult task, as our developing jurisprudence vis-à-vis rights affirmed in the Pennsylvania Constitution well before environmental rights amply shows. *See, e.g., Pap's,* 812 A.2d at 603 (freedom of expression); *In re D.M.,* 566 Pa. 445, 781 A.2d 1161 (2001) (unreasonable searches and seizures); *United Artists,* 635 A.2d at 615–19 (taking without just compensation). The difficulty of the task, however, is not a ground upon which a court may or should abridge rights explicitly guaranteed in the Declaration of Rights. *See Pap's,* 812 A.2d at 607 (uncertainty of constitutional rights under evolving federal standard will not deter this Court "from effectuating [a] separate judgment under the Pennsylvania Constitution"); *cf. Commonwealth v. Gilmour Mfg. Co.,* 573 Pa. 143, 822 A.2d 676, 683 (2003) ("mere administrative ease cannot justify a regulation which is inconsistent with the language and purpose of the statute"). Nor is the difficulty of articulating standards an appropriate ground upon which a court may abdicate its duty and authority to interpret the Pennsylvania Constitution. *Mesivtah,* 44 A.3d at 7 ("ultimate power and authority to interpret the Pennsylvania Constitution rests with the Judiciary, and in particular with this Court"). *See, generally,* Saylor, 59 N.Y.U. Annual Survey of Am. L. at 310 (footnotes omitted) ("Experience teaches that determining the character and scope of vital state constitutional provisions is in itself a difficult task, one that has at times been omitted, perhaps by inadvertence, for convenience, or by necessity for lack of consensus. But there is little foundation for proceeding further absent concrete grounding in some identified, fundamental value. As a threshold matter, a determination should also be made whether the salient, constitutional value is, in some way, under-protected by the application of the prevailing rule or standard (or the absence of implementing doctrine), since, if impingement is lacking, con-

stitutional rulemaking for the sake of implementation would be unjustified.").

The actions brought under Section 27 since its ratification, which we will describe further below, have provided this Court with little opportunity to develop a comprehensive analytical scheme based on the constitutional provision. Moreover, it would appear that the jurisprudential development in this area in the lower courts has weakened the clear import of the plain language of the constitutional provision in unexpected ways. As a jurisprudential matter (and, as we explain below, as a matter of substantive law), these precedents do not preclude recognition and enforcement of the plain and original understanding of the Environmental Rights Amendment. *See District of Columbia v. Heller,* 554 U.S. 570, 625, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); *Mayle v. Pa. Dep't of Highways,* 479 Pa. 384, 388 A.2d 709, 717–18 (1978) (overruling long-standing precedent establishing judicial sovereign immunity rule justified in part upon constitutional grounds, as inconsistent with plain language of Constitution); *Dickson,* 918 A.2d at 108–09 (upon first opportunity to address plain language of statute, Court disapproved long-standing Superior Court precedent as inconsistent with plain language of statute); *Gilmour Mfg. Co.,* 822 A.2d at 681 (upon first opportunity to determine whether long-standing administrative regulation is consonant with enabling statute, court found regulation inconsistent). *Accord* Saylor, 59 N.Y.U. Annual Survey of Am. L. at 310. The matter now before us offers appropriate circumstances to undertake the necessary explication of the Environmental Rights Amendment, including foundational matters. *See Scampone,* 57 A.3d at 604–05 (decisional law generally develops incrementally; we render determinations that spring from facts before us, while recognizing that task is not simply to decide this case, but also to provide guidance upon broader legal issue. "By necessity, this undertaking requires breadth of vision and consideration of both sides of the coin: the facts of a given case on one side, and the law, which will almost always be more conceptual, on the other.").

### 4. Plain language

Initially, we note that the Environmental Rights Amendment accomplishes two primary goals, via prohibitory and non-prohibitory clauses: (1) the provision identifies protected rights, to prevent the state from acting in certain ways, and (2) the provision establishes a nascent framework for the Commonwealth to participate affirmatively in the development and enforcement of these rights. Section 27 is structured into three mandatory clauses that define rights and obligations to accomplish these twin purposes; and each clause mentions "the people." [38]

■■■ A legal challenge pursuant to Section 27 may proceed upon alternate theories that either the government has infringed upon citizens' rights or the government has failed in its trustee obligations, or upon both theories, given that the two paradigms, while serving different purposes in the amendatory scheme, are also related and overlap to a significant degree. *Accord* 1970 Pa. Legislative Journal–House 2269, 2272 (April 14, 1970) (Section 27 "can be viewed almost as two separate bills—albeit there is considerable interaction between them, and the legal doctrines invoked by each should tend mutually to support and reinforce the other because of their inclusion in a single amendment."). Facing a claim premised upon Section 27 rights and obligations, the courts must conduct a principled analysis of whether the Environmental Rights Amendment has been violated. *See Payne,* 361 A.2d at 273.

■■■ To determine the merits of a claim that the General Assembly's exercise of its police power is unconstitutional, we inquire into more than the intent of the legislative body and focus upon the effect of the law on the right allegedly

**38.** The Environmental Rights Amendment originated in the Pennsylvania House of Representatives as House Bill No. 958. The bill eventually received unanimous support in both houses and, perhaps as a direct result, its legislative record consists simply of a statement in support offered by its primary sponsor, Representative Franklin L. Kury. The statement includes a pre-adoption "Analysis of HB 958, the Proposed Pennsylvania Environmental Declaration of Rights" by Robert Broughton, Associate Professor of Law at Duquesne University Law School.

violated. *See, e.g., Lehman v. Pa. State Police,* 576 Pa. 365, 839 A.2d 265, 270–71 (2003). The General Assembly's declaration of policy does not control the judicial inquiry into constitutionality. Indeed, "for this Court to accept the notion that legislative pronouncements of benign intent can control a constitutional inquiry ... would be tantamount to ceding our constitutional duty, and our independence, to the legislative branch." *Stilp,* 905 A.2d at 945.

### I. First Clause of Section 27—Individual Environmental Rights

■■■ According to the plain language of Section 27, the provision establishes two separate rights in the people of the Commonwealth. The first—in the initial, prohibitory clause of Section 27—is the declared "right" of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment.[39] This clause affirms a limitation on the state's power to act contrary to this right. While the subject of the right certainly may be regulated by the Commonwealth, any regulation is "subordinate to the enjoyment of the right ... [and] must be regulation purely, not destruction"; laws of the Commonwealth that unreasonably impair the right are unconstitutional. *Page,* 58 Pa. 338 at *8; *see also Hartford Accident & Indem. Co. v. Ins. Comm'r,* 505 Pa. 571, 482 A.2d 542, 548–49 (1984); *Butler,* 328 A.2d at 855–56.

The terms "clean air" and "pure water" leave no doubt as to the importance of these specific qualities of the environment

**39.** The Environmental Rights Amendment speaks of the rights of "the people." The only other constitutional provision similarly formulated is interpreted to guarantee a constitutional right personal to each citizen. *Compare* PA. CONST. art. I, § 27 with PA. CONST. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...."); *see, e.g., Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199 (2007) (criminal defendant's evidentiary challenge premised upon Section 8 of Article I); *Edmunds,* 586 A.2d at 898 (unlike federal counterpart, Article I, Section 8 analysis premised, *inter alia,* upon individual right to privacy); *accord* 1970 Pa. Legislative Journal–House 2269, 2273 (April 14, 1970) (first clause of Section 27 affirms constitutional right "in individual citizens").

for the proponents of the constitutional amendment and for the ratifying voters. Moreover, the constitutional provision directs the "preservation" of broadly defined values of the environment, a construct that necessarily emphasizes the importance of each value separately, but also implicates a holistic analytical approach to ensure both the protection from harm or damage and to ensure the maintenance and perpetuation of an environment of quality for the benefit of future generations.

 Although the first clause of Section 27 does not impose express duties on the political branches to enact specific affirmative measures to promote clean air, pure water, and the preservation of the different values of our environment, the right articulated is neither meaningless nor merely aspirational. The corollary of the people's Section 27 reservation of right to an environment of quality is an obligation on the government's behalf to refrain from unduly infringing upon or violating the right, including by legislative enactment or executive action. Clause one of Section 27 requires each branch of government to consider in advance of proceeding the environmental effect of any proposed action on the constitutionally protected features. The failure to obtain information regarding environmental effects does not excuse the constitutional obligation because the obligation exists *a priori* to any statute purporting to create a cause of action.[40]

Moreover, as the citizens argue, the constitutional obligation binds all government, state or local, concurrently. *Franklin Twp.*, 452 A.2d at 722 & n. 8 (citing Section 27, Court stated that protection and enhancement of citizens' quality of life "is a constitutional charge which must be respected by all levels of government in the Commonwealth"); *see Hartford*, 482 A.2d at 549 (Declaration of Rights provision "circumscribes the conduct of state and local government entities and officials

40. We recognize that there is existing lower court jurisprudence which suggests, to the contrary, that Section 27 rights are merely co-extensive with statutory protections. *See, e.g., Larwin Multihousing Pa. Corp. v. Com.*, 19 Pa.Cmwlth. 181, 343 A.2d 83, 89 n. 9 (1975). This suggestion is discussed in more detail *infra*.

of all levels in their formulation, interpretation and enforcement of statutes, regulations, ordinances and other legislation as well as decisional law."). Meanwhile, as with any constitutional challenge, the role of the judiciary when a proper and meritorious challenge is brought to court includes the obligation to vindicate Section 27 rights. *See Pap's,* 812 A.2d at 611 (although Court generally looks to federal law in articulating freedom of expression constitutional jurisprudence, where federal law is unsettled, "Pennsylvania citizens should not have the contours of their fundamental rights under our charter rendered uncertain, unknowable, or changeable.... There is an entirely different jurisprudential and constitutional imperative at work when this Court, which is the final word on the meaning of our own charter in a properly joined case or controversy, is charged with the duty to render a judgment."); *accord* Pa. Legislative Journal–House at 2272 (proposed amendment is more than statement of policy; it is intended to create legally enforceable right to protect and enhance environmental quality); Franklin L. Kury, *Clean Politics, Clean Streams: A Legislative Autobiography and Reflections,* app. C (2011) (appendix includes copy of questions and answers document distributed to public prior to referendum on Environmental Rights Amendment).[41] Courts may fashion an appropriate remedy to vindicate the environmental rights at issue. *See Edmunds,* 586 A.2d at 905–06 (rejecting federal

41. Among the questions and answers distributed prior to the May 18, 1971 referendum and intended to aid voters in understanding the proposed constitutional amendment was the following:

Q. Will the amendment make any real difference in the fight to save the environment?

A. Yes, once [the amendment] is passed and the citizens have a legal right to a decent environment under the State Constitution, every governmental agency or private entity, which by its actions may have an adverse effect on the environment, must consider the people's rights before it acts. If the public's rights are not considered, the public could seek protection of its legal rights in the environment by an appropriate law suit....

Q. Will there be any "teeth" in the law, if passed?

A. It will be up to the courts to apply the three broad principles [articulated in the amendment] to legal cases. However, having this law passed will strengthen substantially the legal weapons available to protect our environment from further destruction....

good faith exception to exclusionary rule—a judicially-created remedy for constitutional violation—in search warrant cases, and finding broader protection for privacy under Article I, Section 8 of Pennsylvania Constitution provision addressing search warrants).

Also apparent from the language of the constitutional provision are the substantive standards by which we decide a claim for violation of a right protected by the first clause of Section 27. The right to "clean air" and "pure water" sets plain conditions by which government must abide. We recognize that, as a practical matter, air and water quality have relative rather than absolute attributes. Furthermore, state and federal laws and regulations both govern "clean air" and "pure water" standards and, as with any other technical standards, the courts generally defer to agency expertise in making a factual determination whether the benchmarks were met. *Accord* 35 P.S. § 6026.102(4) (recognizing that General Assembly "has a duty" to implement Section 27 and devise environmental remediation standards). That is not to say, however, that courts can play no role in enforcing the substantive requirements articulated by the Environmental Rights Amendment in the context of an appropriate challenge. Courts are equipped and obliged to weigh parties' competing evidence and arguments, and to issue reasoned decisions regarding constitutional compliance by the other branches of government. The benchmark for decision is the express purpose of the Environmental Rights Amendment to be a bulwark against actual or likely degradation of, *inter alia,* our air and water quality. *Accord Montana Env'l Info. Ctr. v. Dep't of Env'l Quality,* 296 Mont. 207, 988 P.2d 1236, 1249 (1999) (constitutional "inalienable ... right to a clean and healthful environment" did not protect merely against type of environmental degradation "conclusively linked" to ill health or physical endangerment and animal death, but could be invoked to provide anticipatory and preventative protection against unreasonable degradation of natural resources).

Section 27 also separately requires the preservation of "natural, scenic, historic and esthetic values of the environ-

ment." PA. CONST. art. I, § 27. By calling for the "preservation" of these broad environmental values, the Constitution again protects the people from governmental action that unreasonably causes actual or likely deterioration of these features. The Environmental Rights Amendment does not call for a stagnant landscape; nor, as we explain below, for the derailment of economic or social development; nor for a sacrifice of other fundamental values. But, when government acts, the action must, on balance, reasonably account for the environmental features of the affected locale, as further explained in this decision, if it is to pass constitutional muster. *Accord* John C. Dernbach, *Taking the Pennsylvania Constitution Seriously When It Protects the Environment: Part II—Environmental Rights and Public Trust,* 104 Dickinson L. Rev. 97, 17–20 (1999).

The right delineated in the first clause of Section 27 presumptively is on par with, and enforceable to the same extent as, any other right reserved to the people in Article I. *See* PA. CONST. art. I, § 25 ("everything" in Article I is excepted from government's general powers and is to remain inviolate); *accord* 1970 Pa. Legislative Journal–House at 2272 ("If we are to save our natural environment we must therefore give it the same Constitutional protection we give to our political environment."); Kury, app. C (Questions and answers).[42] This parity between constitutional provisions may serve to limit the extent to which constitutional environmental rights may be asserted against the government if such rights are perceived as potentially competing with, for example, property rights as guaranteed in Sections 1, 9, and 10. PA. CONST. art. I, §§ 1, 9, 10, 27; *see, generally, Norton v. Glenn,* 580 Pa. 212, 860 A.2d 48, 58 (2004) (referring to "seesawing balance between the constitutional rights of freedom of expression and of safeguarding

42. The questions and answers document also explained the effect of the amendment on governmental power:

Q. Won't the right of eminent domain still exist?
A. Yes, however, it will have to be exercised in conformity with this amendment. A highway department or utility company could not take land without fully considering the public's right to a decent environment. [The amendment] should force a much more judicious use of eminent domain.

one's reputation: protection of one of those rights quite often leads to diminution of the other"); *Driscoll v. Corbett,* 620 Pa. 494, 515, 69 A.3d 197, 210 (2013) (referring to "manifest need" to balance citizens' competing constitutionally-grounded rights to equal protection of laws and to amend governing charter as they see fit).

Relatedly, while economic interests of the people are not a specific subject of the Pennsylvania Declaration of Rights, we recognize that development promoting the economic well-being of the citizenry obviously is a legitimate state interest. In this respect, and relevant here, it is important to note that we do not perceive Section 27 as expressing the intent of either the unanimous legislative sponsors or the ratifying voters to deprive persons of the use of their property or to derail development leading to an increase in the general welfare, convenience, and prosperity of the people. But, to achieve recognition of the environmental rights enumerated in the first clause of Section 27 as "inviolate" necessarily implies that economic development cannot take place at the expense of an unreasonable degradation of the environment. As respects the environment, the state's plenary police power, which serves to promote said welfare, convenience, and prosperity, must be exercised in a manner that promotes sustainable property use and economic development. *See* John C. Dernbach, *Taking the Pennsylvania Constitution Seriously When It Protects the Environment: Part I—An Interpretive Framework for Article I, Section 27,* 103 Dickinson L. Rev. 693, 718–20 (1999); *accord* 1970 Pa. Legislative Journal–House at 2270 ("the measure of our progress is not just what we have but how we live, that it is not man who must adapt himself to technology but technology which must be adapted to man").

## II. *The Second and Third Clauses of Section 27—The Public Trust*

The second right reserved by Section 27 is the common ownership of the people, including future generations, of Pennsylvania's public natural resources.[43] On its terms, the

---

**43.** The sovereign's powers flowing from the fiction of public "ownership" over natural resources is limited as recognized in *Hughes v.*

second clause of Section 27 applies to a narrower category of "public" natural resources than the first clause of the provision. The drafters, however, left unqualified the phrase public natural resources, suggesting that the term fairly implicates relatively broad aspects of the environment, and is amenable to change over time to conform, for example, with the development of related legal and societal concerns. *Accord* 1970 Pa. Legislative Journal–House at 2274. At present, the concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property. *See, e.g.,* 30 Pa.C.S. § 721 (fish: acquisition of property by Commonwealth); 34 Pa.C.S. § 103(a) (Commonwealth's ownership of game or wildlife); 71 P.S. § 1340.302(a) (acquisition and disposition of Commonwealth-owned forests). *See also* 35 P.S. §§ 691.1, 691.501, 691.503 (pollution of Commonwealth's waters, as broadly defined by act, is public nuisance; protection required); 35 P.S. § 1451 (public interest in quantity of water; authorizes immediate action by governor to conserve natural resources threatened by drought and forest fire); 35 P.S. §§ 4003, 4013 (violation of Air Pollution Control Act and

*Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (state may not exercise power over natural resources in manner that conflicts with constitutional federal prerogatives). *Hughes* overruled a prior case, *Geer v. State of Conn.,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), in which the Court had recognized a state's power to regulate the taking and limit out-of-state transportation of wildlife based on the premise of the sovereign's ownership of the state's wildlife. The sovereign ownership concept eroded over the years and, in *Hughes,* the High Court overruled *Geer,* stating that the state ownership doctrine was a legal fiction, which did not conform to practical realities. *Hughes,* 441 U.S. at 334–35, 99 S.Ct. 1727. In subsequent cases, the *Hughes* decision has been interpreted not to modify the state government's duties to its citizens that arise under the concept of common ownership of the people or the sovereign's duties as public trustee. *See, e.g., Owsichek v. State, Guide Licensing & Control Bd.,* 763 P.2d 488, 495 n. 12 (Alaska 1988); *Complaint of Steuart Transp. Co.,* 495 F.Supp. 38, 40 (E.D.Va.1980) (right and duty to protect and preserve public's interest in natural wildlife resources does not derive from ownership of resources but from duty owing to the people) (citing *Toomer v. Witsell,* 334 U.S. 385, 408, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948)).

related regulations, orders, permits is public nuisance); 35 P.S. §§ 4501, 4502 (immunity for shooting ranges in public nuisance suits for noise pollution; assumes noise pollution regulated at local level); *accord* Dernbach, 104 Dickinson L. Rev. at 10–11.

The legislative history of the amendment supports this plain interpretation. In its original draft, the second clause of the proposed Environmental Rights Amendment included an enumeration of the public natural resources to be protected. The resources named were "the air, waters, fish, wildlife, and the public lands and property of the Commonwealth...." But, after members of the General Assembly expressed disquietude that the enumeration of resources would be interpreted "to limit, rather than expand, [the] basic concept" of public natural resources, Section 27 was amended and subsequently adopted in its existing, unrestricted, form. The drafters seemingly signaled an intent that the concept of public natural resources would be flexible to capture the full array of resources implicating the public interest, as these may be defined by statute or at common law. *See* 1970 Pa. Legislative Journal–House at 2271–75.

The third clause of Section 27 establishes the Commonwealth's duties with respect to Pennsylvania's commonly-owned public natural resources, which are both negative (*i.e.*, prohibitory) and affirmative (*i.e.*, implicating enactment of legislation and regulations). The provision establishes the public trust doctrine with respect to these natural resources (the corpus of the trust), and designates "the Commonwealth" as trustee and the people as the named beneficiaries. *Payne*, 361 A.2d at 272. The terms of the trust are construed according to the intent of the settlor which, in this instance, is "the people." *See Estate of Sykes*, 477 Pa. 254, 383 A.2d 920, 921 (1978) ("To ascertain this intent, a court examines the words of the instrument and, if necessary, the scheme of distribution, the circumstances surrounding execution of the [instrument] and other facts bearing on the question.").

"Trust" and "trustee" are terms of art that carried legal implications well developed at Pennsylvania law at the time

the amendment was adopted. *Accord* 1 Pa.C.S. § 1903(a) (technical words that have acquired peculiar and appropriate meaning to be interpreted according to such meaning); *Michigan Coalition of State Employee Unions v. Michigan Civil Serv. Comm'n*, 465 Mich. 212, 634 N.W.2d 692, 698 (2001) ("[I]f a constitutional phrase is a technical legal term or a phrase of art in the law, the phrase will be given the meaning that those sophisticated in the law understood at the time of enactment unless it is clear from the constitutional language that some other meaning was intended."). The statement offered in the General Assembly in support of the amendment explained the distinction between the roles of proprietor and trustee in these terms:

Under the proprietary theory, government deals at arms['] length with its citizens, measuring its gains by the balance sheet profits and appreciation it realizes from its resources operations. Under the trust theory, it deals with its citizens as a fiduciary, measuring its successes by the benefits it bestows upon all its citizens in their utilization of natural resources under law.

1970 Pa. Legislative Journal–House at 2273. *See also Nat'l Audubon Soc'y v. Superior Court*, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 724 (1983) ("[P]ublic trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust."). The trust relationship does not contemplate a settlor placing blind faith in the uncontrolled discretion of a trustee; the settlor is entitled to maintain some control and flexibility, exercised by granting the trustee considerable discretion to accomplish the purposes of the trust. *See Lang v. Commonwealth*, 515 Pa. 428, 528 A.2d 1335, 1345 (1987). An exposition here is not necessary on all the ramifications that the term trustee may have in the context of Section 27. As in our discussion of the Environmental Rights Amendment generally, we merely outline foun-

dational principles relevant to our disposition of this matter. *See Scampone, supra.*

This environmental public trust was created by the people of Pennsylvania, as the common owners of the Commonwealth's public natural resources; this concept is consistent with the ratification process of the constitutional amendment delineating the terms of the trust. The Commonwealth is named trustee and, notably, duties and powers attendant to the trust are not vested exclusively in any single branch of Pennsylvania's government. The plain intent of the provision is to permit the checks and balances of government to operate in their usual fashion for the benefit of the people in order to accomplish the purposes of the trust. This includes local government. *See Franklin Twp.,* 452 A.2d at 722 & n. 7; *accord Geer v. State of Conn.,* 161 U.S. 519, 529, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (with development of free institutions, power lodged in state is to be exercised "as trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good") *overruled on other grounds by Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (see explanatory footnote 43, *supra* ).

■■ As trustee, the Commonwealth is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct. The explicit terms of the trust require the government to "conserve and maintain" the corpus of the trust. *See* PA. CONST. art. I, § 27. The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources. As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust—the public natural resources—with prudence, loyalty, and impartiality. *See In re Mendenhall,* 484 Pa. 77, 398 A.2d 951, 953 (1979) (citing RESTATEMENT (SECOND) OF TRUSTS § 174) (duty of prudence generally requires trustee to exercise ordinary skill, prudence, and caution in managing corpus of trust); *Lang, supra,* 528 A.2d at 1342 (citing RESTATEMENT (SECOND)

OF TRUSTS § 170) (trustee has duty of loyalty to administer trust solely in beneficiary's interest and not his own); *In re Hamill's Estate*, 487 Pa. 592, 410 A.2d 770, 773 (1980) (citing RESTATEMENT (SECOND) OF TRUSTS § 232) (trustee has duty of impartiality).

As the parties here illustrate, two separate Commonwealth obligations are implicit in the nature of the trustee-beneficiary relationship. The first obligation arises from the prohibitory nature of the constitutional clause creating the trust, and is similar to other negative rights articulated in the Declaration of Rights. Stated otherwise, the Commonwealth has an obligation to refrain from performing its trustee duties respecting the environment unreasonably, including via legislative enactments or executive action. As trustee, the Commonwealth has a duty to refrain from permitting or encouraging the degradation, diminution, or depletion of public natural resources, whether such degradation, diminution, or depletion would occur through direct state action or indirectly, *e.g.*, because of the state's failure to restrain the actions of private parties. In this sense, the third clause of the Environmental Rights Amendment is complete because it establishes broad but concrete substantive parameters within which the Commonwealth may act. *Compare* PA. CONST. art. I, § 27 *with, e.g.*, PA. CONST. art. I, § 28. This Court perceives no impediment to citizen beneficiaries enforcing the constitutional prohibition in accordance with established principles of judicial review. *See, e.g.*, *Adoption of Walker*, 360 A.2d at 605–06 (Adoption Act provision is unconstitutional because it denies unwed fathers parental privileges accorded to unwed mothers solely on basis of gender, in violation of Article I, Section 28, which states that "[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual"); *Hartford*, 482 A.2d at 549 (insurance commissioner's decision to rescind approval of company's gender-based rate schedule proper because commissioner had duty to interpret statutory language prohibiting "unfairly discriminatory rates" to include Article I, Section 28 gender-based considerations).

The second obligation peculiar to the trustee is, as the Commonwealth recognizes, to act affirmatively to protect the environment, via legislative action. *Accord Geer*, 161 U.S. at 534, 16 S.Ct. 600 (trusteeship for benefit of state's people implies legislative duty "to enact such laws as will best preserve the subject of the trust, and secure its beneficial use in the future to the people of the state"). The General Assembly has not shied from this duty; it has enacted environmental statutes, most notably the Clean Streams Act, see 35 P.S. § 691.1 *et seq.;* the Air Pollution Control Act, see 35 P.S. § 4001 *et seq.;* and the Solid Waste Management Act, see 35 P.S. § 6018.101 *et seq.* As these statutes (and related regulations) illustrate, legislative enactments serve to define regulatory powers and duties, to describe prohibited conduct of private individuals and entities, to provide procedural safeguards, and to enunciate technical standards of environmental protection. These administrative details are appropriately addressed by legislation because, like other "great ordinances" in our Declaration of Rights, the generalized terms comprising the Environmental Rights Amendment do not articulate them.[44] The call for complementary legislation, however, does not override the otherwise plain conferral of rights upon the people. *Accord* Jose L. Fernandez, *State Constitutions, Environmental Rights Provisions, and the Doctrine of Self-Execution: A Political Question?*, 17 Harv. Envtl. L.Rev. 333, 352 (1993) (if constitutional provision appears to be complete and enforceable, language inviting legislative action should not be interpreted "as expressing an intent to withhold enforcement until the legislature acts"). *See, e.g.,* PA. CONST. art. I, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."); *Mayle,*

44. Mr. Justice Holmes famously used the phrase "great ordinances" to describe the provisions of the Bill of Rights of the U.S. Constitution. *Springer v. Philippine Islands,* 277 U.S. 189, 209, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (Holmes, J., dissenting, joined by Brandeis, J.). *Accord Vreeland v. Byrne,* 72 N.J. 292, 370 A.2d 825, 831–32 (1977).

388 A.2d at 717–18 (Article I, Section 11 affirms right to remedy by due course of law and second clause, which preserves for General Assembly opportunity to make Commonwealth immune in certain cases, does not establish sovereign immunity as "constitutional rule unless the Legislature decides otherwise.").

Of course, the trust's express directions to conserve and maintain public natural resources do not require a freeze of the existing public natural resource stock; rather, as with the rights affirmed by the first clause of Section 27, the duties to conserve and maintain are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development. *Accord* 1970 Pa. Legislative Journal–House at 2273; *Nat'l Audubon Soc'y,* 189 Cal.Rptr. 346, 658 P.2d at 727–29 (public trust doctrine permits sovereign to utilize trust resources required for prosperity and habitability of state, even if uses harm trust corpus; but, before state courts and agencies approve use of trust resources, they must consider effect of use upon public trust interests and attempt, so far as feasible, to avoid or minimize any harm to those interests; in that dispute, absence of "objective study" of impact on natural resource was deemed to hamper proper decision).

Within the public trust paradigm of Section 27, the beneficiaries of the trust are "all the people" of Pennsylvania, including generations yet to come. The trust's beneficiary designation has two obvious implications: first, the trustee has an obligation to deal impartially with all beneficiaries and, second, the trustee has an obligation to balance the interests of present and future beneficiaries. *See In re Hamill's Estate,* 487 Pa. 592, 410 A.2d 770, 773 (1980) (citing RESTATEMENT (SECOND) OF TRUSTS § 232). Dealing impartially with all beneficiaries means that the trustee must treat all equitably in light of the purposes of the trust. *Accord* 20 Pa.C.S. § 7773.[45] Here, the duty of impartiality implicates questions of access to and distribution of public natural resources, including consum-

45. Although the Environmental Rights Amendment creates an express trust that is presumptively subject to the Uniform Trust Act, *see* 20 Pa.C.S. §§ 7702, 7731, the "ultimate power and authority to interpret"

able resources such as water, fish, and game. *See* Dernbach, 104 Dickinson L. Rev. at 14. The second, cross-generational dimension of Section 27 reinforces the conservation imperative: future generations are among the beneficiaries entitled to equal access and distribution of the resources, thus, the trustee cannot be shortsighted. *Accord* 1970 Pa. Legislative Journal–House at 2273 ("[s]ince the public trust doctrine would implicitly preclude the wasting of resources, the explicit inclusion of future generations as part of the relevant public might be considered superfluous," although situations may arise where such inclusion may prove wise). Moreover, this aspect of Section 27 recognizes the practical reality that environmental changes, whether positive or negative, have the potential to be incremental, have a compounding effect, and develop over generations. The Environmental Rights Amendment offers protection equally against actions with immediate severe impact on public natural resources and against actions with minimal or insignificant present consequences that are actually or likely to have significant or irreversible effects in the short or long term. *See id.*[46]

### 5. Other Considerations

Section 27 is explicit regarding the respective rights of the people and obligations of the Commonwealth, and consider-

the constitutional command regarding the purposes and obligations of the public trust created by Section 27 "rests with the Judiciary, and in particular with this Court." *Mesivtah*, 44 A.3d at 7.

46. In undertaking its constitutional cross-generational analysis, the Commonwealth trustee should be aware of and attempt to compensate for the inevitable bias toward present consumption of public resources by the current generation, reinforced by a political process characterized by limited terms of office. *See* Barton H. Thompson Jr., *Environmental Policy and State Constitutions: The Potential Role of Substantive Guidance*, 27 Rutgers L.J. 863, 900–01 (1996); *see, e.g., Fox*, 342 A.2d at 482 ("The only environmental result from which any serious injury might result is the possible future loss of current open space to future residential and commercial development, which may be a remote consequence of the installation of the sewer lines. This, however, is not the type of harm which would justify the [Department of Environmental Protection] in now refusing a sewer construction permit, and, as to current pollution, of course, the [Environmental Hearing Board] has clearly found that such would be kept to a minimum.").

ations upon which we typically rely in statutory construction confirm our development of the basic principles enunciated by its drafters. Among the relevant considerations are the occasion and necessity for the constitutional provision, the legislative history and circumstances of enactment and ratification, the mischief to be remedied and the object to be attained. *See Omar*, 981 A.2d at 185; 1 Pa.C.S. § 1921(c).

It is not a historical accident that the Pennsylvania Constitution now places citizens' environmental rights on par with their political rights. Approximately three and a half centuries ago, white pine, Eastern hemlock, and mixed hardwood forests covered about 90 percent of the Commonwealth's surface of over 20 million acres. The Pennsylvania Lumber Museum, *History*, online at www.lumbermuseum.org/history. php (last accessed on May 23, 2013). Two centuries later, the state experienced a lumber harvesting industry boom that, by 1920, had left much of Pennsylvania barren. "Loggers moved to West Virginia and to the lake states, leaving behind thousands of devastated treeless acres," abandoning sawmills and sounding the death knell for once vibrant towns. Regeneration of our forests (less the diversity of species) has taken decades. *See id.; accord* Pa. Dep't of Envtl. Protection, *Pennsylvania Forestry*, online at www.portal.state.pa.us/ portal/server.pt?open=514&objID=588459&mode=2 (last accessed on May 23, 2013).

Similarly, by 1890, "game" wildlife had dwindled "as a result of deforestation, pollution and unregulated hunting and trapping." Pa. Game Comm'n, *About the Pennsylvania Game Commission*, online at www.portal.state.pa.us/portal/server.pt? open=514&objID=983474&mode=2 (last accessed on May 23, 2013). As conservationist John M. Phillips [47] wrote, "In

47. John M. Phillips (1861–1953) of Pittsburgh, Pennsylvania, was a founder and long-time president of the Phillips Mine Supply Company. He was also a long-term president of the Board of Game Commissioners of Pennsylvania; a trustee of the American Wildlife Institute; and a member of the National Executive Board of the Boy Scouts of America. Pa. Hist. & Museum Comm'n, *The Pennsylvania State Archives*, online at www.phmc.state.pa.us/bah/dam/mg/mg161.htm (last accessed on May 23, 2013).

1890, the game had practically disappeared from our state. . . .
We had but few game laws and those were supposed to be
enforced by township constables, most of whom were politi-
cians willing to trade with their friends the lives of our beasts
and birds in exchange for votes." Explore Pa. History, *First
State Game Lands Historical Marker*, online at http://explore
pahistory.com/hmarker.php?markerId=1-A-140 (last accessed
on May 23, 2013). In 1895, the General Assembly created the
Pennsylvania Game Commission and, two years later, adopted
a package of new game laws to protect endangered popula-
tions of deer, elk, waterfowl, and other game birds. Over the
following decades, the Game Commission sought to restore
populations of wildlife, by managing and restocking species
endangered or extinct in Pennsylvania, establishing game
preserves in state forests, and purchasing state game lands.
Sustained efforts of the Game Commission over more than a
century (coupled with restoration of Pennsylvania's forests)
returned a bounty of wildlife to the Commonwealth. *See id.;
see also* Pa. Game Comm'n, *Wildlife Conservation History
(1643 to Present)*, online at www.portal.state.pa.us/portal/
server.pt?open=514&objID=683433&mode=2 (last accessed
on May 23, 2013).

The third environmental event of great note was the indus-
trial exploitation of Pennsylvania's coalfields from the middle
of the nineteenth well into the twentieth century. During that
time, the coal industry and the steel industry it powered were
the keystone of Pennsylvania's increasingly industrialized
economy. *See* Pa. Dep't of Envtl. Protection, *Operation Scar-
lift: The After Effects of Over 100 Years of Coal Mining in
Pennsylvania and Current Programs to Combat Them* (1967),
online at www.portal.state.pa.us/portal/server.pt/community/
mine_reclamation_operation_scarlift (last accessed on May 23,
2013). The two industries provided employment for large
numbers of people and delivered tremendous opportunities for
small and large investors. "[W]hen coal was a reigning mon-
arch," the industry operated "virtually unrestricted" by either
the state or federal government. The result, in the opinion of
many, was devastating to the natural environment of the coal-

rich regions of the Commonwealth, with long-lasting effects on human health and safety, and on the esthetic beauty of nature. These negative effects include banks of burning or non-burning soft sooty coal and refuse; underground mine fires; pollution of waters from acid mine drainage; subsidence of the soil; and landscapes scarred with strip mining pits and acid water impoundments. *See id.* In the mid–1960s, the Commonwealth began a massive undertaking to reclaim over 250,000 acres of abandoned surface mines and about 2,400 miles of streams contaminated with acid mine drainage, which did not meet water quality standards. *See* Pa. Dep't of Envtl. Protection, *Pennsylvania's Comprehensive Plan for Abandoned Mine Reclamation* (1998), online at www.portal.state.pa.us/portal/server.pt?open=514&objID=588910&mode=2 (last accessed on May 23, 2013). The cost of projects to date has been in the hundreds of millions of dollars, and the Department of Environmental Protection has predicted that an estimated 15 billion dollars is in fact necessary to resolve the problem of abandoned mine reclamation alone. *Id.*

The overwhelming tasks of reclamation and regeneration of the Commonwealth's natural resources, along with localized environmental incidents (such as the 1948 Donora smog tragedy in which twenty persons died of asphyxiation and 7,000 persons were hospitalized because of corrosive industrial smoke; the 1959 Knox Mine disaster in which the Susquehanna River disappeared into the Pittston Coal Vein; the 1961 Glen Alden mine water discharge that killed more than 300,-000 fish; and the Centralia mine fire that started in 1962, is still burning, and led to the relocation of all residents in 1984) has led to the gradual enactment of statutes protecting our environment. The drafters of the Environmental Rights Amendment recognized and acknowledged the shocks to our environment and quality of life:

> We seared and scarred our once green and pleasant land with mining operations. We polluted our rivers and our streams with acid mine drainage, with industrial waste, with sewage. We poisoned our 'delicate, pleasant and wholesome' air with the smoke of steel mills and coke ovens and

with the fumes of millions of automobiles. We smashed our highways through fertile fields and thriving city neighborhoods. We cut down our trees and erected eyesores along our roads. We uglified our land and we called it progress. 1970 Pa. Legislative Journal–House at 2270 (quoting anonymous 1698 description of Penn's Woods air).

With these events in the recent collective memory of the General Assembly, the proposed Environmental Rights Amendment received the unanimous assent of both chambers during both the 1969–1970 and 1971–1972 legislative sessions. *See* Joint Resolution No. 4 of 1970, H.B. No. 958 & Joint Resolution No. 3 of 1971, H.B. No. 31 (enacted); *see also* PA. CONST. art. XI, § 1 (Proposal of amendments by the General Assembly and their adoption).[48] Pennsylvania voters ratified the proposed amendment of the citizens' Declaration of Rights on May 18, 1971, with a margin of nearly four to one, receiving 1,021,342 votes in favor and 259,979 opposed. Dernbach, 103 Dickinson L.Rev. at 695 n.2 (citing Franklin L. Kury, The Environmental Amendment to the Pennsylvania Constitution: Twenty Years Later and Largely Untested, 1 Vill. Envtl. L.J. 123, 123 (1990)); *see also Gettysburg*, 311 A.2d at 596 n. 1 (Jones, C.J., dissenting) (amendment received more affirmative votes than any candidate seeking election to statewide office that same day).[49]

48. During the 1969–1970 session (House Bill 958), the proposed amendment received 188 votes in favor and 0 against in the House, and 39 votes in favor and 0 against in the Senate; on second consideration (House Bill 31), the amendment received similar unanimous support of 199 votes in favor and 0 against in the House, and 45 votes in favor and 0 against in the Senate. Representative Kury of Northumberland, as primary sponsor of the bill, noted that the proposed amendment was "a great step forward in assuring for ourselves and our posterity a natural environment of quality, rather than relegating ourselves to extinction or a mere survival level of existence." 1970 Pa. Legislative Journal–House at 2271. Representative Kury introduced into the record with the unanimous assent of the House a statement and supplemental legal analysis from Professor Robert Broughton, which offered the anticipatory elucidation of the proposed amendment to which we cite throughout this Opinion. *See id.* at 2272–81.

49. Pennsylvania voters considered five constitutional amendments at the referendum of May 18, 1971. Of the four other proposed amendments, two were adopted by much smaller margins than Section 27,

The decision to affirm the people's environmental rights in a Declaration or Bill of Rights, alongside political rights, is relatively rare in American constitutional law. In addition to Pennsylvania, Montana and Rhode Island are the only other states of the Union to do so. *See* Pa. Const. art. I, § 27 (1971); Mt. Const. art. II, § 3 (1889); R.I. Const. art. I, § 17 (1970). Three other states—Hawaii, Illinois, and Massachusetts—articulate and protect their citizens' environmental rights in separate articles of their charters. *See* Hi. Const. art. XI, §§ 1, 9 (1978); Ill. Const. art. XI, §§ 1, 2 (1971–72); Ma. Const. amend. 49 (1972). Of these three states, Hawaii and Illinois, unlike Pennsylvania, expressly require further legislative action to vindicate the rights of the people. By comparison, other state charters articulate a "public policy" and attendant directions to the state legislatures to pass laws for the conservation or protection of either all or enumerated natural resources. *See, e.g.,* Ak. Const. art. VIII, §§ 1–18 (1959); Colo. Const. art. XXVII, § 1 (1993); La. Const. art. IX, § 1 (1974); N.M. Const. art. XX, § 21 (1971); N.Y. Const. art. XIV, §§ 1–5 (1941); Tx. Const. art. XVI, § 59 (1917); Va. Const. art. XI, §§ 1–4 (1971).[50] Some charters address the people's rights to fish and hunt, often qualified by the government's right to regulate these activities for the purposes of conservation. *See, e.g.,* Ky. Const. § 255A (2012); Vt. Const. Ch. II, § 67 (1777); Wi. Const. art. I, § 26 (2003). Still other state constitutions simply authorize the expenditure of public money for the purposes of targeted conservation efforts. *See,*

and two were defeated. Dernbach, 103 Dickinson L. Rev. at 695 n.2 (citing Kury, 1 Vill. Envtl. L.J. at 123–24 n.2). To say the Environmental Rights Amendment was broadly supported by the people and their representatives would be an understatement.

**50.** Representative Kury explained that New York State's environmental amendment inspired his proposal for the Pennsylvania amendment. Kury, *Clean Politics, Clean Streams,* at 69. But, Kury viewed the New York amendment as "too detailed and focused on environmental matters peculiar to that state" and proposed instead an amendment that would give the natural environment the same kind of constitutional protection as had been given to political rights. *Id.; compare* N.Y. Const. art. XIV, §§ 1–5 (Conservation) *with* Pa. Const. art. I § 27. Unlike Pennsylvania's Environmental Rights Amendment, the New York environmental conservation provisions are not part of that State's Bill of Rights. *See* N.Y. Const. art. I, § 1 *et seq.*

*e.g.*, OR. CONST. art. IX–H, §§ 1–6 (1970); W.V. CONST. art. VI, §§ 55, 56 (1996). Finally, many of the remaining states do not address natural resources in their organic charters at all. *See, e.g.*, NV. CONST. art. I, § 1 *et seq.*

That Pennsylvania deliberately chose a course different from virtually all of its sister states speaks to the Commonwealth's experience of having the benefit of vast natural resources whose virtually unrestrained exploitation, while initially a boon to investors, industry, and citizens, led to destructive and lasting consequences not only for the environment but also for the citizens' quality of life. Later generations paid and continue to pay a tribute to early uncontrolled and unsustainable development financially, in health and quality of life consequences, and with the relegation to history books of valuable natural and esthetic aspects of our environmental inheritance. The drafters and the citizens of the Commonwealth who ratified the Environmental Rights Amendment, aware of this history, articulated the people's rights and the government's duties to the people in broad and flexible terms that would permit not only reactive but also anticipatory protection of the environment for the benefit of current and future generations. Moreover, public trustee duties were delegated concomitantly to all branches and levels of government in recognition that the quality of the environment is a task with both local and statewide implications, and to ensure that all government neither infringed upon the people's rights nor failed to act for the benefit of the people in this area crucial to the well-being of all Pennsylvanians.[51]

51. We also note that natural gas industry development in the Marcellus Shale Formation affects interests of citizens of neighboring states. The Marcellus Shale Formation underlies approximately two-thirds of Pennsylvania's territory and extends to about 36 percent of the Delaware River Basin. *See* Delaware River Basin Comm'n, *Natural Gas Drilling,* online at www.nj.gov/drbc/programs/natural/ (last accessed on May 23, 2013). The Delaware River Basin Commission is a regional body created by compact between the federal government and the four basin states (Pennsylvania, New York, New Jersey, and Delaware) in 1961 to oversee a unified approach to managing the river system. The Commission includes the four basin state governors and the North Atlantic Division Engineer from the U.S. Army Corps of Engineers, who serves as the federal government's representative. The Commission has legal

### 6. Existing Jurisprudence Regarding Article I, Section 27

For the most part, to date, the promise of the Environmental Rights Amendment to protect and conserve the quality of our environment has been realized via legislative enactments and executive agency action. The question of how Article I, Section 27 obligations restrain the exercise of police power by the government (*e.g.*, to regulate an industry), although a significant matter, has not presented itself for judicial resolution and this Court has had no opportunity to address the original understanding of the constitutional provision in this context until now. *See Heller*, 554 U.S. at 625–26, 128 S.Ct. 2783. Subsequent to ratification, the Court entertained claims regarding the application of Section 27 in factual scenarios that generally fell within two categories: (1) challenges to specific private or governmental development projects, which implicated alleged violations of constitutional environmental rights and (2) challenges to local or statewide environmental quality laws, which implicated alleged violations of constitutional property rights. In light of the challenges, precedent has tended to define the broad constitutional rights in terms of compliance with various statutes and, as a result, to minimize the constitutional import of the Environmental Rights Amendment. Moreover, existing precedent has failed to differentiate

authority over water quality and water quantity-related issues throughout the Delaware River Basin.

The Commission has suggested that hydraulic fracturing techniques require large amounts of fresh water to release the natural gas. Although a significant amount of the fresh water used is recaptured, the fracking fluid "includes natural gas and chemicals added to facilitate the extraction process, as well as brine and other contaminants released from the formation." *Id.* In connection with natural gas drilling, the Commission identified "three major areas of concern":

1. Gas drilling projects in the Marcellus Shale or other formations may have a substantial effect on the water resources of the [Delaware River B]asin by reducing the flow in streams and/or aquifers used to supply the significant amounts of fresh water needed in the natural gas mining process.

2. On-site drilling operations may potentially add, discharge or cause the release of pollutants into the ground water or surface water.

3. The recovered "frac[k] water" must be treated and disposed of properly.

*Id.*

between challenges based on whether they implicated the people's rights under the first or second clauses of Section 27, or the Commonwealth's trustee duties under the second and third clauses, or both. Courts seemingly applied the same analytical scheme to both types of challenges, which introduced additional confusion for the bench and bar and, as a practical matter, has impeded efforts to develop a coherent environmental rights jurisprudence.

## I. *Environmental Challenges to Development Projects*

The leading cases in the first category of decisions are the 1973 decision in *Gettysburg, supra,* and the 1975–76 Commonwealth Court and Supreme Court opinions in *Payne, supra.* In *Gettysburg,* Commonwealth parties sought to enjoin the construction of an observation tower on private property neighboring the Gettysburg Battlefield, in Cumberland Township, Adams County. 311 A.2d at 589–90. The Commonwealth parties alleged that the proposed construction disrupted the skyline, dominated the setting, and eroded and despoiled the natural beauty and historic environment of the site. Cumberland Township and Adams County, the affected local governments, had no land use legislation to restrict the development, however, and, as a result, the Commonwealth sought relief only under Article I, Section 27 of the Constitution. This Court affirmed the lower court's denial of relief. The decision of the Court was deeply divided: Messrs. Justice O'Brien and Pomeroy would have held that the Environmental Rights Amendment was not self-executing and because, in their view, the Commonwealth could not bring suit absent legislation implementing the amendment, the action had to be dismissed without reaching its merits, *id.* at 590–95; Mr. Justice Nix concurred in the result with no opinion; Messrs. Justice Roberts and Manderino, who did not specifically address the question of self-execution, would have reached the merits of the Commonwealth's claim and would have affirmed, finding no error with the lower courts' conclusion that the Commonwealth had not carried its burden of proof, *id.* at 595–96; and finally, Mr. Chief Justice Jones and Mr. Justice Eagen would have held that Section 27 was self-

executing and would have reversed on the merits, concluding that the evidence of record did not support the lower court's decision, *id.* at 597–99.[52] Because no majority rule or reasoning emerged from the several opinions, the *Gettysburg* decision offered little guidance regarding the standards applicable in deciding an Article I, Section 27 challenge.

The Court's next opportunity to address the substantive standards of proof required to obtain relief under Section 27 likewise offered little guidance. In *Payne*, residents of the City of Wilkes–Barre sought to enjoin the plan of the Pennsylvania Department of Transportation to widen River Street at the expense of one-half acre of the River Common, a local park; the project also required removal of several large trees and the elimination of a pedestrian walk. The residents/challengers argued that the Commonwealth violated its duties as trustee of Pennsylvania's public natural resources by approving the River Street project. In affirming the Commonwealth Court's denial of relief, this Court held, *inter alia*, that the

52. One commentator has observed that, "For a constitutional provision to be self-executing, the provision must provide the court with a complete and enforceable rule.... [T]he constitutional language must supply a sufficient rule by means of which the right which the provision grants may be enjoyed and protected." Fernandez, 17 Harv. Envtl. L. Rev. at 333; *see also* Williams, 27 Okla. City U.L. Rev. at 221. On the issue of whether Section 27 of Article I was self-executing, no majority holding or reasoning emerged from the *Gettysburg* Court. Meanwhile, the Commonwealth Court in that case had held earlier that Section 27 was self-executing. *See Commonwealth v. Nat'l Gettysburg Battlefield Tower, Inc.,* 8 Pa.Cmwlth. 231, 302 A.2d 886, 892 (1973). The parties here do not dispute the self-executing nature of Section 27 in such terms, albeit aspects of the Commonwealth's arguments concerning justiciability implicate the point. Nor do the parties dispute that the Commonwealth may adopt legislation on the issues addressed in Section 27 pursuant to its police power. We note that the characterization of the *Gettysburg* Court's ultimate stance on these points in *United Artists Theater Circuit, Inc. v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612, 620 (1993), is erroneous. In *United Artists,* the Court stated that "a plurality of the [*Gettysburg* ] Court held that [Section 27] was not self-executing, and legislative action was necessary to accomplish [its] goals." In fact, only two of the seven Justices in *Gettysburg* subscribed to that view; two Justices concluded the opposite; and three Justices did not address the issue. The prevailing view, insofar as the *Gettysburg* case was concerned, was the Commonwealth Court's holding that the provision was self-executing.

residents had not met their burden of proof. 361 A.2d at 273. According to the Court, the residents were seeking automatic relief by merely asserting a common right to a protected value under the trusteeship of the state. But, the Court stated, the proper approach was to balance interests in conservation of natural resources and maintenance of an adequate highway system, a task that the legislation pursuant to which the River Street project had been approved, Act 120 of 1970, already accomplished. *See id.* (citing 71 P.S. § 511 *et seq.* (Powers and Duties of Department of Transportation)). The residents, therefore, were not entitled to relief under Section 27. Notably, however, the Court directed that in its role as trustee, the Commonwealth (via agency action) had an obligation to avoid any environmental harm if possible but, absent a feasible alternative to the proposed development, had to permit the land use "in such a way as to minimize the environmental or ecological impact of the use." *Id.* at 272–73.

The *Payne* Court also addressed a three-part test, which the Commonwealth Court had adopted to explicate the residents' burden of proof under Section 27. The Court did not adopt that test but noted that the standard was equivalent to appellate review of the agency's River Street project decision under Act 120. *See id.* at 273 n. 23; *accord Eagle Envtl. II,* 884 A.2d at 879 (although recognizing that balancing must take place, *Payne* Court did not require any specific balancing test between Commonwealth's duty to protect environment and other duties to public).

The Commonwealth Court in *Payne,* acting *en banc* and in its original jurisdiction, had dismissed the matter and entered a decree *nisi. Payne v. Kassab,* 11 Pa.Cmwlth. 14, 312 A.2d 86, 97 (1973). Notably, the court held that Section 27 was intended to allow "controlled development of resources rather than no development," and rejected the residents' argument that Section 27 had to be read in absolute terms so as to require an injunction any time a historical area was affected by a proposed development. In the court's formulation, relief under Section 27 required consideration of the following factors: "(1) Was there compliance with all applicable statutes

and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?" *Id.* at 94. Applying the test it devised, the Commonwealth Court concluded that the River Street project was constitutionally permissible. Subsequently, the court entered a final decree upon its earlier decision, *Payne v. Kassab,* 14 Pa.Cmwlth. 491, 323 A.2d 407 (1974); that decision was appealed by the residents and, as explained, our Court affirmed without elaborating further on the applicable substantive standards for obtaining Section 27 relief.

In subsequent cases implicating Section 27 challenges, the Commonwealth Court has generally applied its *Payne* test to a wide array of factual circumstances. *See, e.g., Energy Conservation Council of Pa. v. Pub. Util. Comm'n,* 25 A.3d 440, 453 (Pa.Cmwlth.2011) (Public Utility Commission did not violate Section 27 by approving power line project and permitting construction to begin before receipt of National Park Service permit); *Concerned Residents of Yough, Inc. v. Dep't of Envtl. Res.,* 162 Pa.Cmwlth. 669, 639 A.2d 1265, 1274–75 (1994) (citizens have no Section 27 claim based on esthetic and noise concerns relating to use of property by solid waste management facility; Solid Waste Management Act regulates every aspect of solid waste disposal and balanced environmental concerns through legislative process); *see also Borough of Moosic v. Pa. Pub. Util. Comm'n,* 59 Pa.Cmwlth. 338, 429 A.2d 1237 (1981); *Fox, supra,* 20 Pa.Cmwlth. 335, 342 A.2d 468. Notably, although the test was developed in the context of a challenge pursuant to the second and third clauses of Section 27 (implicating trustee duties), the Commonwealth Court has applied it irrespective of the type of environmental rights claim raised.

More importantly, the *Payne* test appears to have become, for the Commonwealth Court, the benchmark for Section 27

decisions in lieu of the constitutional text. In its subsequent applications, the Commonwealth Court has indicated that the viability of constitutional claims premised upon the Environmental Rights Amendment was limited by whether the General Assembly had acted and by the General Assembly's policy choices, rather than by the plain language of the amendment. *See, e.g., Larwin Multihousing Pa. Corp. v. Com.,* 19 Pa. Cmwlth. 181, 343 A.2d 83, 89 n. 9 (1975) ("It is difficult to understand what protections are afforded by [Section 27] not already supplied by the township zoning ordinance and the comprehensive statutes of the Commonwealth concerning streams, air pollution and sewage disposal."). But, while the *Payne* test may have answered a call for guidance on substantive standards in this area of law and may be relatively easy to apply, the test poses difficulties both obvious and critical. First, the *Payne* test describes the Commonwealth's obligations—both as trustee and under the first clause of Section 27—in much narrower terms than the constitutional provision. Second, the test assumes that the availability of judicial relief premised upon Section 27 is contingent upon and constrained by legislative action. And, finally, the Commonwealth Court's *Payne* decision and its progeny have the effect of minimizing the constitutional duties of executive agencies and the judicial branch, and circumscribing the abilities of these entities to carry out their constitutional duties independent of legislative control. *Accord* Fernandez, 17 Harv. Envtl. L. Rev. at 358 ("When a state court declines to enforce a constitutional provision on the ground that it is not self-executing, it restricts its own role in the governing process."); *see, e.g., Borough of Moosic, supra; Fox, supra.*[53] The branches of

53. In *Fox,* for example, the Commonwealth Court held that the decision of the former Department of Environmental Resources to grant a permit to run a sewer extension line along a stream was proper under the Clean Streams Act. The panel therefore vacated the decision of the Environmental Quality Board, which had remanded the matter to the Department for consideration, in light of the Department's constitutional trustee duties, of the impact on constitutional environmental values of the proposed development. In the panel's view, while the Department could consider such impact pursuant to other environmental statutes, the review of a permit decision under the Clean Streams Act was more limited. According to the Commonwealth Court, the Board's

government have independent constitutional duties pursuant to the Environmental Rights Amendment, as these duties are interpreted by the judicial branch and this Court in particular. *See Mesivtah,* 44 A.3d at 7. Because of these critical difficulties, we conclude that the non-textual Article I, Section 27 test established in *Payne* and its progeny is inappropriate to determine matters outside the narrowest category of cases, *i.e.,* those cases in which a challenge is premised simply upon an alleged failure to comply with statutory standards enacted to advance Section 27 interests.

## II. *Challenges that Implicate a Balancing of Article I Rights*

In a second line of decisions, our Court has addressed challenges to environmental legislation intended to protect the rights articulated in the Environmental Rights Amendment. In these matters, the Court has generally cited Section 27 as stating a public policy favoring environmental interests which the legislation sought to implement. *See, e.g., Nat'l Wood Preservers, Inc., supra,* 489 Pa. 221, 414 A.2d 37. In *National Wood Preservers,* owners leased a property for use by a

decision would have required the Department to overstep its statutory authority under the Clean Streams Act, an action which the Environmental Rights Amendment did not authorize. 342 A.2d at 482–83. The Commonwealth Court's conclusions that the Amendment limits rather than expands executive agency authority, and that executive agency authority to act is limited by its enabling legislation, are certainly reasonable. The difficulty with the *Fox* decision is in how the court went about reaching those conclusions. Thus, the Commonwealth Court indicated that satisfying the *Payne* test (pursuant to which legislative enactments are deemed to delineate the parameters of constitutional trustee duties, rather than the plain language of the constitutional provision) was sufficient to dispose of any constitutional challenge to an agency decision. The court seemingly relieved executive agencies of the obligation to apply statutes and exercise their statutory discretion in a manner consonant with the Constitution, indicating that mere compliance with the enabling statute and relevant regulations was sufficient to satisfy constitutional strictures. *See Hartford,* 482 A.2d at 549. The Commonwealth Court's subsequent application of *Fox* in *Borough of Moosic* reflects this narrow understanding of an agency's constitutional duties. 429 A.2d at 1240 (borough has no standing to intervene and present evidence of environmental harm to Public Utility Commission because consideration of constitutional environmental concerns falls outside Commission's statutory authority).

business interest using chemicals to preserve wood. The business disposed of waste liquids containing toxic chemicals by discharging them into a well, which drained into the groundwater beneath the property and then into a nearby stream. Following an investigation, the-then Department of Environmental Resources ordered the owners and the business enterprise to abate the harmful condition, pursuant to Section 316 of the Clean Streams Law. *Id.* at 39–40 (citing 35 P.S. § 691.1). On appeal, this Court held that the agency orders were appropriate under Section 316. The Court, *inter alia*, rejected the appellants' argument that Section 316 was an impermissible exercise of police power, holding that enforcement of the provision did not constitute a taking under Article I, Section 10 of the Pennsylvania Constitution and the Fourteenth Amendment of the U.S. Constitution. According to the Court, in adopting the provision, the General Assembly acted in the interest of the public because "maintenance of the environment is a fundamental objective of state power," and a duty imposed upon the Commonwealth. *Id.* at 44 (citing Pa. Const. art. I, § 27). The Court also rejected the argument that Section 316 was an oppressive exercise of the police power, and held that ownership or occupancy were sufficient predicates for requiring corrective orders under the circumstances: "[t]he notion of fault is least functional ... when balancing the interests of a state in the exercise of its police power, because the beneficiary is not an individual but the community." *Id.* at 47 n. 18. *See also Commonwealth v. Blosenski Disposal Serv.*, 523 Pa. 274, 566 A.2d 845 (1989) (warrantless inspection provisions of Solid Waste Management Act did not violate search and seizure clause of Pennsylvania Constitution, Article I, Section 8, especially because provision implements Section 27); *Commonwealth v. Parker White Metal Co.*, 512 Pa. 74, 515 A.2d 1358, 1370 (1986) (provisions of Solid Waste Management Act creating criminal sanctions allowing prosecutorial discretion did not violate equal protection clause of Pennsylvania Constitution, Article I, Section 26, but provided flexible and effective means to enforce statute that implements Section 27).

In 1993, the Court rejected another challenge to the constitutionality of legislation adopted to vindicate Section 27 rights. *See United Artists,* 635 A.2d at 614. Appellant, the owner of the Boyd Theater in Philadelphia, challenged the historic landmark designation of the interior and exterior of the theater as a violation of the takings clauses of the Pennsylvania and U.S. Constitutions. On appeal, this Court vacated the historical designation order because the City had exceeded the scope of its statutory authority by designating the interior of the theater historic. In doing so, the Court nevertheless expressly upheld the constitutionality of the local ordinance, holding that the ordinance did not constitute a taking under either the U.S. Constitution or the Pennsylvania Constitution. *Id.* at 614–15 (citing *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 128–29, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). The Court also rejected the contention that the Pennsylvania Constitution guaranteed more expansive rights than its federal counterpart with respect to governmental takings. In undertaking its analysis under the then-recent decision in *Edmunds, supra,* which reinvigorated Pennsylvania constitutional law, the Court noted that Section 27 "reflects a state policy encouraging the preservation of historic and aesthetic resources" and that the local ordinance was consistent with the policy. *Id.* at 620.

Generally, litigation efforts of private interests to limit the exercise of the General Assembly's police power to protect the environment by asserting competing constitutional rights have been unsuccessful, in recognition of the Section 27 imperative. This second line of precedents is consistent with an interpretation of the Environmental Rights Amendment as encompassing a duty of the General Assembly to act in a manner that protects Pennsylvania's public natural resources from degradation and diminution.

### III. *The Limitations of Existing Decisional Law in Light of the Present Dispute*

Nothing in this Court's precedent offers substantive and controlling guidance with respect to the type of claims that the

citizens assert in this matter. The two lines of cases described above illustrate simply that the legislative and executive branches have taken the initiative in adding substance to the rights guaranteed by Section 27, as the drafters of the constitutional provision anticipated. Contrary to the same drafters' expectations, however, the provision has not yet led to the development of an environmental rights jurisprudence comparable to the tradition of political rights jurisprudence. The absence of such jurisprudence, however, does nothing to diminish the textual, organic rights. *See Pap's,* 812 A.2d at 605 (absence of earlier jurisprudence involving freedom of expression under Pennsylvania Constitution may be explained by fact that "Pennsylvania legislators, executives, and judges were all true to their oaths of fidelity to our Constitution"). In any event, this Court has an obligation to vindicate the rights of its citizens where the circumstances require it and in accordance with the plain language of the Constitution. *Id.*

### B. The Relevant Provisions of Act 13

The adoption of Act 13 by the General Assembly accomplished the first major overhaul in nearly three decades of Title 58 of the Pennsylvania Consolidated Statutes, the Oil and Gas Act. The General Assembly declared its intent to permit optimal development of the Commonwealth's oil and gas resources, to protect the safety of personnel and facilities in covered industries, to protect the safety and property rights of persons residing in areas hosting oil and gas operations, and to protect natural resources, environmental rights and values secured by the Constitution of Pennsylvania. *See* 58 Pa.C.S. § 3202 (Declaration of purpose of chapter). Act 13 was initially introduced in the House of Representatives (House Bill 1950), where it was adopted on November 17, 2011, by a vote of 107 to 76. On December 14, 2011, the Senate adopted an amended bill by a vote of 28 to 22. Because the House did not concur in the amendments and the Senate insisted on the amendments, House Bill 1950 was sent to a conference committee on February 6, 2012. The conference committee adopted its report the same day and presented it to the two legislative houses on February 7, 2012. Against some protests

that the call for votes did not permit further debate and amendment (*see, e.g.,* 2012 Pa. Legislative Journal—Senate 105, 108), the Senate adopted the conference committee's report on February 7, 2012, by a vote of 31 to 19, and the House adopted the same report on February 8, 2012, by a vote of 101 to 90. The General Assembly sent the bill to Governor Corbett on February 10, 2012, and the Governor signed it on February 14, 2012.

On appeal to this Court, the citizens request that we declare Act 13 unconstitutional in its entirety. This request for relief is premised primarily upon claims that discrete provisions central to Act 13 are unconstitutional: Sections 3303, 3304, and 3215(b)(4) and (d); but, the citizens also address other provisions, *i.e.,* Sections 3305 through 3309. 58 Pa.C.S. §§ 3303–3309; 3215(b), (d).[54]

The Chapter 33 provisions—Sections 3303 through 3309—address local ordinances relating to oil and gas operations. Section 3303 states that "environmental acts are of Statewide concern and, to the extent that they regulate oil and gas operations, occupy the entire field of regulation, to the exclusion of all local ordinances." The General Assembly's stated intent in Act 13 is to preempt and supersede "local regulation of oil and gas operations regulated by the [statewide] environmental acts, as provided in this chapter[, Chapter 33]."

In addition, Section 3304 institutes uniformity among local ordinances Commonwealth-wide, to allow, as stated, for "the reasonable development of oil and gas resources," by both precluding local governments from acting in certain ways, and then requiring local government to take certain dictated actions while approving and permitting oil and gas operations within the parameters articulated by the provision. Section 3304 thus commands that all political subdivisions:

(1) Shall allow well and pipeline location assessment operations, including seismic operations and related activities conducted in accordance with all applicable Federal and

54. The citizens also raise discrete claims implicating other provisions of Act 13, which we will address in part IV of this Opinion (Other Claims).

State laws and regulations relating to the storage and use of explosives throughout every local government.

(2) May not impose conditions, requirements or limitations on the construction of oil and gas operations that are more stringent than conditions, requirements or limitations imposed on construction activities for other industrial uses within the geographic boundaries of the local government.

(3) May not impose conditions, requirements or limitations on the heights of structures, screening and fencing, lighting or noise relating to permanent oil and gas operations that are more stringent than the conditions, requirements or limitations imposed on other industrial uses or other land development within the particular zoning district where the oil and gas operations are situated within the local government.

(4) Shall have a review period for permitted uses that does not exceed 30 days for complete submissions or that does not exceed 120 days for conditional uses.

(5) Shall authorize oil and gas operations, other than activities at impoundment areas, compressor stations and processing plants, as a permitted use in all zoning districts.

(5.1) Notwithstanding section 3215 (relating to well location restrictions), may prohibit, or permit only as a conditional use, wells or well sites otherwise permitted under paragraph (5) within a residential district if the well site cannot be placed so that the wellhead is at least 500 feet from any existing building. In a residential district, all of the following apply:

(i) A well site may not be located so that the outer edge of the well pad is closer than 300 feet from an existing building.

(ii) Except as set forth in paragraph (5) and this paragraph, oil and gas operations, other than the placement, use and repair of oil and gas pipelines, water pipelines, access roads or security facilities, may not take place within 300 feet of an existing building.

(6) Shall authorize impoundment areas used for oil and gas operations as a permitted use in all zoning districts, provided that the edge of any impoundment area shall not be located closer than 300 feet from an existing building.

(7) Shall authorize natural gas compressor stations as a permitted use in agricultural and industrial zoning districts and as a conditional use in all other zoning districts, if the natural gas compressor building meets the following standards:

(i) is located 750 feet or more from the nearest existing building or 200 feet from the nearest lot line, whichever is greater, unless waived by the owner of the building or adjoining lot; and

(ii) the noise level does not exceed a noise standard of 60dbA at the nearest property line or the applicable standard imposed by Federal law, whichever is less.

(8) Shall authorize a natural gas processing plant as a permitted use in an industrial zoning district and as conditional uses in agricultural zoning districts if all of the following apply:

(i) The natural gas processing plant building is located at the greater of at least 750 feet from the nearest existing building or at least 200 feet from the nearest lot line unless waived by the owner of the building or adjoining lot.

(ii) The noise level of the natural gas processing plant building does not exceed a noise standard of 60dbA at the nearest property line or the applicable standard imposed by Federal law, whichever is less.

(9) Shall impose restrictions on vehicular access routes for overweight vehicles only as authorized under 75 Pa.C.S. (relating to vehicles) or the MPC.

(10) May not impose limits or conditions on subterranean operations or hours of operation of compressor stations and processing plants or hours of operation for the drilling of oil and gas wells or the assembly and disassembly of drilling rigs.

(11) May not increase setback distances set forth in Chapter 32 (relating to development) or this chapter. A local ordinance may impose setback distances that are not regulated by or set forth in Chapter 32 or this chapter if the setbacks are no more stringent than those for other industrial uses within the geographic boundaries of the local government.

58 Pa.C.S. § 3304.

Reviewing the amended Act, few could seriously dispute how remarkable a revolution is worked by this legislation upon the existing zoning regimen in Pennsylvania, including residential zones. In short, local government is required to authorize oil and gas operations, impoundment areas, and location assessment operations (including seismic testing and the use of explosives) as permitted uses in all zoning districts throughout a locality. Local government is also required to authorize natural gas compressor stations as permitted uses in agricultural and industrial districts, and as conditional uses in all other zoning districts. Local governments are also commanded to authorize natural gas processing plants as permitted uses in industrial districts and as conditional uses in agricultural districts. Moreover, Section 3304 limits local government to imposing conditions: on construction of oil and gas operations only as stringent as those on construction activities for industrial uses; and on heights of structures, screening and fencing, lighting and noise only as stringent as those imposed on other land development within the same zoning district. Local government is also simply prohibited from limiting subterranean operations and hours of operation for assembly and disassembly of drilling rigs, and for operation of oil and gas wells, compressor stations, or processing plants. Localities also may not increase setbacks from uses related to the oil and gas industry beyond those articulated by Act 13. In addition, the dictated approach to setbacks focuses only on "existing buildings," offering residents and property owners no setback protections should they desire to develop further their own properties. That local government's zoning role is reduced to *pro forma* accommodation is confirmed by the fact

that review under local ordinances of proposed oil and gas-related uses must be completed in 30 days for permitted uses, and in 120 days for conditional uses. The displacement of prior planning, and derivative expectations, regarding land use, zoning, and enjoyment of property is unprecedented.

The subsequent provisions of Chapter 33, Sections 3305 through 3309, create an enforcement mechanism to facilitate implementation of the preceding parts of the Act, Chapter 32 and Sections 3302 through 3304. Thus, Section 3305 authorizes the Public Utility Commission to issue advisory opinions to municipalities regarding the compliance of proposed local ordinances with the dictates of Act 13 and, upon request by a resident or an oil and gas entity, to issue orders to enforce compliance of enacted local ordinances with Act 13 requirements. The Commission's orders related to enacted ordinances are subject to *de novo* review in the Commonwealth Court, while the advisory opinions are deemed unappealable. Moreover, Section 3306 authorizes civil actions in the Commonwealth Court to enjoin the enforcement of a local ordinance alleged to be contrary to Chapters 32 and 33 of Act 13 or the Municipalities Planning Code.

A failure to comply with Act 13's requirements that local government act swiftly to accommodate Act 13's new regimen has significant financial consequences for local government as well. Section 3307(a) authorizes the shifting of attorneys' fees and costs to local government, if the court determines that "local government enacted or enforced a local ordinance with willful or reckless disregard" of Act 13. Section 3308 also deems a municipality ineligible to receive unconventional gas well fees if the Public Utility Commission, the Commonwealth Court, or this Court issues an order that a local ordinance violated Act 13. Under Section 3309, local government has but a 120–day grace period following the effective date of Act 13 in which to take action to overturn the locality's prior land use planning scheme and to bring existing local ordinances into compliance with the new regime.

In Chapter 32, Section 3215 imposes modest oil and gas well location restrictions in reference to sensitive water resources, as follows:

(b) Limitation.—(1) No well site may be prepared or well drilled within 100 feet or, in the case of an unconventional well, 300 feet from the vertical well bore or 100 feet from the edge of the well site, whichever is greater, measured horizontally from any solid blue lined stream, spring or body of water as identified on the most current 7 1/2 minute topographic quadrangle map of the United States Geological Survey.

(2) The edge of the disturbed area associated with any unconventional well site must maintain a 100–foot setback from the edge of any solid blue lined stream, spring or body of water as identified on the most current 7 1/2 minute topographic quadrangle map of the United States Geological Survey.

(3) No unconventional well may be drilled within 300 feet of any wetlands greater than one acre in size, and the edge of the disturbed area of any well site must maintain a 100–foot setback from the boundary of the wetlands.

58 Pa.C.S. § 3215(b)(1)-(3). However, even these modest restrictions can be averted by the gas industry, with the Pennsylvania Department of Environmental Protection given considerable authority under the Act to grant waivers of setbacks:

(4) The department shall waive the distance restrictions upon submission of a plan identifying additional measures, facilities or practices to be employed during well site construction, drilling and operations necessary to protect the waters of this Commonwealth. The waiver, if granted, shall include additional terms and conditions required by the department necessary to protect the waters of this Commonwealth. Notwithstanding section 3211(e), if a waiver request has been submitted, the department may extend its permit review period for up to 15 days upon notification to the applicant of the reasons for the extension.

58 Pa.C.S. § 3215(b). In short, notwithstanding the purported protection of sensitive waters via setbacks, pursuant to Section 3215(b)(4), oil and gas operators are **entitled** to automatic waivers of setbacks "upon submission of a plan identifying the additional measures, facilities or practices as prescribed by the [Department of Environmental Protection] to be employed during well site construction, drilling and operations." A waiver "shall include additional terms and conditions required by the [D]epartment necessary to protect the waters of this Commonwealth," consistent with regulations that "shall" be developed by the Environmental Quality Board. 58 Pa.C.S. § 3215(b)-(c), (e)(1). Remarkably, if a drilling permit that contains Department-imposed conditions is appealed, it is not the industry, but the Department, that "has the burden of proving that the conditions were necessary to protect against a probable harmful impact of [sic] the public resources." 58 Pa.C.S. § 3215(e)(2).[55]

In a further blanket accommodation of industry and development, Section 3215(d) limits the ability of local government to have any meaningful say respecting drilling permits and well locations in their jurisdictions. Under Act 13, a municipality in which an unconventional gas well is proposed may submit written comments "describing local conditions or circumstances" which the municipality would like the Department of Environmental Protection to consider. But, the Department is not obligated to act upon local comments, although it may do so. In another remarkable provision, the Act further provides that, "[n]otwithstanding any other law, no municipality . . . shall have a right of appeal or other form of review from the [D]epartment's decision." 58 Pa.C.S. § 3215(d).

55. Other parts of Section 3215 provide similar measures for granting waivers or variances with respect to development-sensitive features, such as water wells and floodplains. *See* 58 Pa.C.S. § 3215(a), (f). In each instance, development and disturbance of the environment is preferred over the natural state, along the same statutory approach articulated in Section 3215(b). The citizens do not assert separate claims premised upon either subsection (a) or (f) of Section 3215; nevertheless, in light of our present decision, enforcement of these provisions obviously is constitutionally suspect.

## C. Article I, Section 27 Rights in Application

We underscore that the citizens raise claims which implicate primarily the Commonwealth's duties as trustee under the Environmental Rights Amendment.[56] The Commonwealth's position on the municipalities' role following Act 13's land use revolution respecting oil and gas operations is similar to its stance regarding the authority of the judiciary to entertain and decide this dispute: in the Commonwealth's view, there is no role. According to the Commonwealth, the question here is strictly one of policy, which only the General Assembly may formulate pursuant to its police powers and authority as trustee of Pennsylvania's public natural resources. By the Commonwealth's reasoning, municipalities have no authority to articulate or implement a different policy, and they have no authority even to claim that the General Assembly's policy violates the Commonwealth's organic charter. The Commonwealth suggests that Act 13 is an enactment based on valid legislative objectives and, therefore, falls properly within its exclusive discretionary policy judgment.

In contrast, the citizens construe the Environmental Rights Amendment as protecting individual rights and devolving duties upon various actors within the political system; and they claim that breaches of those duties or encroachments upon those rights is, at a minimum, actionable. According to the citizens, this dispute is not about municipal power, statutory or otherwise, to develop local policy, but it is instead about compliance with constitutional duties. Unless the Declaration of Rights is to have no meaning, the citizens are correct.

In relevant part, as we have explained previously, the Environmental Rights Amendment to the Pennsylvania Constitution delineates limitations on the Commonwealth's power

56. We recognize that the rights under the first clause of Article I, Section 27 of individual appellants—Messrs. Ball and Coppola, and Ms. van Rossum—may also be implicated here. These appellants, however, have not developed arguments regarding the merits of such claims sufficient to enable us to render a reasoned decision. Accordingly, we express no opinion on the issue of whether Act 13 violates the rights of individual plaintiffs under the first clause of the Environmental Rights Amendment.

to act as trustee of the public natural resources. It is worth reiterating that, insofar as the Amendment's prohibitory trustee language is concerned, the constitutional provision speaks on behalf of the people, to the people directly, rather than through the filter of the people's elected representatives to the General Assembly. *See* PA. CONST. art. I, §§ 25, 27.

The Commonwealth's obligations as trustee to conserve and maintain the public natural resources for the benefit of the people, including generations yet to come, create a right in the people to seek to enforce the obligations. *See Commonwealth ex rel. Logan v. Hiltner,* 307 Pa. 343, 161 A. 323, 325 (1932) ("It is a settled rule of constitutional construction that prohibitive and restrictive provisions are self[-]executing and may be enforced by the courts independently of any legislative action."); *accord Payne,* 361 A.2d at 272 (Environmental Rights Amendment creates public trust and names Commonwealth trustee; "[n]o implementing legislation is needed to enunciate these broad purposes and establish these relationships; the amendment does so by its own *Ipse dixit.*"). This view is not an outlier. *Washingtonian Home of Chicago v. City of Chicago,* 157 Ill. 414, 41 N.E. 893, 896 (1895) ("[W]here [constitutional] provisions are negative or prohibitory in their character, they execute themselves. Where [the Constitution] limits the power of either of the departments of the government, or where it prohibits the performance of any act by an officer or person, none would contend that the power might be exercised or the act performed until prohibited by the general assembly. The constitution undeniably has as much vigor in prohibiting the exercise of power or the performance of an act as the general assembly."); Fernandez, 17 Harv. Envtl. L. Rev. at 353–54 ("If, despite the absence of a remedy, a provision directly vests a right on a party, the court may declare the provision to be self-executing and fashion a remedy itself."). Statutes and regulations addressing the right are "subordinate to the enjoyment of the right, the exercise of which is regulated. It must be regulation purely, not destruction." *Page v. Allen,* 58 Pa. 338, 1868 WL 7243, at *8 (Pa.1868). As a corollary, the Legislature may not abridge,

add to, or alter the constitutional qualification of a right by statute. *See id.*

We recognize that, along with articulating the people's rights as beneficiaries of the public trust, the Environmental Rights Amendment also encourages the General Assembly to exercise its trustee powers to enact environmental legislation that serves the purposes of the trust. But, in this litigation, the citizens' constitutional challenge is not to the General Assembly's power to enact such legislation; that is a power the General Assembly unquestionably possesses. The question arising from the Commonwealth's litigation stance is whether the General Assembly can perform the legislative function in a manner inconsistent with the constitutional mandate. *See also Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757, 760 (1989).

Act 13 is not generalized environmental legislation, but is instead a statute that regulates a single, important industry—oil and gas extraction and development. Oil and gas resources are both privately owned and partly public, *i.e.*, insofar as they are on public lands. Act 13 does not remotely purport to regulate simply those oil and gas resources that are part of the public trust corpus, but rather, it addresses the exploitation of all oil and gas resources throughout Pennsylvania. Act 13's primary stated purpose is not to effectuate the constitutional obligation to protect and preserve Pennsylvania's natural environment. Rather, the purpose of the statute is to provide a maximally favorable environment for industry operators to exploit Pennsylvania's oil and natural gas resources, including those in the Marcellus Shale Formation. *See* 58 Pa.C.S. § 3202 (primary purpose is to permit "optimal development of oil and gas resources"). The authority to regulate the oil and gas industry in this context derives, therefore, from the General Assembly's plenary power to enact laws for the purposes of promoting the general welfare, including public convenience and general prosperity, rather than from its corresponding duties as trustee of Pennsylvania's public natural resources. *See Clifton*, 969 A.2d at 1211 n. 19; *Best*, 141 A.2d at 611. The public natural resources implicated by the

"optimal" accommodation of industry here are resources essential to life, health, and liberty: surface and ground water, ambient air, and aspects of the natural environment in which the public has an interest. As the citizens illustrate, development of the natural gas industry in the Commonwealth unquestionably has and will have a lasting, and undeniably detrimental, impact on the quality of these core aspects of Pennsylvania's environment, which are part of the public trust.

As we have explained, Pennsylvania has a notable history of what appears retrospectively to have been a shortsighted exploitation of its bounteous environment, affecting its minerals, its water, its air, its flora and fauna, and its people. The lessons learned from that history led directly to the Environmental Rights Amendment, a measure which received overwhelming support from legislators and the voters alike. When coal was "King," there was no Environmental Rights Amendment to constrain exploitation of the resource, to protect the people and the environment, or to impose the sort of specific duty as trustee upon the Commonwealth as is found in the Amendment. Pennsylvania's very real and mixed past is visible today to anyone travelling across Pennsylvania's spectacular, rolling, varied terrain. The forests may not be primordial, but they have returned and are beautiful nonetheless; the mountains and valleys remain; the riverways remain, too, not as pure as when William Penn first laid eyes upon his colonial charter, but cleaner and better than they were in a relatively recent past, when the citizenry was less attuned to the environmental effects of the exploitation of subsurface natural resources. But, the landscape bears visible scars, too, as reminders of the past efforts of man to exploit Pennsylvania's natural assets. Pennsylvania's past is the necessary prologue here: the reserved rights, and the concomitant duties and constraints, embraced by the Environmental Rights Amendment, are a product of our unique history.

The type of constitutional challenge presented today is as unprecedented in Pennsylvania as is the legislation that engendered it. But, the challenge is in response to history seeming to repeat itself: an industry, offering the very real

prospect of jobs and other important economic benefits, seeks to exploit a Pennsylvania resource, to supply an energy source much in demand. The political branches have responded with a comprehensive scheme that accommodates the recovery of the resource. By any responsible account, the exploitation of the Marcellus Shale Formation will produce a detrimental effect on the environment, on the people, their children, and future generations, and potentially on the public purse, perhaps rivaling the environmental effects of coal extraction. The litigation response was not available in the nineteenth century, since there was no Environmental Rights Amendment. The response is available now.

The challenge here is premised upon that part of our organic charter that now explicitly guarantees the people's right to an environment of quality and the concomitant expressed reservation of a right to benefit from the Commonwealth's duty of management of our public natural resources. The challengers here are citizens—just like the citizenry that reserved the right in our charter. They are residents or members of local legislative and executive bodies, and several localities directly affected by natural gas development and extraction in the Marcellus Shale Formation. Contrary to the Commonwealth's characterization of the dispute, the citizens seek not to expand the authority of local government but to vindicate fundamental constitutional rights that, they say, have been compromised by a legislative determination that violates a public trust. The Commonwealth's efforts to minimize the import of this litigation by suggesting it is simply a dispute over public policy voiced by a disappointed minority requires a blindness to the reality here and to Pennsylvania history, including Pennsylvania constitutional history; and, the position ignores the reality that Act 13 has the potential to affect the reserved rights of every citizen of this Commonwealth now, and in the future. We will proceed now to the merits.

### 1. Section 3303

We begin by addressing the citizens' claims regarding the constitutionality of Section 3303 of Act 13. We

recognize that, as the Commonwealth states, political subdivisions are "creations of the state with no powers of their own." *Fross v. County of Allegheny*, 610 Pa. 421, 20 A.3d 1193, 1202 (2011). Municipalities have only those powers "expressly granted to them by the Constitution of the Commonwealth or by the General Assembly, and other authority implicitly necessary to carry into effect those express powers." *Id.* Within this construct, the General Assembly has the authority to alter or remove any powers granted and obligations imposed by statute upon municipalities. *See, e.g., Huntley*, 964 A.2d at 862 (even where state has granted powers to act in particular field, such powers do not exist if Commonwealth preempts field). By comparison, however, constitutional commands regarding municipalities' obligations and duties to their citizens cannot be abrogated by statute. *See Mesivtah*, 44 A.3d at 9 (statute "cannot excuse the constitutional minimum" for meeting public charity exemption from taxation); *Alliance Home of Carlisle, Pa. v. Bd. of Assessment Appeals*, 591 Pa. 436, 919 A.2d 206, 223 (2007) (General Assembly cannot authorize exemption from taxation going beyond what is permitted by constitutional text and, if exemption is deemed to exceed what is authorized, courts are duty-bound to strike it down); *Stilp*, 905 A.2d at 943 (quoting *Jorgensen v. Blagojevich*, 211 Ill.2d 286, 285 Ill.Dec. 165, 811 N.E.2d 652, 669–70 (2004) ("No principle of law permits us to suspend constitutional requirements for economic reasons, no matter how compelling those reasons may seem.")). Moreover, the General Assembly has no authority to remove a political subdivision's implicitly necessary authority to carry into effect its constitutional duties. *Cf. Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193, 196–97 (1971) ("Judiciary must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice . . . .").

With respect to the public trust, Article I, Section 27 of the Pennsylvania Constitution names not the General Assembly but "the Commonwealth" as trustee. We have explained that,

as a result, all existing branches and levels of government derive constitutional duties and obligations with respect to the people. The municipalities affected by Act 13 all existed before that Act was adopted; and most if not all had land use measures in place. Those ordinances necessarily addressed the environment, and created reasonable expectations in the resident citizenry. To put it succinctly, our citizens buying homes and raising families in areas zoned residential had a reasonable expectation concerning the environment in which they were living, often for years or even decades. Act 13 fundamentally disrupted those expectations, and ordered local government to take measures to effect the new uses, irrespective of local concerns. The constitutional command respecting the environment necessarily restrains legislative power with respect to political subdivisions that have acted upon their Article I, Section 27 responsibilities: the General Assembly can neither offer political subdivisions purported relief from obligations under the Environmental Rights Amendment, nor can it remove necessary and reasonable authority from local governments to carry out these constitutional duties. Indeed, if the General Assembly had subsumed local government entirely by Act 13—it did not, instead it required local government essentially to be complicit in accommodating a new environmental regime irrespective of the character of the locale—the General Assembly could not eliminate the commands of Article I, Section 27. Rather, the General Assembly would simply have shifted the constitutional obligations onto itself. And those obligations include the duty to "conserve and maintain" the public natural resources, including clean air and pure water, "for the benefit of all the people." The Commonwealth, by the General Assembly, declares in Section 3303 that environmental obligations related to the oil and gas industries are of statewide concern and, on that basis, the Commonwealth purports to preempt the regulatory field to the exclusion of all local environmental legislation that might be perceived as affecting oil and gas operations. Act 13 thus commands municipalities to ignore their obligations under Article I, Section 27 and further directs municipalities to take affirmative actions to undo existing protections of the

environment in their localities. The police power, broad as it may be, does not encompass such authority to so fundamentally disrupt these expectations respecting the environment. Accordingly, we are constrained to hold that, in enacting this provision of Act 13, the General Assembly transgressed its delegated police powers which, while broad and flexible, are nevertheless limited by constitutional commands, including the Environmental Rights Amendment.

## 2. Section 3304

Next, we address the Commonwealth's claims regarding the constitutionality of Section 3304, a provision that elaborates upon local regulation of oil and gas development in Pennsylvania. In regulating the oil and gas industry, the General Assembly exercises its constitutional police powers (to promote general welfare, convenience, and prosperity) but it must also exercise its discretion as trustee of the public natural resources (to "conserve and maintain" public natural resources for the benefit of the people), permitting changes to the corpus of the trust to encourage sustainable development where appropriate. *See Payne,* 361 A.2d at 273 ("[i]t is manifest that a balancing must take place...."). Discretion, in the trustee context, equates to a legal discretion cabined by the language of the trust and the trustee's fiduciary duties, rather than to mere subjective judgment. *Struthers Coal & Coke Co. v. Union Trust Co.,* 227 Pa. 29, 75 A. 986, 988 (1910); *see In re Sparks' Estate,* 328 Pa. 384, 127 Pa.Super. 364, 196 A. 48, 57 (1938). Proper exercise of a trustee's discretion is measured by benefits "bestow[ed] upon all [the Commonwealth's] citizens in their utilization of natural resources" rather than "by the balance sheet profits and appreciation [the trustee] realizes from its resources operations." *See* 1970 Pa. Legislative Journal–House at 2273; *id.* at 2270 ("[T]he measure of our progress is not just what we have but how we live...."). In this sense, the trustee may use the assets of the trust only for purposes authorized by the trust or necessary for the preservation of the trust; other uses are beyond the scope of the discretion conferred, even where the trustee claims to be acting solely to advance other discrete interests of

the beneficiaries. *Metzger v. Lehigh Valley Trust & Safe Deposit Co.*, 220 Pa. 535, 69 A. 1037, 1038 (1908).

With respect to Act 13, the General Assembly certainly recognized, among other things, its twin constitutional duties to provide for the general welfare and prosperity by "permit[ting] optimal development of oil and gas resources of this Commonwealth," and for the protection of "natural resources, environmental rights and values secured by the Constitution of Pennsylvania." 58 Pa.C.S. § 3202. A declaration of intent, regardless of its validity or its beneficence, is neither dispositive nor is it even particularly probative of whether the means articulated in the legislative enactment, by which the intent is pursued, are constitutional. *See Stilp*, 905 A.2d at 945. We pass upon a constitutional challenge to the legislative enactment not by measuring the wisdom of the means chosen by the General Assembly to pursue its policy, but by measuring the enactment against the relevant constitutional command.

We have explained that, among other fiduciary duties under Article I, Section 27, the General Assembly has the obligation to prevent degradation, diminution, and depletion of our public natural resources, which it may satisfy by enacting legislation that adequately restrains actions of private parties likely to cause harm to protected aspects of our environment. We are constrained to hold that Section 3304 falls considerably short of meeting this obligation for two reasons.

First, a new regulatory regime permitting industrial uses as a matter of right in every type of pre-existing zoning district is incapable of conserving or maintaining the constitutionally-protected aspects of the public environment and of a certain quality of life. In Pennsylvania, terrain and natural conditions frequently differ throughout a municipality, and from municipality to municipality. As a result, the impact on the quality, quantity, and well-being of our natural resources cannot reasonably be assessed on the basis of a statewide average. Protection of environmental values, in this respect, is a quintessential local issue that must be tailored to local conditions. *See, e.g.*, 75 Pa.C.S. § 4706(b.1)(1) & 67 Pa.Code § 177.51(c)-(f) (vehicle emissions inspection requirements stricter in metro-

politan areas, Philadelphia and Pittsburgh). Moreover, the Commonwealth is now over three centuries old, and its citizens settled the territory and built homes and communities long before the exploitation of natural gas in the Marcellus Shale Formation became economically feasible. Oil and gas operations do not function autonomously of their immediate surroundings. Act 13 emerged upon this complex background of settled habitability and ownership interests and expectations.

Despite this variety in the existing environmental and legislative landscape, Act 13 simply displaces development guidelines, guidelines which offer strict limitations on industrial uses in sensitive zoning districts; instead, Act 13 permits industrial oil and gas operations as a use "of right" in **every zoning district throughout the Commonwealth,** including in residential, commercial, and agricultural districts. *See* 58 Pa.C.S. § 3304(a), (b)(1), (5)-(9). Insofar as Section 3304 permits the fracking operations and exploitation of the Marcellus Shale at issue here, the provision compels exposure of otherwise protected areas to environmental and habitability costs associated with this particular industrial use: air, water, and soil pollution; persistent noise, lighting, and heavy vehicle traffic; and the building of facilities incongruous with the surrounding landscape. The entirely new legal regimen alters existing expectations of communities and property owners and substantially diminishes natural and esthetic values of the local environment, which contribute significantly to a quality of environmental life in Pennsylvania. Again, protected by their organic charter, these communities and property owners could reasonably rely upon the zoning schemes that municipalities designed at the General Assembly's prompt, schemes in which participation was mandatory and which imposed costs (for example, land use restrictions) upon participants, in addition to benefits. The costs, under the local schemes, presumably were rationally related to the scheme's benefits. For communities and property owners affected by Act 13, however, the General Assembly has effectively disposed of the regulatory structures upon which citizens and communities

made significant financial and quality of life decisions, and has sanctioned a direct and harmful degradation of the environmental quality of life in these communities and zoning districts. In constitutional terms, the Act degrades the corpus of the trust. *Cf. HHAP*, 77 A.3d at 604 & n. 20 (passing upon due process challenge, describes effect of challenged retrospective legislation on appellees' settled rights; cites U.S. Supreme Court as "warning that settled expectations should not be lightly disrupted, and highlighting the importance of scrutinizing retrospective laws with particular caution because of the Legislature's unmatched powers to sweep away settled expectations suddenly and without individualized consideration").

A second difficulty arising from Section 3304's requirement that local government permit industrial uses in all zoning districts is that some properties and communities will carry much heavier environmental and habitability burdens than others. *Accord* Agencies' Brief (as appellees), at 5–9 (admitting that uniform provisions of Act 13, including Section 3304, have "potentially different impacts on differently situated communities and property owners"). This disparate effect is irreconcilable with the express command that the trustee will manage the corpus of the trust for the benefit of "all the people." PA. CONST. art. I, § 27. A trustee must treat all beneficiaries equitably in light of the purposes of the trust. *See Hamill's Estate*, 410 A.2d at 773; 20 Pa.C.S. § 7773. Again, we do not quarrel with the fact that competing constitutional commands may exist, that sustainable development may require some degradation of the corpus of the trust, and that the distribution of valuable resources may mean that reasonable distinctions are appropriate. But, Act 13's blunt approach fails to account for this constitutional command at all and, indeed, exacerbates the problem by offering minimal statewide protections while disabling local government from mitigating the impact of oil and gas development at a local level. *See* 58 Pa.C.S. § 3304(b)(2)-(4), (10)-(11). Section 3304 requires either that no "conditions, requirements or limitations" be imposed on certain aspects of oil and gas location or

operations or that such conditions, requirements, or limitations be no "more stringent" than those imposed on other industrial uses in the municipality (relating to construction activities) or other land development in the zoning district (relating to heights of structures, screening and fencing, lighting or noise). Remarkably, Section 3304 then goes even further, as it prohibits local government from tailoring protections for water and air quality (*e.g.*, through increased setbacks) and for the natural, scenic, and esthetic characteristics of the environment (*e.g.*, through increased setbacks, screening, fencing, reduced hours of operation requirements) in the affected areas within a municipality. *Id.* Imposing statewide environmental and habitability standards appropriate for the heaviest of industrial areas in sensitive zoning districts lowers environmental and habitability protections for affected residents and property owners below the existing threshold and permits significant degradation of public natural resources. The outright ban on local regulation of oil and gas operations (such as ordinances seeking to conform development to local conditions) that would mitigate the effect, meanwhile, propagates serious detrimental and disparate effects on the corpus of the trust.

To be sure, the Commonwealth and its *amici* make compelling policy arguments that Pennsylvania's populace will benefit from the exploitation of the natural gas found in the Marcellus Shale Formation. Shale gas, according to the Commonwealth and its *amici,* has the potential to be a long-term source of energy that is cheap to transport to large metropolitan centers and businesses on the East Coast, and that can provide a welcome source of tax and other income for the Commonwealth and local communities.[57] The Commonwealth offers

57. The U.S. Department of Energy suggests that in 2011, the U.S. consumed about 23 trillion cubic feet ("Tcf") of natural gas per year, of which 20 Tcf were produced domestically. The Department cited the projection that there are 827 Tcf of recoverable natural gas from all U.S. shales (including Marcellus), which represents an approximately 36-year supply at current consumption levels. In 2009, shale gas production amounted to 14 percent of the total volume of natural gas produced in the U.S. and 12 percent of the natural gas consumed domestically. The Marcellus Shale play contributed to approximately 2

that it has devised the best means by which to take advantage of Pennsylvania's rich shale gas resources, including by anticipating what it believes would be local efforts to derail industry development and by preventing what it says would be a "balkanization" of legal regimes with which the industry would have to comply.

◼ If economic and energy benefits were the only considerations at issue, this particular argument would carry more weight. But, the Constitution constrains this Court not to be swayed by counter-policy arguments where the constitutional command is clear. In this sense, the Commonwealth fails to respond in any meaningful way to the citizens' claims that Act 13 falls far short of providing adequate protection to existing environmental and habitability features of neighborhoods in which they have established homes, schools, businesses that produce or sell food and provide healthcare, and other ventures, which ensure a quality of human life. In our view, the framers and ratifiers of the Environmental Rights Amendment intended the constitutional provision as a bulwark against enactments, like Act 13, which permit development with such an immediate, disruptive effect upon how Pennsylvanians live their lives. To comply with the constitutional command, the General Assembly must exercise its police powers to foster sustainable development in a manner that respects the reserved rights of the people to a clean, healthy, and esthetically-pleasing environment. *Cf. Schuylkill Trust Co. v. Schuylkill Mining Co.*, 358 Pa. 535, 57 A.2d 833 (1948) (same principle applicable outside trustee/beneficiary relationship, in context where both legal and equitable interests exist: holder of legal title to mining property (owner) has right to mine property and even to exhaust mineral wealth, with no charge of waste by holder of equitable interest not in possession (mortgage holder), except where holder of legal title

Tcf of a total of 3.5 to 4.5 Tcf of shale gas produced in 2009–2010. By 2035, it is projected that the shale gas share will increase to 45 percent of the total volume of gas produced in the U.S. U.S. Dep't of Energy, *supra*, at 4.

engages in mining operations in unskilled or careless manner that renders irreparable damage to property).

For these reasons, we are constrained to hold that the degradation of the corpus of the trust and the disparate impact on some citizens sanctioned by Section 3304 of Act 13 are incompatible with the express command of the Environmental Rights Amendment. We recognize the importance of this legislation, and do not question the intentions behind it; we recognize, too, the urgency with which the political branches believe they must act to secure the benefits of developing the unconventional natural gas industry. By any measure, this legislation is of sweeping import. But, in that urgency, it is apparent that the Article I, Section 27 constitutional commands have been swept aside. Act 13's unauthorized use of the public trust assets is unprecedented and constitutionally infirm, even assuming that the trustee believes it is acting solely and in good faith to advance the economic interests of the beneficiaries. *See Metzger*, 69 A. at 1038.[58]

### 3. Section 3215(b)

 Finally, we address the Commonwealth's claims regarding the constitutionality of Section 3215(b)(4). At the outset, we agree with the Commonwealth that Section 3215(b)(4) cannot be considered in isolation, and that we must review the entire decisional process regarding the protection of certain bodies of water described in Section 3215(b) to render a proper decision.[59] Even placed into this broad

58. Section 3304 also has a similar effect to Section 3303, in that it removes local government's necessary and reasonable authority to carry out its trustee obligations by prohibiting the enactment of ordinances tailored to local conditions. As we explained relative to Section 3303, the General Assembly may not command municipalities to ignore their obligations under Article I, Section 27 and, thereby, abridge citizens' constitutional rights indirectly. *See Mesivtah*, 44 A.3d at 9 (statute "cannot excuse the constitutional minimum" for meeting public charity exemption from taxation); *cf. Carroll*, 274 A.2d at 196–97 (Judiciary "must possess" inherent power to carry out its mandated responsibilities). Accordingly, for this additional reason, Section 3304 is unconstitutional.

59. There is no dispute that regulation of the Commonwealth's waters implicates public natural resources that are a subject of the Article I, Section 27 trust.

context, the Commonwealth's characterization of the provision is, nevertheless, unpersuasive.

Section 3215(b) states mandatory setbacks for the gas industry but, even then, the provision also requires the Department of Environmental Protection to waive the setbacks on condition that the permit applicant submit "a plan" to protect Commonwealth waters. The Act requires the Department to articulate protective terms and conditions it deems "necessary," but upon appeal by the applicant, the Department has the burden to justify these conditions. In the process of granting these permits, the Act empowers the Department to "consider" local comments, but it is not required to act upon local concerns. Unlike the industry, local government may not seek review of permit decisions. *See* 58 Pa.C.S. § 3215(b), (d)-(e); *see also* 58 Pa.C.S. § 3212.1(b). Section 3215(b) presents twin difficulties.

Initially, neither Section 3215(b), nor any other provision of Act 13, describes what additional measures are "necessary" for a waiver of setbacks to be appropriate. The Commonwealth insists that Act 13 impliedly creates a floor and a ceiling on the type of conditions the Department may impose on a permit applicant. In the Commonwealth's view, the Department's discretion is limited by Act 13's express intent and by the Commonwealth's various existing environmental statutes. But, predictably enough given the broad language of Section 3215, the Commonwealth fails to identify any actual substantive conditions that may be deemed necessary for the purposes of Act 13. Rather, the necessary protections are determined according to criteria that the Environmental Quality Board shall articulate, which are to account for the impact on public natural resources of oil and gas operations; notably, those criteria must ensure optimal development of the industry. *See* 58 Pa.C.S. § 3215(e).[60] The direction to the Depart-

60. The Environmental Quality Board is to articulate criteria for granting permits premised on consideration of the impact on public natural resources, including publicly owned parks, forests, game lands and wildlife areas; national or state scenic rivers; national natural landmarks; habitats of rare and endangered flora and fauna and other critical communities; historical and archaeological sites listed on the

ment of Environmental Protection then is merely "to consider" the Environmental Quality Board's criteria in granting well permits. At that point, again, review is limited to industry challenges. Neither local government nor affected citizens may pursue an appeal.

Even accounting for all elements of the statutory scheme in a manner most deferential to Act 13's statutory purpose, we are constrained to conclude that what the crucial term "necessary" entails in the context of Section 3215(b) remains malleable and unpredictable. The statute does not provide any ascertainable standards by which public natural resources are to be protected if an oil and gas operator seeks a waiver of the Section 3215(b) setbacks. The statement of legislative intent, which simply articulates broad principles, offers no additional clarification regarding the environmental standard governing either the applicant or the Department of Environmental Protection. Moreover, Act 13 offers no reference, however oblique, to any requirement that the Department is obligated to consider the Commonwealth's environmental statutes in rendering its permit decisions or imposing well permit conditions under Act 13. Section 3257 of Act 13, for example, which the Commonwealth cites as incorporating standards of environmental statutes into the Section 3215(b) decision, declares as a general matter (while offering specific examples) merely

federal or state list of historic places; and sources used for public drinking supplies. It is worth noting that the Commonwealth does not specify whether any independent scientific study has been commissioned or what data will be used to assess the impact on any or all of the public natural resources that the Board is to consider in promulgating regulations. In addition to strengthening the citizens' claims that the statutory scheme offers no clear standards for determining permit applications, the absence of data also suggests that the Commonwealth has failed to discharge its trustee duty of gathering and making available to the beneficiaries complete and accurate information as to the nature and amount of the trust property. *In re Rosenblum's Estate,* 459 Pa. 201, 328 A.2d 158, 164–65 (1974) (citing RESTATEMENT (SECOND) OF TRUSTS § 173) (right of access to trust records is essential part of beneficiary's right to complete information concerning administration of trust; right of inspection has independent source in beneficiary's property interest in trust estate); *see also* RESTATEMENT (SECOND) OF TRUSTS § 173 cmt. c ("[B]eneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust.").

that Chapter 32 of Act 13 "provide[s] additional and cumulative remedies to control activities related to drilling for or production of oil and gas in this Commonwealth, and nothing contained in this chapter abridges or alters rights of action or remedies existing, or which existed previously, in equity or under common or statutory law, criminal or civil." 58 Pa.C.S. § 3257. The provision makes no reference to whether or how substantive standards of existing environmental acts enter into a well permit determination, let alone into a Section 3215(b)(4) decision. Considered in its totality, the Section 3215(b) scheme lacks identifiable and readily-enforceable environmental standards for granting well permits or setback waivers, which yields at best arbitrary terms and conditions and, at worst, wholly ineffective protections for the waters of the Commonwealth. In this sense, the Act has failed to ensure compliance with the express command of the Environmental Rights Amendment that the Commonwealth trustee "conserve and maintain," *inter alia,* the waters of the Commonwealth.

To exacerbate this problem, the decisional process of Section 3215 creates incentives to define "necessary" conditions by nominal standards, and invites arbitrary decision-making with a disparate impact on trust beneficiaries. From the outset, Section 3215(b) appears to provide for nothing more than a set of voluntary setbacks or, as an alternative, the opportunity for a permit applicant to negotiate with the Department of Environmental Protection the terms or conditions of its oil or natural gas well permit. If an applicant appeals permit terms or conditions—and only the applicant can appeal—Section 3215 remarkably places the burden on the Department to "prov[e] that the conditions were necessary to protect against a probable harmful impact of [sic] the public resources." 58 Pa.C.S. § 3215(e). Viewed in terms of the constitutional mandates, this is topsy-turvy: Act 13 places on the Department the burden of proof and persuasion, and the people are allocated thereby the risk of an erroneous decision by the Environmental Quality Board. *See Commonwealth v. Sanchez,* 614 Pa. 1. 36 A.3d 24, 65 (2011). This naturally

invites the Department to articulate "necessary" conditions as minimal standards that an applicant would accept without litigation. The scheme also provides the oil and gas operator leverage in the first instance to negotiate permit terms and conditions to optimize industrial development, even at the expense of protected environmental and habitability concerns. The statutory scheme overall dilutes the Department's authority to regulate and enforce adequate environmental standards, and fosters departures from the goal of sustainable development.

■■■ Finally, Section 3215(d) marginalizes participation by residents, business owners, and their elected representatives with environmental and habitability concerns, whose interests Section 3215 ostensibly protects. *See* 58 Pa.C.S. § 3202 (Declaration of purpose of chapter). The result is that Section 3215 fosters decisions regarding the environment and habitability that are non-responsive to local concerns; and, as with the uniformity requirement of Section 3304, the effect of failing to account for local conditions causes a disparate impact upon beneficiaries of the trust. Moreover, insofar as the Department of Environmental Protection is not required, but is merely permitted, to account for local concerns in its permit decisions, Section 3215(d) fails to ensure that any disparate effects are attenuated. Again, inequitable treatment of trust beneficiaries is irreconcilable with the trustee duty of impartiality. *See Hamill's Estate*, 410 A.2d at 773; 20 Pa.C.S. § 7773.

Calling upon agency expertise to make permit decisions that comply with the Commonwealth's trustee obligations does not dissipate the structural difficulties with a statutory scheme that fails both to ensure conservation of the quality and quantity of the Commonwealth's waters and to treat all beneficiaries equitably in light of the purposes of the trust. In these respects, we are constrained to conclude that Act 13 has failed to properly discharge the Commonwealth's duties as trustee of the public natural resources.[61]

61. We note that the citizens challenged only Section 3215(b)(4) and (d) of Act 13, rather than Section 3215 in its entirety.

### 4. Mandate

For these reasons, we agree with the citizens that, as an exercise of police power, Sections 3215(b)(4) and (d), 3303, and 3304 are incompatible with the Commonwealth's duty as trustee of Pennsylvania's public natural resources. Accordingly, we hold that these provisions are unconstitutional. Because we find that Sections 3215(b)(4) and 3304 violate the Environmental Rights Amendment, we do not address the related claims that these provisions violate, respectively, the separation of powers doctrine and the due process clauses of the Pennsylvania Constitution and the U.S. Constitution. *See* Citizens' Petition for Review, 3/29/12, at 27–49, 88–91 (Counts I–III, VIII).

The Commonwealth Court's decision is affirmed in part, albeit on different grounds, and reversed in part.[62]

**62.** Mr. Justice Eakin's dissent, which would deny relief *in toto*, joins Justice Saylor's dissent and then addresses four distinct points: (1) standing; (2) waiver of the Environmental Rights Amendment claim; (3) a comment that Act 13 is about the choice between a pipeline and transportation of natural gas by tractor-trailers; and (4) a claim that the finding of unconstitutionality represents a reweighing of policy and a substitution of the Court's judgment for that of the General Assembly, with the Court "act[ing] legislatively" as a result, and not "serv[ing] the Commonwealth as we should." We respectfully disagree with the dissent in all respects.

The issues involved here are considerably less monolithic, and correspondingly more complex, than the dissent allows. The standing and waiver issues have been addressed at length in text. The dissent's bare assertions neither acknowledge nor engage the precedent as cited and applied. The third point, which begins with the statement "This Act is about a pipeline," scarcely implicates the provisions of Act 13 actually challenged here. Gas must be extracted before it is transported.

On the last issue, it is erroneous to state that we are directing what policy choices or laws the General Assembly should make vis-à-vis natural gas extraction; the extent of the holding is that Act 13, as enacted, violates the Environmental Rights Amendment. The Amendment so construed is not "judicial legislation;" it is part of the Declaration of Rights enshrined in the Constitution. We believe it has meaning. The Amendment announces rights and obligations to protect environmental values of which legislation cannot run afoul. Some may view the dissent's preference to label the dispute "political" and move on as a refusal to discharge the judicial obligation.

There are constitutional restraints upon all branches of government, and our finding that this particular legislation crosses this constitutional line is not a substitution of our own preferences for those of the

## IV. Other Claims

### A. Article III, Section 32 of the Pennsylvania Constitution (Special Laws)

Next, we address the citizens' claims that Sections 3218.1, 3304 through 3307, and Act 13 globally, violate the prescription of the Pennsylvania Constitution against enactment of special laws. *See* Citizens' Petition for Review, 3/29/12, at 49–61 (Count IV). The Commonwealth Court sustained the Commonwealth's preliminary objections and dismissed Count IV of the citizens' Petition for Review, which articulated these claims. With little analytical development, the court concluded that Section 3304 and, therefore, Act 13 does not violate Article III, Section 32 of the Pennsylvania Constitution because, although the statute treats the oil and gas industry differently than other extraction industries, "the distinction is based on real differences that justify varied classifications for zoning purposes." The court did not address specifically the merits of the citizens' remaining claims regarding Sections 3218.1 and 3305 through 3307 of Act 13. *Robinson Twp.*, 52 A.3d at 487.

The citizens appeal the Commonwealth Court's decision and begin by criticizing the "blanket conclusion" that Act 13's special treatment of the oil and gas industry is justified. According to the citizens, the lower court failed to articulate any explanation for why the different treatment of the industry in each of the discrete challenged provisions has a reasonable relationship with the proffered distinction, and is justified by a legitimate state interest. The court's error, the citizens continue, stems from the General Assembly's inability to provide adequate justification in this regard. In this sense, according to the citizens, the preferential treatment the General Assembly has afforded the oil and gas industry cannot be

General Assembly. It construes the organic command and thereby defines the parameters within which the General Assembly is fully free to act. This is true with all judicial decisions resolving constitutional challenges to legislation. In our view, the notion that judicial decisions passing upon such challenges represent "judicial legislation"—unless the legislative act is rubber-stamped—misconceives our own duty.

explained solely on the ground that natural gas extraction provides "an economic boost to Pennsylvania communities."

The citizens concede that the oil and gas industry may be inherently different from any other industry. But, they claim that the distinctions offered by the Commonwealth are not reasonably related to, nor do they justify, Act 13's preferential treatment of the oil and gas industry with respect: to zoning restrictions (Section 3304); to the zoning review process (Sections 3304 through 3306); to penalties on local government (Section 3307); and to limitations on the protection of private water systems (Section 3218.1). The citizens offer separate arguments for why each challenged provision violates the constitutional prescription against enactment of special laws. Citizens' Brief (as cross-appellants), at 17–29.[63]

The Commonwealth responds with a global argument that Act 13 is not a "special law," stating that its provisions are focused on the industry to permit optimal development of oil and gas resources while protecting health, safety, property and the environment. The Commonwealth says Act 13 applies uniformly throughout the state rather than impermissibly creating an immutable class of one. Moreover, the Commonwealth argues that as long as the General Assembly could

---

**63.** Regarding Section 3218.1, the citizens argue that, while Act 13 provides for notification to any public drinking water facility in the event of an oil or gas drilling-related spill, the statute requires no such notifications to any other drinking water sources or persons, including owners of private wells. *See* 58 Pa.C.S. § 3218.1. But, the citizens note, private water wells are the prevalent drinking water sources in the rural areas where gas drilling will primarily be taking place; and the danger to public health and welfare posed by drilling is exacerbated because private wells are not subject to routine testing and monitoring, as is the case with public water sources. The citizens claim that there is no justification for treating private wells differently than public water sources for the purposes of notification. *See* Citizens' Brief (as appellants) at 28.

Although arguments related to this provision, more than other arguments forwarded under the "special law" heading, appear to implicate substantive constitutional rights under Article I discussed in other parts of this Opinion, the citizens here offer this provision only as an example of why Act 13 is a special law, which the General Assembly is prohibited from enacting under Article III, Section 32. The citizens do not develop any substantive arguments regarding Section 3218.1 premised upon Article I rights; accordingly, we express no opinion on the issue.

reasonably have believed that Act 13's classifications serve legitimate state purposes, the Court must defer to its judgment.

The Commonwealth further claims that the citizens misconstrue the governing standards, and fail to offer any persuasive precedent for the proposition that the General Assembly cannot articulate statewide standards for an industry. According to the Commonwealth, Section 32 prohibits "granting special privileges to one person, one company, or one county" but not from creating a class consisting of "one type of member." Moreover, the Commonwealth states that caselaw does not require or authorize a reviewing court "to parse through a law in infinite detail in order to justify every arguable distinction the General Assembly made." Finally, the Commonwealth dismisses the citizens' challenges to the individual provisions as mere complaints about "potentially different impacts on differently situated communities and property owners." According to the Commonwealth, looking at the impact of a statute on individual persons, communities, or municipalities is not a proper basis upon which to find that a law is prohibited special legislation. *See* Agencies' Brief (as appellees), at 5–9; *accord* OAG's Brief (as appellee), at 24–25.

This part of the citizens' cross-appeal arises from the Commonwealth Court's decision to sustain preliminary objections in the nature of a demurrer to Count IV of the Petition for Review. As already noted, we may affirm an order sustaining preliminary objections only if the party filing the petition for review is not entitled to relief as a matter of law. *See Stilp,* 940 A.2d at 1232 n. 9. In our review, "we accept as true all well-pleaded material facts set forth in the [petition for review] and all inferences fairly deducible from those facts." *Thierfelder,* 52 A.3d at 1253. "A challenge to the constitutionality of legislation poses a question of law, and thus, our review is plenary and non-deferential." *Pennsylvania Tpk. Comm'n v. Commonwealth,* 587 Pa. 347, 899 A.2d 1085, 1094 (2006).

We have previously noted that the overarching purpose of Article III of our Constitution is "to place restraints on the

legislative process and encourage an open, deliberative, and accountable government." *PAGE*, 877 A.2d at 395. Article III enumerates constitutional requirements that govern procedural aspects of legislative enactment. *Stilp*, 905 A.2d at 951. First adopted in the Pennsylvania Constitution of 1874, Section 32 of Article III was intended to end "the flood of privileged legislation for particular localities and for private purposes which was common in 1873." *Pennsylvania Tpk. Comm'n*, 899 A.2d at 1094. Over time, Section 32—akin to the equal protection clause of the Fourteenth Amendment—has been recognized as implicating the principle "that like persons in like circumstances should be treated similarly by the sovereign." *Id.*

 This Court does not apply Section 32 to divest the General Assembly of its general authority either to identify classes of persons and the different needs of a class, or to provide for differential treatment of persons with different needs. Our constitutionally mandated concerns are to ensure that the challenged legislation promotes a legitimate state interest, and that a classification is reasonable rather than arbitrary and "rest[s] upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation." *Id.* at 1095 (citing *Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 828 A.2d 1079, 1088–89 (2003); *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265, 268 (1995)). A legislative classification must be based on "real distinctions in the subjects classified and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition." *Id.* (citing *Harrisburg Sch. Dist. v. Hickok*, 563 Pa. 391, 761 A.2d 1132, 1136 (2000)). In its review, a court may hypothesize regarding the reasons why the General Assembly created the classifications. *Id.* Alternately, a court may deem a statute or provision *per se* unconstitutional "if, under the classification, the class consists of one member and is closed or substantially closed to future membership." *Id.* at 1098.

In our constitutional analysis of a statute, we are also mindful that, although Act 13 does not itself address severability, the Statutory Construction Act creates the presumption that the provisions of every statute are severable. *See* 1 Pa.C.S. § 1925 (constitutional construction of statutes). In this sense, where a petitioner's challenge to an act is premised upon claims that discrete provisions of the act violate the Constitution, a proper analysis begins with the application of the law to the individual provisions challenged. *See, e.g., Zahorchak,* 4 A.3d at 1048–49; *PAGE,* 877 A.2d at 415–19.[64] The Commonwealth's suggestion that a reviewing court is not required to parse the law and "justify" every distinction may be appropriate in some circumstances, but we do not find it persuasive here to prohibit the court's review of the citizens' properly preserved and articulated individual challenges.

In our view, the Commonwealth Court plainly erred in sustaining the Commonwealth's preliminary objections and failing to address individually the citizens' claims regarding the discrete provisions of Act 13 that were challenged. The record shows that, in their Petition for Review, the citizens offered discrete arguments that enumerated provisions of Act 13 violated Article III, Section 32 of our Constitution; the citizens requested, *inter alia,* a declaration that Act 13 was unconstitutional and any other relief the court might find proper. In response, the Commonwealth Court proceeded to assess the constitutionality of Section 3304, and Act 13 as a vague whole, based on an overly broad distinction and absent any analysis of whether the distinction had any fair and substantial relationship to the challenged provisions' object, in light of the distinct constitutional breaches alleged by the citizens.

64. In appropriate circumstances, the Court may, of course deem an entire act unconstitutional on the basis that it is special legislation. *See, e.g., Pennsylvania Tpk. Comm'n,* 899 A.2d at 1098 (First–Level Supervisor Collective Bargaining Act is special law because (1) differential treatment was not justified by any real distinction between Turnpike Commission's first-level supervisors and other Commonwealth-employed first-level supervisors and, alternately, (2) Act created one-member class that was closed or substantially closed to future membership).

In short, the Commonwealth Court sustained the Commonwealth's preliminary objections upon a basis insufficient as a matter of law. Identifying the oil and gas industry as a class that may be subject to different treatment at law and concluding that regulation of oil and gas operations accomplishes a legitimate state purpose are only the beginning of the special legislation constitutional inquiry. It is neither sufficient to look at the oil and gas industry and determine whether it is different from other industries, nor simply to accept that the declared benign purpose of Act 13 controls the constitutional inquiry, as the Commonwealth argues. *See, e.g., Stilp,* 905 A.2d at 945. Rather, the required inquiry is into the effect of the provisions challenged by the citizens, with respect to whether the admitted different treatment of the oil and gas industry represented by Act 13 rests upon some ground of difference that is reasonable rather than arbitrary and has a fair and substantial relationship to the object of each challenged provision. *See Pennsylvania Tpk. Comm'n,* 899 A.2d at 1094. To illustrate the point, it is simple enough to explain why the oil and gas industry is *sui generis,* and simple enough to declare that a statutory scheme designed to facilitate extraction promises economic benefits. But, those facts hardly explain why, for example, in the event of a "spill," notice is required to public water suppliers but not to owners of private wells. Finally, to the extent that the citizens also offered the alternate theory, as the Commonwealth suggests, that Act 13 is *per se* unconstitutional because it creates a class of one, the Commonwealth Court also failed to dispose of that claim.

For these reasons, we vacate the decision of the Commonwealth Court in this respect and remand the matter to that court for an appropriate merits disposition in accordance with this Opinion.

**B. Article I, Sections 1 and 10 of the Pennsylvania Constitution and the Fifth Amendment of the U.S. Constitution (Eminent Domain)**

Next, we address the citizens' claim that Section 3241 authorizes unconstitutional takings of property for private

purposes, in violation of the eminent domain provisions of the Pennsylvania Constitution and the U.S. Constitution. *See* Citizens' Petition for Review, 3/29/12, at 61–63 (Count V).[65] The Commonwealth Court sustained the Commonwealth's preliminary objections and dismissed the citizens' claim on the ground that the citizens failed "to demonstrate that any of their property has been or is in imminent danger of being taken, with or without just compensation." Moreover, the court held that the citizens failed to follow the appropriate and exclusive procedure to challenge a taking articulated in Section 306 of the Eminent Domain Code and, accordingly, the court concluded that it had no jurisdiction over the matter. *See Robinson Twp.*, 52 A.3d at 487–88 (citing 26 Pa.C.S. § 306(a)(1)).

On appeal, the citizens argue that the Commonwealth Court misapprehended the nature of their claim. According to the citizens, their claim was not an eminent domain challenge but a facial challenge to the constitutionality of the statutory provision, which the court should have addressed on the merits. Regarding the merits of their constitutional claim, the citizens state that Section 3241 permits a private corporation to exercise the state's eminent domain power for the storage of its private natural gas; the private storage of natural gas, according to the citizens, does not serve any public purpose that justifies the taking of private property. Furthermore, the citizens note that the corporations described in Section 3241 do not clearly qualify for the public utility exception to the rule against the taking of property for a private use. Citizens' Brief at 29–31 (citing 26 Pa.C.S. § 204; *In re Opening Private Rd. for Benefit of O'Reilly*, 607 Pa. 280, 5 A.3d 246, 253 n. 5, 258 (2010)).

65. Section 3241 provides, in relevant part that:
 [A] corporation empowered to transport, sell or store natural gas or manufactured gas in this Commonwealth may appropriate an interest in real property located in a storage reservoir or reservoir protective area for injection, storage and removal from storage of natural gas or manufactured gas in a stratum which is or previously has been commercially productive of natural gas.
 58 Pa.C.S. § 3241(a).

Relying upon the Commonwealth Court's reasoning, the Commonwealth responds that the citizens' claim is not ripe for consideration because no property has yet been taken. According to the Commonwealth, the Eminent Domain Code provides an adequate avenue for relief if, in the future, the citizens' property will be subject to a taking. Furthermore, the Commonwealth asserts that Section 3241 contains appropriate parameters to ensure that the primary purpose of any taking pursuant to that provision will serve the public. Section 3241(a), the Commonwealth states, is narrow in that only public utilities may appropriate an interest in private property pursuant to the provision. OAG's Brief (as cross-appellee) at 25–27; Agencies' Brief (as cross-appellees) at 10–12.[66] For the reasons that follow, we agree with the citizens that the Commonwealth Court erred in dismissing the citizens' claim premised upon the arguments offered by the Commonwealth and without reaching the merits.

The provision upon which the Commonwealth Court relied to sustain the preliminary objections, Section 306(a)(1) of the Eminent Domain Code, is not applicable here: the citizens have not been served with notice of condemnation and, as a result, the provision's procedure is not applicable on its terms. 26 Pa.C.S. § 306(a)(1) ("Within 30 days after being served with notice of condemnation, the condemnee may file preliminary objections to the declaration of taking."). Indeed, this is not a condemnation matter and, as a result, is not subject to the exclusive procedure of the Eminent Domain Code. *See* 26 Pa.C.S. § 102(a). Rather, the citizens filed their claim pursuant to the Declaratory Judgment Act. The purpose of the Declaratory Judgment Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa.C.S.

**66.** The Commonwealth also emphasizes that Section 3241 is a recodification of a provision of Act 13's predecessor, Section 601.401. *Compare* 58 Pa.C.S. § 3241 *with* 58 P.S. § 601.401. According to the Commonwealth, the eminent domain power in Section 3241 is not new but was codified almost thirty years ago. We note that this is the first opportunity for this Court to address the constitutionality of either provision premised upon the arguments that the citizens make here.

§ 7541(a). According to the Declaratory Judgment Act, "[t]he General Assembly finds and determines that the principle rendering declaratory relief unavailable in circumstances where an action at law or in equity or a special statutory remedy is available has unreasonably limited the availability of declaratory relief and such principle is hereby abolished." 42 Pa.C.S. § 7541(b). Declaratory relief, according to the Act, is "additional and cumulative" to other available remedies. *Id.* The citizens' constitutional challenge here seeks relief from uncertainty and insecurity with respect to rights under Section 3241.

According to the citizens, Section 3241 is incompatible with constitutional limitations on the General Assembly's exercise of police power to permit eminent domain takings. Waiting for a test case implicating a taking under Section 3241—and subject to the Eminent Domain Code's exclusive procedures— is certainly an available avenue for testing the constitutionality of the provision. But, as a facial challenge to the validity of a statutory provision and pure question of law, the citizens' claim is also generally appropriate for pre-enforcement review in a declaratory judgment action. *See Bayada Nurses, Inc. v. Commonwealth,* 607 Pa. 527, 8 A.3d 866, 874–76 (2010). A party challenging the availability of pre-enforcement review may, of course, assert concerns that issues or facts are not adequately developed, and question whether its adversary will suffer any hardships if review is delayed. *Id.* at 874. But, that is not how this litigation developed. Rather, the Commonwealth elected to dispute the availability of pre-enforcement declaratory relief with respect to Section 3241 from a jurisdictional perspective, rather than offering any arguments that the facts or issues are underdeveloped or that delaying review would not cause the citizens any hardship. The Commonwealth Court's conclusory analysis reflects these arguments and, as a result, was misdirected.

For these reasons, while offering no view on the merits, we vacate the Commonwealth Court's decision on this issue and remand this claim to the lower court for further proceedings consistent with this analysis.

## C. Separation of Powers Doctrine

Finally, we address the citizens' contention that Section 3305(a) and (b) violates the separation of powers doctrine. *See* Citizens' Petition for Review, 3/29/12, at 82–87 (Count VII).

 The separation of powers principle is "[o]ne of the distinct and enduring qualities of our system of government," which has been present in our Constitution since the first convention prepared the document in 1776. *Jubelirer*, 953 A.2d at 529. Our Constitution vests legislative power in the General Assembly; executive power in the Executive Department consisting, *inter alia*, of the Governor, the Attorney General, and various administrative agencies, as provided by law; and judicial power in a unified judicial system and, ultimately, in the Supreme Court. *See* PA. CONST. art. II, § 1; art. IV, § 1; art. V, § 1. The judiciary interprets and applies the law, and its proper domain "is in the field of the administration of justice under the law." *Commonwealth v. Sutley*, 474 Pa. 256, 378 A.2d 780, 783 (1977). Meanwhile, the duty of the executive branch is to ensure the faithful execution of laws. *See* PA. CONST. art. IV, § 2.

 The core tenet of the separation of powers principle is that a branch of government is prohibited from exercising the functions committed exclusively to a co-equal branch. *Sutley*, 378 A.2d at 783. Perfect separation of duties between the branches is not required; indeed, the constitutional construct permits "a degree of interdependence and reciprocity between the various branches." *Id.* Moreover, "dividing lines among the three branches are sometimes indistinct and are probably incapable of any precise definition." *Sweeney*, 375 A.2d at 705 (quoting *Stander v. Kelley*, 433 Pa. 406, 250 A.2d 474, 482 (1969) (Opinion Announcing Judgment of Court)). We address each of the challenged provisions in light of these general principles.

### 1. Section 3305(b)

 In relevant part, Section 3305(b) provides that the Public Utility Commission may issue orders determining

whether a local ordinance violates Chapters 32 and 33 of Act 13 or the Municipalities Planning Code, upon request from an owner or operator of an oil or gas operation, or from a local resident. The order is subject to *de novo* review in the Commonwealth Court, where it becomes part of the record. 58 Pa.C.S. § 3305(b). The Commonwealth Court sustained the Commonwealth's preliminary objections to the citizens' challenge to Section 3305(b), holding that this provision did not violate the separation of powers doctrine because the judiciary retains ultimate power to review the constitutionality of local ordinances via *de novo* review of the Public Utility Commission's final order. *Robinson Twp.*, 52 A.3d at 489–90.

On appeal, the citizens challenge the lower court's disposition, renewing their argument below that Section 3305(b) violates the separation of powers doctrine by concentrating judicial power in an executive agency. According to the citizens, only the judicial branch has the authority to pass on the constitutionality of laws; but, by permitting an executive agency to review zoning ordinances, which necessarily implicate constitutional issues, the General Assembly has delegated the exclusive judicial power to pass upon the constitutionality of laws to an executive agency. *See* Citizens' Brief (as cross-appellants) at 40 (citing *Village of Euclid,* 272 U.S. at 365, 47 S.Ct. 114; *Boundary Drive Assocs. v. Shrewsbury Twp. Bd. Supervisors,* 507 Pa. 481, 491 A.2d 86, 90 (1985); *Commonwealth v. Mockaitis,* 575 Pa. 5, 834 A.2d 488, 499 (2003), *First Jud. Dist. v. Pa. Human Rels. Comm'n,* 556 Pa. 258, 727 A.2d 1110, 1112 (1999), *Marbury,* 1 Cranch at 25–26). The Commonwealth Court, the citizens claim, failed to recognize that any review of a zoning ordinance implicates questions of constitutionality.

The citizens assert that the Public Utility Commission is neither a court nor a quasijudicial tribunal, which distinguishes the agency from zoning hearing boards that have "exclusive jurisdiction" under the Municipalities Planning Code to render adjudications on the validity of land use ordinances. The citizens argue that the Public Utility Commission is not a quasi-judicial tribunal because it is exempt in

its Act 13 proceedings from due process requirements, rules against *ex parte* communications, evidentiary rules, Administrative Agency Law procedures, and the Sunshine Act. Act 13 also does not permit appeal of a Commission's advisory opinion. These defects, according to the citizens, render the Act 13 delegation an improper exercise of quasi-judicial power that permits the Public Utility Commission "to strong-arm financially-strapped municipalities into accepting a slanted administrative ruling." *Id.* at 44. The citizens allege that the review process, coupled with the threatened withholding of natural gas revenue and severe penalties, concentrates the power to devise oil and gas policy into the hands of the executive branch. The citizens conclude that the Public Utility Commission is an executive agency that is unconstitutionally exercising judicial power.

The Commonwealth responds that the citizens' claim "consists primarily of *ad hominem* attacks on the General Assembly, the Governor and the Commission" and that the citizens' true grievance is that "they do not like the way Act 13 is designed to operate." Agencies' Brief (as cross-appellees) at 17. The Commonwealth also argues that Section 3305 merely authorizes the Commission to review ordinances for compliance with Act 13 and the Municipalities Planning Code, and not for constitutionality. *Id.* at 17. According to the Commonwealth, the citizens set up a false premise with the argument that any zoning claim involves a constitutional challenge and that whether a zoning claim involves a constitutional challenge cannot be resolved in the abstract. *Id.* at 18–19 (citing *Hoffman Mining Co. v. Zoning Hearing Bd.*, 612 Pa. 598, 32 A.3d 587, 590 (2011) (Surface Mining Act does not preempt setback provision of local ordinance)). Moreover, the Commonwealth states, any blanket contention that an executive agency may not address any issue with constitutional overtones is unfounded. *Id.* at 19 (citing *Lehman*, 839 A.2d at 276 (agency exercises expertise and develops factual record necessary to decide as-applied constitutional challenge)). The Commonwealth posits that the citizens commit a "fundamental error" in their reasoning by insisting that the General Assem-

bly may not set parameters for local government and enforce them; the Constitution provides the municipalities with no authority as against the General Assembly. *Id.* at 20. Finally, the Commonwealth adds that Section 3305(b) does not violate the separation of powers principle because a person aggrieved by an order of the Commission may appeal *de novo,* and the Commonwealth Court is the final arbiter of an ordinance's constitutional validity. OAG's Brief (as appellee) at 31.

In essence, the citizens base their separation of powers argument regarding Section 3305(b) on two premises: that all zoning challenges necessarily implicate constitutional claims, and that administrative agencies have no authority to pass upon constitutional issues. For the proposition that all zoning cases implicate constitutional issues, the citizens cite two cases: *Village of Euclid* and *Boundary Drive Associates.* Although both decisions addressed constitutional claims, neither decision stands for the broad principle for which it is cited. In *Village of Euclid* and *Boundary Drive Associates,* the plaintiffs—industrial concerns—challenged local ordinances as an unconstitutional taking and a violation of the due process clause, respectively; the U.S. Supreme Court and this Court decided the cases in the context of the arguments presented and the pertinent constitutional principles. We have explained that court decisions are to be read against their facts because "decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court." *Scampone,* 57 A.3d at 604 (quoting *Maloney v. Valley Med. Facilities, Inc.,* 603 Pa. 399, 984 A.2d 478, 489–90 (2009)). "For one thing, it is very difficult for courts to determine the range of factual circumstances to which a particular rule should apply in light of the often myriad possibilities." *Id.* Relevant here, the citizens extrapolate from two cases that the myriad "zoning" claims that result across the range of factual circumstances would all be categorized under a "constitutional" decision rubric. Such a broad proposition does not follow.

But even accepting, for the purposes of decision, the citizens' first proposition, the conclusion that the General Assembly improperly delegated judicial power to the Public Utility Commission in this instance does not withstand scrutiny. Initially, we note that the cases cited by the citizens for the second proposition (that executive agencies have no authority to pass upon constitutional issues) do not speak directly to the issue for which they are cited; additionally, the citizens fail to explain their reliance upon these cases. *See First Jud. Dist.*, 727 A.2d at 1112 (administrative agency has no jurisdiction "to investigate and adjudicate complaints filed against the judicial branch of government" because such action would interfere with Supreme Court's exclusive power to supervise practice, procedure, and conduct of all courts); *Mockaitis*, 834 A.2d at 500 (General Assembly cannot "deputize" judicial employees to perform duties exclusively reserved to legislative or executive branch). Furthermore, decisional law more pertinent to the citizens' claim is to the contrary.

As a general matter, a claimed lack of "authority" to decide a particular case is based upon either an assertion that the tribunal is not competent to determine controversies in the general class or a claim that the tribunal lacks power to order or effect certain relief. We explained the distinction in *Mockaitis*:

Some litigants, while believing they are raising a claim of subject matter jurisdiction, are actually posing a challenge to the tribunal's authority, or power, to act. *See Riedel v. Human Rels. Comm'n of Reading*, 559 Pa. 34, 739 A.2d 121, 124 (1999). This confusion between the meaning of the terms "jurisdiction" and "power" is not surprising. While the terms are not synonymous, they are often used interchangeably by judges and litigants alike. *Id.* In *Riedel*, we teased out the distinctions between these terms, explicating that "jurisdiction relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs. Power, on the other hand,

means the ability of a decision-making body to order or effect a certain result." *Id.* 834 A.2d at 495. Here, the citizens suggest that the Public Utility Commission is not competent to decide zoning matters as a class, because such cases necessarily implicate a constitutional issue. They argue that such cases are within the exclusive jurisdiction of courts and zoning hearing boards acting within their quasi-judicial capacity.

Administrative agencies are created by the General Assembly, as part of the executive branch, to aid in the faithful execution of laws. *See* PA. CONST. art. IV, § 1 ("Executive Department ... shall consist of[, *inter alia*,] such other officers as the General Assembly may from time to time prescribe."). The General Assembly may assign the administrative agency the task of deciding disputes regarding the application or enforcement of a particular statute, subject to appellate review of right in a court of record. *See* PA. CONST. art. V, § 9. "Constitutional questions, like all others, can and are legitimately channeled by the legislature in their passage through the judicial process," including administrative review. *Borough of Green Tree v. Bd. of Prop. Assessments*, 459 Pa. 268, 328 A.2d 819, 823 (1974) (Opinion Announcing Judgment of Court). In *Borough of Green Tree*, the Court rejected the invitation to "dispense[ ] with the requirement that a litigant follow statutorily-prescribed remedies merely because a constitutional question is present in the case." *Id.* at 824; *accord Kowenhoven v. County of Allegheny*, 587 Pa. 545, 901 A.2d 1003, 1012 n. 8 (2006) (no suggestion "that ordinary administrative review may be bypassed as a matter of course simply by adding a constitutional claim, no matter how tenuous, to an assessment grievance"); *Elgin v. Dep't of Treasury*, —— U.S. ——, 132 S.Ct. 2126, 2136, 183 L.Ed.2d 1 (2012) (exclusivity of statutory remedy does not turn on constitutional nature of plaintiff's claim). The General Assembly created the Public Utility Commission and, among other duties, empowered the Commission to pass upon the general class of disputes regarding whether local ordinances comply with parts of Act 13. *See*

66 Pa.C.S. § 301(a); 58 Pa.C.S. § 3305(b). In this sense, the predicate for the Commission's authority to act in this general class of cases is certainly present. In asserting jurisdiction over disputes pursuant to Section 3305(b) of Act 13, the Public Utility Commission is exercising executive powers duly granted by the General Assembly.

The issue of jurisdiction over Section 3305(b) disputes is distinct from the question of whether the Public Utility Commission has the ability to order requested relief in cases in which a party asserts a question of constitutionality. *See Mockaitis, supra.* As we noted earlier, our jurisprudence does not preclude administrative agencies from passing upon constitutional claims in the first instance. *Kowenhoven,* 901 A.2d at 1012 n. 8 (court may exercise equitable jurisdiction over dispute implicating "a substantial question of constitutionality (and not a mere allegation) and the absence of an adequate statutory remedy"); *accord Elgin,* 132 S.Ct. at 2138, ("[W]e see nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question[, such as the constitutional claim at issue,] to which the facts pertain."). Under governing law, therefore, the citizens' claim that Section 3305(b) violates separation of powers principles must fail. The Commonwealth Court's decision is affirmed in this respect.[67]

67. The citizens also assert broadly that only quasi-judicial bodies, rather than any administrative agencies vested with jurisdiction, may render decisions on constitutional issues. The citizens create a dubious dichotomy: administrative agencies function as quasi-judicial bodies because they have legislative authorization to execute the law in the context of disputes. While Administrative Agency Law compliance issues and complaints of unfairness may raise questions regarding whether the administrative process is adequate, or concerns of due process and of vindication of the right of appeal, these concerns alone do not implicate the principle of separation of powers. The citizens' challenge here is premised solely upon the separation of powers. We affirm the Commonwealth Court's decision on a different basis here because, like the parties, the court conflated the separation of powers principle and due process interests. In this regard, we note that the Commonwealth Court's unexplained conclusion that a right to *de novo* appeal from an order of the Public Utility Commission under Section 3305(b) would *per se* satisfy any valid separation of powers concerns is

## 2. *Section 3305(a)*

■■■ Section 3305(a), meanwhile, provides that a municipality may request from the Public Utility Commission a written advisory opinion regarding whether a **proposed** local ordinance would violate Chapters 32 and 33 of Act 13 or the Municipalities Planning Code. The advisory opinion statutorily is not subject to appeal. The subsequent provisions of Chapter 33—Sections 3306 through 3309—create no enforcement mechanism related to Section 3305(a); these provisions address actions commenced by parties other than municipalities seeking declarations that **enacted** local ordinances violate Act 13 or the Municipalities Planning Code, such as matters before the Commission under Section 3305(b). *See* 58 Pa.C.S. § 3305(b) (orders of the Commission); *see also* 58 Pa.C.S. §§ 3306–3309.

The citizens argue that the Section 3305(a) process raises a valid separation of powers concern. According to the citizens, the effect of the process employed by Act 13 is to inject the Public Utility Commission into the law-drafting process of zoning ordinances, interfering with the local legislative function. The provision encourages local governments to seek advice from an executive agency in the formulation of zoning ordinances prior to passage by threatening sanctions if, following enactment, the ordinances are found by the Commission or the courts to violate Act 13. *See* 58 Pa.C.S. §§ 3306–3309. The citizens argue that legislative bodies should not have to and indeed are prohibited from relying on outside entities for guidance during the legislative process because it would "encourage legislative irresponsibility." Citizens' Brief (as cross-appellants) at 49 (citing *Township of Whitehall v. Oswald,* 400 Pa. 65, 161 A.2d 348, 349 (1960)). The citizens conclude that,

questionable. *See, e.g., Daniels v. W.C.A.B. (Tristate Transport),* 574 Pa. 61, 828 A.2d 1043, 1051 (2003) (statute imposing on administrative agency obligation to "provide the basis for meaningful appellate review" for purpose of facilitating judicial review presumptively raised separation of powers concern; but, obligation was sufficiently broad and statute imposed no specific remedy for failure to comply so that "determination of exactly what is necessary to provide a basis for effective judicial review under the statute ultimately rest[ed] with the judiciary" and raised no valid separation of powers concern).

as an executive agency, the Public Utility Commission has no authority to render guidance on legislation before its passage. *Id.* at 40–49.[68]

The Commonwealth responds that, far from providing the coercive process the citizens portray, the provision simply constitutes a resource for municipalities. The General Assembly made basic policy choices and did not delegate to the Public Utility Commission any power to make laws, but conferred upon it authority and discretion to execute Act 13, including through the advisory opinion process. Other agencies that exercise quasi-judicial functions are permitted to issue advisory opinions, *e.g.*, the State Ethics Commission, the Office of Open Records, and the Office of the Attorney General. Agencies' Brief (as cross-appellees) at 20–21 (citing 65 Pa.C.S. § 1107(10); 65 P.S. § 67.1310(a)(2); 71 P.S. § 732–204(a)(1)). According to the Commonwealth, while courts may not render advisory opinions, the citizens' "contention that legislative bodies cannot use or otherwise rely on the expertise of executive agencies in enacting legislation is absurd. So long as the executive branch does not tie the hands of the municipality in enacting local zoning ordinances, it does not infringe on the independence of the legislative process." OAG's Brief (as appellee) at 31. Because the Commission simply issues non-binding opinions, the Commonwealth says, the process does not have the coercive effect of which the citizens complain.

The Commonwealth Court sustained the Commonwealth's preliminary objections, holding that Section 3305(a) did not transfer judicial powers to the Public Utility Commission, an executive agency, because the provision did not give the agency any authority over courts to render opinions on consti-

---

**68.** The *Township of Whitehall* decision offers little support to the citizens' claim. *Township of Whitehall* turned on whether a township had standing to file a declaratory judgment action to test the constitutionality of its ordinance, and did not implicate any separation of powers claim. 161 A.2d at 349 ("[I]t can not reasonably be said that the plaintiff township's 'rights, status, or other legal relations' have been adversarily [sic] affected by its own deliberately intended enactment.").

tutional issues. The agency's opinions are non-binding and advisory and, like other advisory opinions, are not appealable. *Robinson Twp.*, 52 A.3d at 489–90.

Initially, we note that the Commonwealth Court's summary reasoning was not responsive to the citizens' actual claim. Moreover, the citizens correctly point out that Section 3305(a) is peculiar in that it imposes obligations upon an executive agency with the goal of facilitating enactment of local legislation (*i.e.*, pre-enactment review of compliance with statutory requirements). Contrary to the Commonwealth's argument, a Public Utility Commission's obligation under Section 3305(a) is not on par, for purposes of a separation of powers analysis, with actions of the State Ethics Commission, or of the Office of Open Records, or of the Office of the Attorney General, under the relevant respective provisions permitting advisory opinions. For example, under the State Ethics Act, the State Ethics Commission may issue advisory opinions upon the request of a person, or the appointing authority or employer of that person—including the legislative and judicial branches. 65 Pa.C.S. § 1107(10). The Ethics Commission purports to offer advice to the various branches in their role as employer or appointing authority; the Commission does not appropriate the branches' respective constitutional duties. In fact, this Court's decision in *Kremer v. State Ethics Commission*, 503 Pa. 358, 469 A.2d 593 (1983) suggests that, insofar as the roles overlap, the State Ethics Act does not apply to a coordinate branch (the judiciary in that case) on separation of powers grounds. *Id.* at 595–96 (insofar as they apply to members of judiciary, financial disclosure provisions of Ethics Act infringe upon Supreme Court's power to supervise courts); *see also Shaulis v. State Ethics Comm'n*, 574 Pa. 680, 833 A.2d 123, 132 (2003) (provision restricting practice of attorney/former government employee interferes with judiciary's exclusive power to regulate practice of law and violates separation of powers principle).

Similarly, the Right to Know Law provides that the Office of Open Records shall issue advisory opinions to agencies and requesters. The Office of Open Records renders decisions

regarding records requests from Commonwealth and local agencies—agencies within the Executive Department, but not from state legislative or judicial agencies. *See* 65 P.S. § 67.503 (appeals from Commonwealth and local agencies to Office of Open Records; judicial and legislative agencies to appoint own appeals officers); 65 P.S. § 67.1310(a)(2) (Office of Open Records established, *inter alia*, to decide appeals and issue advisory opinions). Finally, the Office of the Attorney General has the authority to furnish legal advice only to the Executive Department—"the Governor or the head of any Commonwealth agency," under Section 204 of the Commonwealth Attorneys Act. *See* 71 P.S. § 732–204(a)(1).

In short, the statutes cited by the Commonwealth do not in fact authorize a Commonwealth agency to issue legal advice to a political subdivision acting within its legislative capacity regarding proposed legislation. Nevertheless, for the reasons that follow, we agree ultimately with the Commonwealth Court that Section 3305(a) does not violate the separation of powers doctrine.

The common paradigm implicating the separation of powers principle involves tension between some combination of the General Assembly, the executive branch, and the judiciary. *Bd. of Revision of Taxes v. City of Philadelphia,* 607 Pa. 104, 4 A.3d 610, 627 n. 12 (2010). While we have recognized that similar tension may also arise in disputes involving the separate branches at a local level, such questions implicate additional levels of complexity because local government derives power to act through the delegation of authority from the General Assembly. 53 P.S. § 10601 ("governing body of each municipality, in accordance with the conditions and procedures set forth in this act, may enact, amend and repeal zoning ordinances"); *see Bd. of Revision of Taxes,* 4 A.3d at 627 n. 12 (citing *Jefferson County Court Appointed Employees Ass'n v. P.L.R.B.,* 603 Pa. 482, 985 A.2d 697, 701 n. 3, 706 (2009) (county commissioners' board, acting in legislative capacity, encroached on judicial authority to hire, fire, and supervise its employees)). The parties here do not explain how, if at all, our analysis of a separation of powers claim is affected by the

fact that the primary tension here is not between acts of co-equal branches of government but is further removed, *i.e.,* the tension is between local legislative authority and the state executive branch. We will assume, however, for the purposes of decision, that a separation of powers claim is potentially valid in this scenario.

In *Daniels v. W.C.A.B. (Tristate Transport),* 574 Pa. 61, 828 A.2d 1043 (2003), this Court addressed a claim comparable to that of the citizens here. A workers' compensation claimant challenged whether the workers' compensation judge submitted a "reasoned decision" which "adequately explaine[d]" the judge's credibility determination, pursuant to Section 422(a) of the Workers' Compensation Act. The Court observed that a statutory obligation upon administrative officials to provide a reasoned decision to facilitate a judicial function was peculiar and raised separation of powers concerns. Upon further review, the Court dismissed the claim, holding that, because the statutory requirements were "broadly stated and no specific remedy [wa]s set forth for a failure to comply," the determination of what was necessary to provide a basis for effective judicial review remained ultimately with the judiciary, as befitting its constitutional role and, accordingly, there was no valid separation of powers concern. *Id.* at 1051.

Under the Act 13 construct, local governments retain the power to frame local ordinances as they see fit, within the limitations of their delegated powers. *See* 53 P.S. § 10601 *et seq.;* 58 Pa.C.S. § 3302. Any strictures upon the contents of local ordinances derive from the General Assembly—Act 13—rather than from the executive branch. Furthermore, Act 13 does not require the municipality to submit to pre-enactment review by the Public Utility Commission; the decision to seek an advisory opinion regarding compliance with legislative limitations rests entirely with the municipality. When a municipality does request an advisory opinion, the Commission has no power to enforce the opinion, as Act 13 provides no express benefit or remedy for a municipality's failure to comply. While a municipality may have financial incentives to abide by Act 13 requirements as interpreted by the Commission, local

government nevertheless retains discretion to enact the reviewed ordinance (albeit risking litigation to enjoin enforcement), to amend the ordinance, or to challenge in court the statutory requirement with which the ordinance purportedly does not comply. The prerogatives of acting upon policy judgments and enacting local legislation, while limited by the General Assembly's enactment, remain ultimately with local government under the Act 13 scheme. No valid separation of powers concern exists regarding Section 3305(a). *See* 828 A.2d at 1051. As against this claim, the Commonwealth Court's decision is affirmed, on these different grounds.

## V. Severability

The citizens' requested relief is a declaration that Act 13 is unconstitutional in its entirety, based solely on arguments related to the discrete provisions discussed above. We recognize that certain of the provisions we have held to be unconstitutional represent core aspects of Act 13. But, by the same token, several provisions appear relatively independent of other parts of Act 13. *See, e.g.,* 58 Pa.C.S. § 2302 (unconventional gas well fee); § 2505 (appropriations for Marcellus Legacy Fund). Notably, neither the parties nor Act 13 itself address the potential severability of provisions found unconstitutional. Nevertheless, our holding that Sections 3215(b)(4) and (d), 3303, and 3304 violate the Environmental Rights Amendment does not automatically require finding Act 13 unconstitutional in its entirety. *Mockaitis,* 834 A.2d at 502. Indeed, the presumption is that "[t]he provisions of every statute shall be severable." 1 Pa.C.S. § 1925 (constitutional construction of statutes).[69] Notably, while not citing to the

---

**69.** Section 1925 of the Statutory Construction Act provides that:

If any provision of any statute ... is held invalid, the remainder of the statute ... shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision ... that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925.

Section 1925 severability presumption expressly, the Commonwealth Court obviously recognized that the issue was implicated because, upon finding Section 3304 unconstitutional, the panel was careful to enjoin only those "provisions of Chapter 33 that enforce 58 Pa.C.S. § 3304." *Robinson Twp.*, 52 A.3d at 485.

 Setting aside the question of global severability—*i.e.*, whether the specific provisions held to be unconstitutional require that the entire Act be enjoined—there are obvious consequences of certain of our holdings. Thus, we have already recognized that Section 3215(b)(4), which addresses waivers of the general rule requiring setbacks for the protection of certain waters of the Commonwealth, is a key part of the Section 3215(b) scheme. It would appear that the General Assembly did not intend for the setback provision to operate without allowing industry operators to secure waivers from the setbacks. Absent the enjoined Section 3215(b)(4), the remaining parts of Section 3215(b)—which the citizens do not challenge on appeal—are incomplete and incapable of execution in accordance with the legislative intent. Having held that Section 3215(b)(4) is unconstitutional, we conclude that the remaining parts of Section 3215(b) are not severable. Accordingly, application of Section 3215(b) is enjoined.

 Moreover, insofar as Section 3215(c) and (e) are part of the Section 3215(b) decisional process, these provisions as well are incomplete and incapable of execution in accordance with legislative intent. Application of Section 3215(c) and (e) is, therefore, also enjoined. Finally, Sections 3305 through 3309 are those parts of the statutory scheme that establish a mechanism by which to enforce compliance with the Municipalities Planning Code and with Chapters 32 and 33 of Act 13, including Sections 3215, 3303, and 3304. To the extent that Sections 3305 through 3309 implement or enforce provisions we hold invalid, these provisions are incapable of execution and are enjoined.

We recognize that, in light of the numerous and diverse nature of the constitutional challenges, the parties were not in

an optimal position to present arguments on the severability of the various provisions ultimately held to be unconstitutional. In this Opinion, we decide this issue in part, to the extent that its application is obvious and necessary to provide direction to the parties going forward. Nevertheless, we believe that further inquiry into the continued viability of the entire statute or of discrete provisions, including additional provisions deemed unconstitutional on remand, if any, and guided by additional, targeted briefing from the parties, is salutary and necessary. Accordingly, we remand to the Commonwealth Court for a decision, in the first instance, of whether other parts of Act 13 are properly enjoined upon application of severability principles. *See also HHAP*, 77 A.3d at 606 (clarifying legal issue but remanding for further factual development and ultimate determination regarding statute's constitutionality).

## VI. Conclusion and Mandate

For these reasons, the Commonwealth Court's decision is affirmed in part and reversed in part. We hold that:

A. Brian Coppola; David M. Ball; Maya van Rossum; Robinson Township; Township of Nockamixon; Township of South Fayette; Peters Township; Township of Cecil; Mount Pleasant Township; Borough of Yardley; and the Delaware Riverkeeper Network state justiciable claims. The Commonwealth Court's decision on this question is, therefore, affirmed in part and reversed in part.

B. Dr. Mehernosh Khan also states a justiciable claim. The Commonwealth Court's decision on this issue is reversed, and Dr. Khan's claim is remanded for resolution on the merits.

C. Sections 3215(b)(4), 3215(d), 3303, and 3304 violate the Environmental Rights Amendment. We do not reach other constitutional issues raised by the parties with respect to these provisions. As a result, the Commonwealth Court's decision is affirmed with respect to Sections 3215(b)(4) and 3304 (on different grounds), and reversed with respect to Sections 3215(d) and 3303. Accordingly, application and

enforcement of Sections 3215(b)(4), 3215(d), 3303, and 3304 is hereby enjoined.

D. The remaining parts of Section 3215(b) are not severable from Section 3215(b)(4) and, as a result, the application or enforcement of Section 3215(b) is enjoined in its entirety. Moreover, Sections 3215(c) and (e), and 3305 through 3309 are not severable to the extent that these provisions implement or enforce those Sections of Act 13 which we have found invalid and, in this respect, their application or enforcement is also enjoined.

E. The Commonwealth Court erred in sustaining the Commonwealth's preliminary objections to Counts IV and V of the citizens' petition for review. The lower court's decision in these respects is reversed and the citizens' claims are remanded for decision on the merits.

F. The citizens failed to state a claim in Count VII of the petition for review; in this respect, the Commonwealth Court's decision is affirmed on different grounds.

G. Upon remand, the Commonwealth Court is also directed to address whether any remaining provisions of Act 13, to the extent they are valid, are severable. The Commonwealth Court may request additional briefing from the parties on the issue of severability.

Jurisdiction relinquished.

Former Justice ORIE MELVIN did not participate in the consideration or decision of this matter.

Justices TODD and McCAFFERY join the Opinion.
Justice BAER joins Parts I, II, IV, V, and VI(A), (B), (D)–(G) of the Opinion.

Justice BAER files a Concurring Opinion.

Justice SAYLOR files a Dissenting Opinion in which Justice EAKIN joins.

Justice EAKIN files a Dissenting Opinion.

Justice BAER, concurring.

I compliment my colleague, Mr. Chief Justice Castille, for a thorough, well-considered, and able opinion. Indeed, I join Parts I, II, IV, and V of his opinion, and the disposition and mandate as described in Part VI(A), (B), (D), (E), (F), and (G). In regard to the heart of the opinion, Part III (and its related section, Part VI(C) regarding mandate and disposition), I concur in the result that Sections 3215(b)(4) and (d), 3303, and 3304 of Act 13 of 2012 [1] are unconstitutional. Like Messrs. Justice Saylor and Eakin, however, I respectfully view the primary argument of the challengers to Act 13 [2] to be that the General Assembly has unconstitutionally, as a matter of substantive due process, usurped local municipalities' duty to impose and enforce community planning, and the concomitant reliance by property owners, citizens, and the like on that community planning.

Thus, and despite the pioneering opinion by the Chief Justice, I view the substantive due process contentions made by Challengers to be better developed and a narrower avenue to resolve this appeal. Indeed, I note that the Commonwealth acknowledges in a portion of its reply brief quoted by Justice Saylor that if the oil and gas industry were permitted to

---

**1.** 58 Pa.C.S. §§ 3215(b)(4) & (d), 3303, and 3304. The Chief Justice cogently summarizes the relevant provisions of Act 13 in Part III(B) of his opinion, and I will not repeat that recitation here, except for my brief reiteration of pertinent components of the law, *infra*, pp. 1005–06. At this juncture, I merely note that the thrust of Act 13 is to establish a uniform, statewide oil and gas well permitting and zoning regimen, and to repudiate the ability of political subdivisions to enact or enforce land-use planning and zoning ordinances not in conformance therewith. My concurrence will address the constitutionality of the provisions contained within Sections 3215, 3303, and 3304.

As a housekeeping matter, I further note that my joinder of the aforementioned parts of the Chief Justice's opinion creates a majority opinion in those regards. To the extent that I concur only in the result of Parts III and VI(C), the Chief Justice's opinion is one announcing the judgment of the Court (OAJC). Accordingly, when reference to those portions of the opinion is required, I will designate to it as such.

**2.** The challengers to Act 13 consistent of municipalities, non-profit environmental organizations, and individual citizens of the Commonwealth. For ease of discussion, I will refer to them collectively as "Challengers."

operate where it pleased, and neighbors to those permitting wells on their property were without recourse, "there would be good reason to conclude that Act 13 violates ... substantive due process...." Reply Brief of the Office of Attorney General at 3, *quoted in* Dissenting Op. at 745, 83 A.3d at 1011 (Saylor, J., dissenting). While Justice Saylor recognizes this concession, he ultimately concludes that the constraints on oil and gas development contained in Act 13, which are to be enforced by the Commonwealth rather than local municipalities, save the statute from the due process claim.

I, like the Commonwealth Court majority, after careful consideration, reach the opposite conclusion. I believe that in a state as large and diverse as Pennsylvania, meaningful protection of the acknowledged substantive due process right of an adjoining landowner to quiet enjoyment of his real property can only be carried out at the local level. Accordingly, differing from my esteemed colleague only in degree, I find merit in Challengers' claims in this regard, and would affirm the Commonwealth Court's determination that portions of Act 13 are unconstitutional largely on the basis that court described.

## I.

Pursuant to Article I, Section 1 of the Pennsylvania Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution, no person may be deprived of his private property without due process of law. In the early years of the Union, this constitutional guarantee translated into the general notion that a landowner had the right to do as he saw fit with his property. As modern American jurisprudence developed, however that constitutional guarantee developed an important limitation: *sic utere tuo ut alienum non laedas*—so use your own property as not to injure your neighbors. As early as 1907, one commentator noted that courts "are not disinclined" to impose damages upon a landowner for use of his property that causes an injustice to his

neighbor. G.A.I., *Sic Utere Tuo ut Alienum Non Laedas,* 5 MICH. L. REV., 673, 673 (Jun. 1907).[3]

Accordingly, governmental interference with private property, again otherwise forbidden under the above-stated constitutional provisions, has been permitted "by attempted regulations under the guise of the police power...." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386, 47 S.Ct. 114, 71 L.Ed. 303 (1926). These "attempted regulations," commonly known today as zoning ordinances, were first seen in the United States around the beginning of the twentieth century to combat the complexities of rapidly developing urban and industrial life. *Id.* at 386–87, 47 S.Ct. 114. As evinced by this case, the advent of new technologies (such as horizontal hydrofracturing of the Marcellus Shale Formation to extract natural gas) mandates that notions of zoning remain malleable "to meet the new and different conditions which are constantly coming within the field of their operation." *Id.* at 387, 47 S.Ct. 114. Nevertheless, despite the changing conditions to which zoning ordinances and statutes may be aimed, any law "found clearly not to conform to the Constitution, of course, must fall." *Id.*[4]

From where, however, do local municipalities gain the ability to zone the private property contained within their borders? While, for all the reasons just explained, it is a constitutionally ordained mandate, zoning in Pennsylvania is implemented through the Municipalities Planning Code (MPC), which provides that "each municipality has the authority to enact, amend, and repeal zoning ordinances." *Hoffman Mining Co.,*

3. More recently, the United States Supreme Court has further recognized that *sic utere tuo ut alienum non laedas* is closely related to the common law doctrine of nuisance: "no individual has a right to use his property so as to create a nuisance or otherwise harm others...." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 490 n. 20, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *see also Lucas v. S. Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

4. Indeed, this need for flexibility is one of the important considerations militating against statewide rules, and in favor of local municipality protection of the local citizenry's constitutional rights.

*Inc. v. Zoning Hearing Bd. of Adams Tp.,* 612 Pa. 598, 32 A.3d 587, 603 (2011). The MPC is obviously a state statute, passed by the General Assembly in 1968, and therefore just as obviously can be amended by the legislature. *See Denbow v. Borough of Leetsdale,* 556 Pa. 567, 729 A.2d 1113, 1118 (1999) (quoting *Knauer v. Commonwealth,* 17 Pa.Cmwlth. 360, 332 A.2d 589, 590 (1975)). "Municipal corporations have no inherent powers and may do only those things which the [l]egislature has expressly or by necessary implication placed within their power to do." *Id.* (quoting *Knauer,* 332 A.2d at 590). In other words, what the Commonwealth giveth to municipalities, the Commonwealth can taketh away, but with an important limitation: only when constitutionally permissible. *Id.*

Thus, this appeal presents a conundrum. May the General Assembly, through a law applicable statewide, remove *en toto* from local municipalities the apparatus it provided to vindicate the individual substantive due process rights of Pennsylvanian landowners? Justices Saylor and Eakin would seem to say "yes," so long as the legislature substitutes adequate alternative safeguards, which they believe it did through Act 13. The Commonwealth Court, in the decision below, said "no," reasoning that by requiring municipalities to forego their established zoning restrictions regarding, for example, oil and gas drilling and production, the General Assembly forced municipalities to "violat[e] substantive due process because [municipalities can no longer] protect the interests of neighboring property owners from harm," and further because Act 13 "alters the character of neighborhoods, and makes irrational classifications...." *Robinson Tp. v. Commonwealth,* 52 A.3d 463, 485 (Pa.Cmwlth.2012) (*en banc*). As previously stated, I find myself largely in agreement with the Commonwealth Court's conclusion. While I acknowledge that it might be possible, I am skeptical that the legislature could devise a scheme of statewide scope that sufficiently protects substantive due process; and, while it can certainly amend the MPC and related statutes, it must do so with full respect and deference to the constitutional underpinning of those laws.

## II.

Thus, where my dissenting colleagues and I apparently differ centers upon whether Act 13's provisions protect the substantive due process rights of Pennsylvania landowners. "In reviewing zoning ordinances, this Court has stated that an ordinance must bear a substantial relationship to the health, safety, morals, or general welfare of the community." *Hopewell Tp. Bd. of Supervisors v. Golla*, 499 Pa. 246, 452 A.2d 1337, 1342 (1982) (quoting *Surrick v. Zoning Hearing Bd. of Upper Providence Tp.*, 476 Pa. 182, 382 A.2d 105, 108 (1977)). No constitutional or statutory law prohibits the Commonwealth from establishing itself in the field of statewide zoning and, to the extent it did so here, it hoped to provide for the health, safety, morals, and general welfare of the citizens of the Commonwealth by enumerating setbacks, environmental standards, and permit specifications within Act 13.

Indeed, as Justice Saylor notes in his dissent, the Commonwealth argues that the setback requirements established in Act 13 permissibly substitute for the regulations and standards established by local government officials as they relate to oil and gas development. Reply Brief of the Office of Attorney General at 3, *quoted in* Dissenting Op. at 744–46, 83 A.3d at 1011–12 (Saylor, J., dissenting). In the Commonwealth's view, Challengers' assertions that residential neighborhoods will be "torn apart by the indiscriminate placement of gas wells," and of neighboring landowners who are "victims [with] no rights and no recourse" are simply inaccurate. *Id.*, *quoted in* Dissenting Op. at 745, 83 A.3d at 1011 (Saylor, J., dissenting). Indeed, as I referenced earlier in this concurrence, the Commonwealth concedes that the tearing apart of neighborhoods without recourse would unquestionably lead to the "conclu[sion] that Act 13 violates the substantive due process rights of Pennsylvania's citizens." *Id.*, *quoted in* Dissenting Op. at 745, 83 A.3d at 1011 (Saylor, J., dissenting). The Commonwealth contends, however, that this will not occur because Act 13 contains restrictions which are rationally related to the statewide production of natural gas and oil, and

simultaneously provides adequate safeguards to Pennsylvania residents.

Indeed, the Commonwealth goes even further in its advocacy. It asserts that the Commonwealth Court created a constitutional right where one does not exist. In the Commonwealth's view, the majority below relied upon an unexpressed and fundamentally flawed premise that the private property rights found in the United States and Pennsylvania Constitutions may be used as swords by one neighbor upon another. To the Commonwealth, the maxim of *sic utere tuo ut alienum non laedas* cannot be used to establish constitutional due process violations, as a landowner cannot violate the due process rights of his neighbor; only government can infringe upon constitutional rights. Thus, it asserts that the Fifth and Fourteenth Amendments, and Article I, Section 1 are shields against governmental action only, and to the extent a landowner wants to drill for gas on his own land, his neighbor does not have a constitutional argument to voice. Similarly, Article I of the Pennsylvania Constitution does not confer enforceable rights upon municipalities; and, thus, cities, boroughs, and townships cannot assert a violation of Article I rights on behalf of their citizenries.

Challengers counter these assertions by first recognizing that a landowner's right to use his property how he sees fit has been judicially limited through the doctrine of *sic utere tuo ut alienum non laedas* and the attendant notion of zoning. Challengers read this maxim and the zoning cases developed thereunder as being inextricably linked with the constitutional, due process rights associated with private property. In Challengers' view, the MPC and zoning ordinances are designed to prohibit the proverbial "pig in the parlor instead of the barnyard," *Village of Euclid,* 272 U.S. at 388, 47 S.Ct. 114 as municipalities have a constitutional duty to "preserv[e] the character of neighborhoods, securing 'zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.'" *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 732–33, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (quoting *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)). Absent zoning ordinances, communities, especially in

urban areas, will not develop or continue in ordered fashions. *Accord Swade v. Zoning Bd. of Adjustment of Springfield Tp.,* 392 Pa. 269, 140 A.2d 597, 598 (1958) *(per curiam )*.

Challengers thus assert that the municipalities of Pennsylvania have a constitutional obligation to enforce ordered zoning in accord with *Village of Euclid* and *Edmonds*, and the General Assembly's mandate, through Act 13, that they permit oil and gas drilling in residential and agricultural areas forces municipalities to breach that constitutional responsibility. *Accord Denbow*, 729 A.2d at 1118 (providing that legislature may not force a municipal corporation to perform an unconstitutional act). As Challengers point out, Act 13 makes it easier for Chevron to establish a drilling rig in the middle of a corn field than a church to build a small ten-pew worship space in the same field. Act 13 simply removes from municipalities the discretion of their zoning hearing boards to decide whether drilling, hydrofracturing, pipeline operations, compressor plants and stations, wastewater impoundment areas, commercial truck traffic, and other oil and gas operations belong in agriculturally and/or heavily residentially-zoned areas. In Challengers' view, zoning, per the aforementioned constitutional concerns, must be inherently a local consideration.

## III.

In analyzing the parties' various positions, a certain disconnect is presented by this appeal because, in a "run of the mill" zoning case, a citizen challenges a local zoning ordinance or a decision by a municipality's zoning hearing board as being violative of the constitutional prohibition against the diminution of his private property rights without due process of law. The constitutions, both federal and state, protect each citizen's right to enjoy private property without governmental interference, and any interference therewith must be in accord with due process of law. *See, e.g., Hopewell Tp.,* 452 A.2d at 1341. Zoning is inherently a governmental interference, but is designed to afford the concomitant right of quiet enjoyment by one's neighbor; again, it serves as a regulatory process within the doctrine of *sic utere tuo ut alienum non laedas.* Howev-

er, the right to enjoy one's land as one sees fit is the preeminent factor in a private property action, and therefore any governmental interference therewith "must bear a substantial relationship to the health, safety, morals, or general welfare of the community." *Id.* (quoting *Surrick*, 382 A.2d at 108). Given this, a governmental regulation related to zoning will not afford a property owner due process of law vis-à-vis his enjoyment of private property if it lacks this substantial relationship. *Id.*

"Hence, the function of judicial review, when the validity of a [generic] zoning ordinance [or statute] is challenged, is to engage in a meaningful inquiry into the reasonableness of the restriction on land use in light of the deprivation of landowner's freedom thereby incurred." *Id.* at 1342. Essentially, to satisfy the necessity of due process for the encroachment by government into private property, the aforementioned governmental purpose must "adequately outweigh" the private property interest. *Id.*

## (A)

However, Act 13 is not, in the common sense, a governmental intrusion into private property. Arguably, it expands private property rights by mandating that individual municipalities permit property owners in residentially or agriculturally zoned areas to bring oil and gas operations onto their land. As Challengers duly note, these industrial-like operations include blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant bright lighting at night, and the potential for life- and property-threatening explosions and gas well blowouts.

Thus, the governmental intrusion, at least on the individual citizen level, is to the neighbor of the landowner who wishes to have oil and gas operations on his land. Essentially, through Act 13, the General Assembly is mandating that municipalities pass land-use and zoning ordinances, which permit landown-

ers, statewide, to violate *sic utere tuo ut alienum non laedas.* While some neighbors may not object to the operation of oil and gas wells, compressor stations, and the like on private property adjacent to their own, I am compelled to note what the plain language of Act 13 explicitly permits within residentially and agriculturally zoned areas:

— Well sites for drilling within 500 feet of existing buildings or water wells, and 300 feet from the nearest property line. 58 Pa.C.S. §§ 3215(a) & 3304(b)(5.1).

— Natural gas compressor stations within 750 feet of existing buildings, and 200 feet from the nearest property line. 58 Pa.C.S. § 3304(b)(7).

— Natural gas processing plants in agricultural zones within 750 feet of existing buildings, and 200 feet from the nearest property line. 58 Pa.C.S. § 3304(b)(8).

— No restrictions on vehicles unless overweight as defined by the Vehicle Code or the MPC. 58 Pa.C.S. § 3304(b)(9).

— No noise, light, or hours of operation restrictions on any of the above activities, with the exception of decibel limits imposed for compressor stations and processing plants. 58 Pa.C.S. § 3304(b)(10).

Individual municipalities have no ability to alter these requirements, even for pressing, local environmental concerns, 58 Pa.C.S. § 3303, with the exception of, in some instances, *decreasing* the enumerated setbacks upon application by a property owner or oil and gas leaseholder. 58 Pa.C.S. § 3304(b)(5.1)(i)-(ii). Perhaps even more disturbing, Section 3215(b)(4) mandates that the Department of Environmental Protection "waive the distance restrictions upon submission of a plan" by the oil and gas well operator, which outlines theoretical protections of any potentially affected water sources. Neither neighboring landowners nor municipality zoning boards have any statutory ability to object or comment meaningfully upon these waivers, nor may they appeal or seek review from the Department's granting of a waiver. 58 Pa.C.S. § 3215(d).

(B)

In my respectful view, and inherent within several decisions of courts of this Commonwealth, the federal bench, and sister states, once a state authorizes political subdivisions to zone for the "best interests of the health, safety and character *of their communities," Cohen v. Bd. of Appeals of Village of Saddle Rock,* 100 N.Y.2d 395, 764 N.Y.S.2d 64, 795 N.E.2d 619, 624 (2003) (emphasis added); *see also City of Edmonds,* 514 U.S. at 732, 115 S.Ct. 1776; *Village of Euclid,* 272 U.S. at 388, 47 S.Ct. 114; *Hopewell Tp.,* 452 A.2d at 1343, and zoning ordinances are enacted and relied upon by the residents of a community, the state may not alter or invalidate those ordinances, given their constitutional underpinning. This is so even if the state seeks their invalidation with the compelling justification of improving its economic development.

In this regard I note Pennsylvania's extreme diversity. We are a state of 46,000 square miles and 12.76 million people. Our largest county (Philadelphia) contains 1.55 million residents, and our smallest (Forest) has 7,667 inhabitants. The population density of Philadelphia is 11,450 people per square mile, while in Cameron County it is 13 people per square mile. The northwestern and southeastern corners of our state are flat; however, the 745 square miles of Allegheny County are uniformly hill and dale, and the Appalachians, one of the oldest mountain ranges on Earth, run right through the middle of our great Commonwealth. How can the legislature's "one size fits all" within Act 13 possibly protect the constitutional rights of the landowners of this diverse citizenry and geography? Zoning provisions "should . . . give consideration to the character of the municipality, the needs of the citizens[,] and the suitabilities and special nature of particular parts of the municipality." *Hoffman Mining,* 32 A.3d at 603 (quoting 53 P.S. § 10603(a)); *see also Village of Euclid,* 272 U.S. at 388, 47 S.Ct. 114 (providing that constitutionally apt zoning occurs not "by an abstract consideration of . . . the thing, [but] by considering it in connection with the circumstances *and the locality* " affected) (emphasis added). Act 13 simply does not.

(C)

To that end, my thoughts further echo those of the Commonwealth Court majority below:

> [B]y requiring municipalities to violate their comprehensive plans for growth and development, [Act 13] violates substantive due process because it does not protect the interests of neighboring property owners from harm, alters the character of neighborhoods and makes irrational classifications— irrational because it requires municipalities to allow [...] drilling operations and impoundments, gas compressor stations, storage[,] and use of explosives in all zoning districts, and applies industrial criteria to restrictions on height of structures, screening and fencing, lighting[,] and noise. Succinctly, 58 Pa.C.S. § 3304 is a requirement that zoning ordinances be amended in violation of the basic precept that "Land-use restrictions designate districts in which only compatible uses are allowed and incompatible uses are excluded."

*Robinson Tp.*, 52 A.3d at 484–85 (quoting *City of Edmonds*, 514 U.S. at 732, 115 S.Ct. 1776).

Similarly, this Court has observed that the constitutional protections afforded by zoning under the guise of "general welfare" of the community have come in varying contexts, and to mean different things. In *Hopewell Township*, we noted that to some jurists, ensuring the general well-being of a municipality could range anywhere from the "absolute, unqualified Constitutional right to liberty and property," to "what the [z]oning [b]oard or a [c]ourt believes is best for the community ... involved," to the overarching right of the government "to set aside millions of acres of open land for the benefit of our Country." 452 A.2d at 1342. Whatever the proffered reason for the benefit of the community may be, it remains unassailable that the hallmark of an unconstitutional zoning ordinance or statute is "an arbitrary and discriminatory impact on different landowners." *Id.* at 1343; *see also In re Petition of Dolington Land Group*, 576 Pa. 519, 839 A.2d 1021, 1035 (2003).

I respect the view that the General Assembly, in its wisdom as the policy-setting branch of government, "has decided to supersede some of the duties and responsibilities municipalities previously have exercised in related to land-use planning and the environment." Dissenting Op. at 743, 83 A.3d at 1010 (Saylor, J., dissenting). However, mandating to municipalities that they enact land-use and zoning ordinances in compliance with the ineffective, yet absolute, "protections" afforded within Act 13, without any available mechanism for objection or remedy by the citizenry consistent with the individualized concerns of each municipality, zoning district, or resident, is the epitome of arbitrary and discriminatory impact.[5]

Indeed, the lead opinion by the Chief Justice, albeit in the context of the Environmental Rights provision of the Pennsylvania Constitution, Article I, Section 27, recognized these same inequalities associated with the "uniform application" of Act 13 statewide:

A second difficulty arising from Section 3304's requirement that local government permit industrial uses in all zoning districts is that some properties and communities will carry much heavier environmental and habitability burdens than others. [...] This disparate effect is irreconcilable with the express command that the trustee [of the Commonwealth's environmental resources] will manage the corpus of the trust for the benefit of "all the people."

OAJC at 980 (internal citations omitted). The OAJC continues that Act 13 "disabl[es] local government from mitigating the impact of oil and gas development at the local level." *Id.* at 980. Such prohibitions on local government by Act 13 include remediation for water and air pollution, protection of the natural aesthetics of the local environment, and ensuring

---

5. Put differently, while the placement of a gas well in a mountain surrounded valley, hidden from all humanity, in central Pennsylvania might be appropriate for one municipality, the same may not be said for the erection of a similar well in the flatlands of southeastern Pennsylvania. The harsh reality that such arbitrariness will undoubtedly occur statewide, without recourse for affected landowners, perfectly exemplifies the constitutionally prohibited discriminatory effect necessarily caused by the universal nature of Act 13's proscriptions.

quality of life in residential and scholastic areas. *Id.* at 981–82. "The local government's zoning role is reduced to *pro forma* accommodation" of the wishes of the General Assembly, *id.* at 972, while concomitantly prohibiting local government from protecting the individual characteristics of its community and residents, and the unwanted and unconstitutional and diminution of enjoyment of one's private property.

These factors, cogently cited within the OAJC, are precisely why Act 13 encroaches upon the substantive due process rights found in Article I, Section 1 of the Pennsylvania Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. Different landowners, in different parts of the Commonwealth (indeed, different neighborhoods in the same municipality), will be arbitrarily impacted by the imposition of Act 13 upon our political subdivisions. *Accord Hopewell Tp.*, 452 A.2d at 1343. Individual landowners and municipalities alike will be unable to acclimatize to the fledgling world of Marcellus Shale hydrofracturing and drilling and the continuing fluidity of its development, and will be unable to seek recourse for the unquestionable damage to their private enjoyment of property.

Rather, Act 13 promotes and mandates the opposite—it sets static commandments to the municipalities of the Commonwealth in a vacuum, without due consideration for any effect upon those municipalities and the related doctrine of *sic utere tuo ut alienum non laedas.* Indeed, it sets absolute standards rather than minimal guidelines that all municipalities and residents must abide by, without providing for any remedy when the inevitable damage to the enjoyment of private property occurs. Sections 3215(b)(4) and (d), 3303, and 3304 not only allow entry of the pigs into the parlor, but further decree that local governments enact zoning ordinances that expressly permit those intrusions, without exception. Accordingly, because these statutes force municipalities to enact zoning ordinances, which violate the substantive due process rights of their citizenries, they cannot survive constitutional scrutiny.

## IV.

Finally, as contemplated within the Chief Justice's Opinion, I must address severability of the various provisions of Act 13.

### (A)

The thrust of Challengers' substantive due process arguments centered upon Sections 3303 and 3304 of Act 13, which, respectively, set forth: the prohibition of local governments to impose environmental regulations upon oil and gas production; and the zoning-type provisions that every municipality in the Commonwealth must uniformly adhere to for the development of oil and gas resources. Like the OAJC, albeit under my substantive due process analysis, I explicitly find that these provisions are unconstitutional. To that end, and for the reasoning given in Part V of the lead opinion, I would further enjoin the entirety of Sections 3305 through 3309 as "incapable of execution" upon the striking of Sections 3303 and 3304.

### (B)

The lead opinion also finds Section 3215(b)(4) and (d), providing for the automatic approval of setback waivers by DEP without the ability for meaningful objection or appeal by affected landowners or municipalities, to be unconstitutional under Article I, Section 27. I note that the Commonwealth Court below found Section 3215(b)(4) to be unconstitutional not under substantive due process or Article I, Section 27, but rather as a violation of the non-delegation rule of Article II, Section 1. For the reasons described above, I would affirm this holding, albeit on the alternative ground of a violation of substantive due process. Regarding subsection (d), the Commonwealth Court denied relief, and Challengers appealed that decision based upon Article I, Section 27. The OAJC agrees with Challengers in this regard, and reverses the Commonwealth Court. For the reasons outlined herein, I would find that Section 3215(d) violates substantive due process; however, Challengers did not preserve to this Court a due process challenge concerning Section 3215(d). I therefore concur only

in the result reached by the lead Justices that Section 3215(d) is unconstitutional. Given that I would strike Section 3215(b)(4) and (d), I further agree with the lead opinion that the entirety of subsection (b), as well as subsections (c) and (e) would be "incapable of execution" and must be enjoined. To this, however, I would also enjoin subsection (a) of Section 3215 (providing for the actual setbacks from water sources) as also being "incapable of execution."[6]

I join the Chief Justice's Opinion in regard to Parts I, II, IV, V, and VI(A), (B), (D), (E), (F), and (G) in full. For the above-stated reasons, I concur in the result of Parts III and VI(C), and would further enjoin enforcement of 58 Pa.C.S. § 3215(a).

Justice SAYLOR, dissenting.

As I read the Brief for Cross–Appellants (denominated by the lead opinion as "citizens," albeit they are largely municipalities), as it pertains to their challenge to Act 13 under Article I, Section 27 of the Pennsylvania Constitution, the main argument is that the General Assembly has inappropriately deprived municipalities of the means to fulfill their own constitutional obligation to protect the environment via zoning regulation. *See* Brief for Cross–Appellants (72 & 73 MAP 2012) at 31–39. Such proposition dovetails with Cross–Appellants' claim, accepted by the Commonwealth Court, that zoning is inherently a matter of local concern reflected in long-standing community planning throughout the Commonwealth, and that, as a matter of substantive due process, the Legislature cannot impact upon such planning over the objection of those who have relied upon it. *See Robinson Twp. v. Commonwealth,* 52 A.3d 463, 485 (Pa.Cmwlth.2012).

**6.** In substance, I would find subsection (a) to violate substantive due process for the same reason that Sections 3215(b)(4) and (d), 3303, and 3304 do. However, the Commonwealth Court did not find subsection (a) as violative of the constitutions, and Challengers have not raised any constitutional challenge to subsection (a) before this Court. Nevertheless, given that subsection (a) describes the setback requirements for which subsection (b)(4) provides the approval of waivers, I find them inextricably linked and therefore must be enjoined.

The lead opinion appears to recognize the tenor of Cross–Appellants' argument. *See* Opinion Announcing the Judgment of the Court ("OAJC"), at 939–41. Nevertheless, after offering some apologia on Cross–Appellants' behalf relative to the limited scope of their contentions, *see id.* at 942–43, the lead Justices embark on their own course to reach broad-scale pronouncements that the General Assembly has implemented "blanket accommodation[s] of industry and development," *id.* at 973, and "swept aside" the Environmental Rights Amendment, *id.* at 981–82. The lead opinion circles back to Cross–Appellants' specific argument pertaining to Article I, Section 27 only in a brief aside, in which it credits their main contention by way of an alternative disposition. *See id.* at 982 n.58.

I cannot support such an approach to review of the constitutionality of a legislative enactment. There are very good reasons why judicial review of social policymaking by the political branch is highly deferential and closely constrained. This Court regularly acknowledges that the Legislature possesses superior resources for information-gathering, debate, and deliberation in the policymaking arena. *See, e.g., Official Comm. Of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 301–02 & n. 27, 989 A.2d 313, 332–33 & n. 27 (2010) (referencing the General Assembly's superior policymaking resources and explaining that, "[u]nlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion"). In a democratic system of government, divisive political controversies pitting citizens against citizens are resolved through the political process. Moreover, courts must take special care to avoid substituting their own policy preferences for those of the political branch. *See, e.g., Parker v. Children's Hosp. of Phila.*, 483 Pa. 106, 116, 394 A.2d 932, 937 (1978). Such perspective informs the strong presumption of validity enjoyed by duly implemented legislative enactments and the allocation of a heavy burden upon all challengers to establish that the General Assembly has clearly, palpably, and plainly violated the Constitution. *See, e.g., West Mifflin Area*

*Sch. Dist. v. Zahorchak,* 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010).

For these compelling reasons, which shape conventional judicial review of legislative enactments, and in consideration of the doctrine of separation of powers residing at the core of our governmental scheme, I believe this Court's deferential review in this case should be strictly confined to the Cross–Appellants' actual arguments relative to Article I, Section 27 of the Pennsylvania Constitution. Accordingly, and from the outset, I differ materially with the lead Justices' approach in doing otherwise.

On its merits, as the Commonwealth parties explain, this case at its center concerns the Legislature's ability to establish economic, environmental, and social policies for the Commonwealth—here, designed to promote economic development and energy self-sufficiency—notwithstanding a clash with land-use decisions by some local government units. *See, e.g.,* Brief for Appellants (63 MAP 2012) at 7 ("Act 13 is the General Assembly's response to the challenges of environmental protection and economic growth that come with the commercial development of unconventional geological formations such as the Marcellus Shale."). For policy reasons well outside this Court's purview, and in conjunction with the Legislature's power to regulate and control natural resources, the Assembly has decided to supersede some of the duties and responsibilities municipalities previously have exercised in relation to land-use planning and the environment.[1]

This Court has consistently recognized that municipalities are creatures of the General Assembly and treated the latter's dictates as preeminent. *See, e.g., Olon v. DOC,* 534 Pa. 90, 94–95, 626 A.2d 533, 535 (1993); *Kline v. City of Harrisburg,* 362 Pa. 438, 442–48, 68 A.2d 182, 184–87 (1949); *accord* 101A

1. The reasons informing the legislative judgment include alleviation of the hurdles to the development of an efficient and cost-effective system of harvesting oil and gas resources posed by a fluid patchwork of restrictions differing from municipality to municipality, particularly where each of the thousands of local government units can erect—as some have erected—barriers to development and supporting infrastructure within their borders.

C.J.S. *Zoning & Land Planning* § 10 (2013) ("A zoning statute which supersedes a local zoning regulation or ordinance is paramount and controlling." (footnote omitted)); Brief for the Public Utility Commission, *et al.,* (72 MAP 2012) at 3 ("[W]hile the Municipalities concede that zoning restrictions can limit the constitutional right to free use of one's property, they argue that they somehow have a constitutionally protected right to impose even greater restrictions on (and use than the General Assembly has decided is appropriate. That illogical position disregards the unassailable truth that municipalities obtain their existence and their enumerated powers solely from the General Assembly.")). The lead opinion, however, appears to completely redefine the role of municipalities relative to the sovereign.

Moreover, while hypothesizing an unreasonably deleterious impact of Act 13 on the environment, *see* OAJC, at 959–62, 975–77, 981–82, the lead opinion gives scant attention to its extensive scheme for well permitting, including the imposition of well location restrictions; the enactment's requirements for protection of fresh groundwater and water supplies; Act 13's dictate to restore land areas disturbed in siting, drilling, completing, and producing a well; the investiture of responsibility in the Department of Environmental Protection to enforce Act 13's requirements, *inter alia,* through permit revocation, assessment of civil fines and penalties, and injunctive relief; and the preservation of existing requirements under environmental laws, including the Clean Streams Law, 35 P.S. §§ 691.1–691.1001, as well as statutory and common-law remedies to abate nuisances and pollution. *See* 58 Pa.C.S., Ch. 32. In this regard, and relative to the lead Justices' non-record-based portrayal of Act 13's impact, I find the following argument from the Commonwealth instructive:

> The Municipalities' argument and the Commonwealth Court's majority opinion in this case are centered on the false premise that Act 13 is inherently incompatible with basic principles of land use planning. They paint a picture of residential neighborhoods torn apart by the indiscriminate placement of gas wells by an industry permitted to

operate wherever it pleases. In the wake of these operations, neighboring landowners are victims who have no rights and no recourse. If this picture were correct, there would be good reason to conclude that Act 13 violates the substantive due process rights of Pennsylvania's citizens. However, this picture is a distortion of how Act 13 actually impacts zoning, and fails to take into account the protections which Act 13 provides to neighboring landowners and the population as a whole. While Act 13 does restrict the ability of Municipalities to exclude oil and gas development from specified zoning districts as a matter of course, it does not leave a vacuum. Rather, it establishes minimum setback requirements, strict environmental standards, and other criteria which must be met before property may be used for oil and gas related activities. Act 13, therefore, does not eviscerate the protections provided by local zoning ordinances; it simply substitutes the regulations and standards established by local government officials as they relate to the location of oil and gas development with those of the General Assembly.

Act 13 provides a minimum setback requirement of 500 feet from any building for an unconventional gas well. 58 Pa. C.S. § 3215. To put this in perspective, an acre of land (of equal dimensions) would be approximately 208 feet by 208 feet. The typical residential neighborhood in Pennsylvania ... would simply not be impacted by Section 3304. Upon closer examination, it is only residential zoning districts which are vastly undeveloped or which have houses on tracts of land which are more than two acres in area which could be affected by Section 3304.[fn] The General Assembly could have reasonably concluded that the benefits of increasing the potential supply of natural gas by allowing limited development in relatively undeveloped and non-densely populated areas of the Commonwealth outweighs the harm in requiring municipalities to deviate from their comprehensive plans under the [Municipalities Planning Code].

[fn] While there are legitimate reasons for a municipality to plan for future growth by reserving certain areas for residential use, they do not supersede all other legitimate government objectives. Moreover, any alleged harm to current residents is significantly diminished where there is limited development, the land which is actually being used for residential purposes is underutilized, and the distance between residences or other buildings is substantial. There is also the distinct possibility in these types of situations that the designation of undeveloped land as "residential" has not been made for proper land use purposes but is a pre-text for the exclusion of industrial, mining, and other business activities which the residents would like to keep out of their community. The General Assembly has both the authority and the responsibility to place the health, safety and welfare of the citizens of the entire state over the parochial interests of individual municipalities.

\* \* \*

While Act 13 theoretically opens up a large number of properties for development which would otherwise be barred under local zoning ordinances, its setback requirements, strict environmental standards, and other substantive and procedural requirements limit the amount of actual development and provide neighboring landowners with significant protections to guarantee their rights under Article I, Section 1 of the Pennsylvania Constitution. *See, e.g.,* Section 3211 (well permits); Section 3212 (Permit Objections); Section 3215 (Well location restrictions); Section 3217 (Protection of fresh groundwater and casing requirements); Section 3218 (Protection of water supplies); Section 3254 (Restraining violations); and Section 3257 (Existing rights and remedies preserved and cumulative remedies authorized).

Reply Brief for Appellants (64 MAP 2012) at 3–4, 6–7 (first footnote omitted).

Addressing the actual argument advanced by Cross–Appellants, I begin with the observation that Article I, Section 27 invests the trusteeship for our natural resources in "the Commonwealth." PA. CONST. art. I, § 27. As the sovereign, statewide policymaking body, the Legislature occupies the primary fiduciary role, and, by constitutional design supported by longstanding judicial precedent, the authority and responsibilities of municipalities are derivative. As much as I understand and appreciate Cross–Appellants' (and the lead

Justices') legitimate and deep concern for local community planning and maximum environmental integrity, nothing in our Constitution confers upon municipalities a vested entitlement in their delegated authority to manage land use or the right to dictate the manner in which the General Assembly administers the Commonwealth's fiduciary obligation to the citizenry at large relative to the environment. *Accord* Brief for Cross–Appellees (73 MAP 2012) at 29 ("The Municipalities' argument is ultimately based on the false premise that Article I, Section 27 grants municipalities power as against the Legislature. Because Article I, Section 27 grants only the Commonwealth the power to conserve and maintain Pennsylvania's public natural resources, and because municipalities' power is limited to that granted by the Legislature, no power of municipalities as against the Legislature may be inferred.").

In terms of the concern for Act 13's impact upon the environment, every form of industry essential to the Commonwealth's economic longevity and growth does the same, in some manner and to some degree. Thus, the State's constitutional obligation to "conserve and maintain" simply cannot mean that Pennsylvania's natural resources may not be responsibly disturbed and utilized. PA. CONST. art. I, § 27. Nothing·in the lead opinion persuades me that its historical account of under-regulated lumber and mining enterprises decimating Pennsylvania lands and resources, *see* OAJC, at 959–62, reasonably can be superimposed on the Act 13 regulatory regime, contrary to the expressed purposes and design of the statutory scheme, *see* 58 Pa.C.S. § 3202 (explaining that Act 13's purposes include protecting the health, safety, environment and property of Pennsylvania citizens, while permitting optimal development of oil and gas resources which the policymaking branch considers important to economic development in Pennsylvania), and without a shred of evidentiary support.

While certainly we are presented with aggressive attacks upon the motivations of the Commonwealth government in enacting and supporting Act 13, it bears repeating that there

simply is no evidence of record to support this. Indeed, on the present record, I discern no evidence that Act 13 is anything other than a non-arbitrary, non-discriminatory exercise of the General Assembly's police powers designed to further both the economic and environmental interests of the Commonwealth and its citizens at large. *See generally Eagle Envtl. II, L.P. v. DEP*, 584 Pa. 494, 519, 884 A.2d 867, 882 (2005) (explaining that "[t]he police power is one of the most essential and least limitable powers of the Commonwealth"). Consistent with the overarching review standards and the separation-of-powers principle, we are to take the Legislature at its word when it said that it intended to "[p]ermit optimal development of oil and gas resources of this Commonwealth consistent with protection of the health, safety, environment and property of Pennsylvania citizens," 58 Pa.C.S. § 3202, at the very least, in the absence of some compelling proof to the contrary.

Thus, I find myself in a dissenting posture relative to the lead opinion's various denunciations of the purposes and effects of Act 13.[2]

**2.** In his concurring opinion, Mr. Justice Baer appears to translate the common-law maxim of *sic utere tuo ut alienum non laedas* into a federal constitutional duty, on the part of local municipalities, to protect property owners from the use of neighboring properties in ways that are undesirable to them. *See* Concurring Opinion, at 729–31, 734–37, 83 A.3d at 1002–03, 1005–06. The decisions referenced in the concurrence, however, generally concern the boundaries of the police power to establish zoning regulations restricting the ability of landowners to do as they wish with their own properties. *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926) (holding that a zoning ordinance impinging upon a landowner's desired use of his property does not offend substantive due process norms so long as the regulation is not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare"); *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732–33, 115 S.Ct. 1776, 1781, 131 L.Ed.2d 801 (1995) (discussing land-use restrictions generally in the context of deciding whether a local zoning regulation violated a federal-antidiscrimination statute). None of these decisions suggests a specific obligation on the part of local governments to affirmatively exercise delegated police powers in any particular fashion or establishes local-government sovereignty over state-level government in such exercise. Indeed, the only opinion referenced in Justice Baer's concurrence which touches on the latter subject concludes as follows: "[I]n this critical area of overlap

Finally, I have serious reservations about the lead Justices' decision to lend municipalities standing to pursue vindication of rights accorded to (or recognized in) individuals under Article I of the Pennsylvania Constitution, particularly as and against the sovereign. As many of the briefs explain, such holding is unprecedented, has serious ramifications, and yields the potential for myriad collateral issues and controversies. *See, e.g.,* Brief of *Amici* Pennsylvania Chamber of Business and Industry, *et al.* at 5–11 ("The idea that the Commonwealth's more than 2,000 municipalities may, and possibly must, advocate on behalf of select groups of residents that may be adversely affected by particular land uses, as a constitutional matter, is simply unfathomable."). I find much force in the notion that, since municipalities are creatures of the sovereign and entirely dependent upon the will of the state for their very existence, they have no authority or duty to challenge the state's alteration of their delegated powers. Moreover, I am concerned that protracted litigation deriving from entertaining a host of arguments which do not demonstrate a clear, palpable, and plain violation of the Constitution can impede the Commonwealth's ability to maintain or enhance its relative position in an increasingly competitive economic marketplace.

In summary, I would, as Appellants urge, recognize the authority of the General Assembly to make basic, rational policy choices—through the democratic process—that balance the various and potentially conflicting purposes of Act 13. It is clearly the vision of our Legislature that the Marcellus Shale resource has the potential to be of great benefit to the Commonwealth at large in terms of economic development (to include job creation) and energy self-sufficiency. Furthermore, I would decline to substitute the Court's own wisdom about the merits of Act 13 for that of the General Assembly, in contravention of the limited role of judges upon their review of a duly-promulgated and presumptively valid legislative enact-

between state and local authority, traditional respect for the primacy of state interest requires that the will of the Legislature prevail over the desires of each individual locality." *Cohen v. Bd. of Appeals of the Village of Saddle Rock,* 100 N.Y.2d 395, 764 N.Y.S.2d 64, 795 N.E.2d 619, 624 (2003).

ment. To the extent this case is about the hierarchy of municipal power relative to that of the Legislature, I am solidly in the camp supporting sovereign control in furtherance of the interests of the citizenry at large.

Justice EAKIN joins this dissenting opinion.

Justice EAKIN, dissenting.

I join the analysis expressed by Justice Saylor, in its entirety.

I find the lead opinion's protracted expression, while thoughtful, to be ultimately inconsistent with the basic relationship between sovereign and subject, and insufficiently considerate of discrete judicial and legislative roles. Its premise conflates individual rights and governmental standing, and the sweeping, general, and necessarily aspirational terms on which the holding is based are too broad and insufficiently defined to provide meaningful guidance in the future. Further, the decision reverses the Commonwealth Court on a theory not presented to us by the parties. While we often *affirm* decisions using different reasoning than the court below, we should be chary of *reversing* on theories not raised or argued.

Of significant concern is the alchemy that recognizes in municipalities the ability to enforce individual constitutional rights. It is a very fundamental precept of constitutional law that the Constitution assures the rights of individuals, not governments. Giving standing to some 2,500 sets of local officials to sue the sovereign based on alleged violations of individual constitutional rights is misguided, and will have precedential repercussions—I fear we will soon face a tide of mischief that will flow from such an ill-advised notion.

Municipalities certainly have the power to manage land use, but such power is given by the legislature, not the Constitution. The allocation of this power is not irrevocable, and it may be removed or modified by the same body that granted it in the first place. And no municipality has any entitlement to manage land use that is superior to that granted by the

Constitution to the sovereign alone. Our municipalities are part of our political structure, and certainly have great interest in the use of land within their borders, but their professed power must bow to the Constitution.

The legislature has determined that our unique shale resource can benefit all citizens; indeed the resource has already resurrected many local economies, though not without cost. The challenge is one of balancing the competing interests of local and individual economic prosperity, national need for energy and a desire for independence from foreign energy, and the unavoidable environmental impact of taking and using any resource from the ground. It is for the legislature to balance these competing interests and rights of the citizenry as a whole, for it is not merely a question of local consequence—indeed, the constitutional provision on which this action relies speaks to resources as "the common property of all the people," not as property of the people currently living in each municipality. Pa. Const. art. I, § 27.

The balancing is far, far from a simple task by any measure, and it cannot be accomplished by giving 2,500 vetoes to local governments. *See Eagle Environmental II, L.P. v. Commonwealth, Department of Environmental Protection,* 584 Pa. 494, 884 A.2d 867, 879 (2005).[1] This is not to demean the thoughtfulness or concern of municipal governments for the rights of their citizens to clean air and water, interests that are compellingly expressed by the lead opinion and the cross-appellants. The point is that there is one body with the authority to address the broad statewide issues that necessarily are involved here—it simply cannot be done town by town or township by township. It demands a comprehensive plan respectful of every citizen's right to the resource.

1. In *Eagle Environmental II,* this Court stated:
 While we have not held that Article 1, Section 27 requires any specific balancing test, we have determined that it is manifest that a balancing must take place between the Commonwealth's duty under Article 1, Section 27 to protect the environment of the Commonwealth and its other duties to provide other needed services to the public.
 *Id.* (citation and internal quotation marks omitted).

And like it or not, the bottom line is this—the gas in question *will* be extracted. It is going to be removed from the earth, and it is going to be transported to refineries. The question for our legislature is not "if" this will happen, but "how." [2]

The means necessary for making these decisions properly lies in the processes of a different branch of government—our role is to assure those decisions do not violate the Constitution. Our role is not inclusive of balancing all the factors on which a political decision must be made. We have a constitutional duty to afford great deference to the body of government given the power by the Constitution to make decisions

2. This Act does not force a derrick into every neighborhood; Justice Saylor's opinion recounts the protections in the Act that have precisely the opposite effect. This Act is about a pipeline—it is aimed at the method of transporting the gas more than the extraction itself. After hearing all voices, the legislature decided transport can best be accomplished by pipeline, and a pipeline cannot be built with 2,500 sets of rules.

Pennsylvania is crosshatched with pipelines. It is not an obtrusive means of transporting energy; a person would be hard pressed to locate a current pipeline were it not for the occasional roadside marker. In fact, the PUC currently inspects the existing pipeline infrastructure that serves consumers—that portion alone consists of over 46,000 miles. Despite the fear mongering about pipelines, practical experience shows the contrary, and there is no evidence suggesting these interfere with our environment in any significant way.

Absent a pipeline, alternate means of transport will be needed—the tractor-trailer. The number of trucks needed to transport the gas that could flow through a pipeline may be fewer than the number of angels that can dance on the head of a pin, but not by much. Will the environment, which underlies the constitutional argument, be better or worse when fleets of trucks expel their exhausts into our air and spill fuel and oil that leaks into our water? Beyond the environmental consequences, the physical toll of such an armada on the repair of our state roads and local highways can hardly be overstated.

We can speculate about which transport will be better or worse, but we have held no hearings, taken no evidence. My speculations are just that, but they are the same type of speculation that girds the lead opinion's broad language and cross-appellants' parade of horribles. Likewise, it is but speculation that leads to the unfortunate characterization of the legislature's motives. Whether pro or con, the various opinions of the members of this Court and the divergent opinions of thousands of local officials about the best means of accomplishing the balance between resources and environment are simply not a proper part of our constitutional analysis.

about such matters. We should not complain of incursions on judicial independence and of refusals to respect our role when we in turn act legislatively.[3]

If we limit our role to the evaluation of the constitutionality of this Act, we serve the Commonwealth as we should. And if we do so, this Act withstands our scrutiny. Hence, I must dissent.

---

**3.** As an example of its tendency to broaden our function, the lead opinion states the "Commonwealth is named trustee and, notably, duties and powers attendant to the trust are not vested exclusively in any single branch of Pennsylvania's government. The plain intent of the provision is to permit the checks and balances of government to operate in their usual fashion for the benefit of the people" for accomplishing the trust purposes. Opinion Announcing the Judgment of the Court, at 956. It is *not* notable that no branch is given exclusive administrative power, in this or any similar concern—the judicial role is not administrative at all. We are a check or balance to be sure, but we have no authority to "administer" things "for the benefit of the people." We benefit the people by assuring constitutional compliance, not by second-guessing the administrative decisions made by the branch of government manifestly charged with that responsibility.